UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REALPAGE, INC.,<br><br>                    Plaintiff,<br><br><br>              v.<br><br>LETITIA JAMES, in her official capacity as the Attorney General of the State of New York,<br><br>                    Defendant. | Case No. 25-cv-9847<br><br>**COMPLAINT** |

## INTRODUCTION

1.      This case is about a sweeping and unconstitutional ban on lawful speech specifically intended to outlaw software developed and sold by companies like Plaintiff RealPage, Inc. that provide information and advice to owners and managers of rental properties.  The law is unconstitutional, both facially and as applied to RealPage and its customers.  Its enforcement should be enjoined before the law takes effect on December 15, 2025.

2.      On October 16, 2025, New York Governor Kathy Hochul signed into law a bill that expressly prohibits certain types of lawful speech about the residential rental segment of the housing market, depending on its content.  *See* S. 7882, 248th Leg., Reg. Sess. (N.Y. 2025), codified at N.Y. Gen. Bus. Law § 340-b (the "Rent Advice Statute" or "Statute").  Specifically, the newly enacted Statute makes it unlawful to operate, license, or use any software that "recommend[s] rental prices, lease renewal terms, ideal occupancy levels, or other lease terms and conditions" to "a residential property owner or manager," when the software does so by "analyzing or processing" data "from two or more residential rental property owners or managers."  § 340-

b(1)–(3).[1]  Violators may face civil penalties of up to $1 million per unlawful act as well as criminal

prosecution.  § 341; *see also* §§ 342, 342-a, 342-b.

    3.    Thus, the Statute broadly prohibits the sale or use of any software to provide or

receive advice on a range of decisions made by residential property owners if such advice is based

on the software's analysis or processing of data, including data from public websites, of two or

more residential rental property owners or managers.

    4.    As one of the bill's sponsors conceded during a colloquy on the State Assembly

floor, the State has enacted a law under which it now "may" be illegal for a "mom-and-pop style

landlord[]" to use "ChatGPT to analyze data available on the internet to help them set their rents."

The Statute is a textbook-overbroad "content-based regulation of speech."  *Reed v. Town of*

*Gilbert*, 576 U.S. 155, 164 (2015).

    5.    Plaintiff RealPage, Inc. is a technology company that provides a broad portfolio of

software to help its customers—including owners and managers of rental properties—compete to

attract and retain residents and better operate their residential communities.  Certain RealPage

offerings, called revenue management software ("RMS"), provide individualized

recommendations to each subscribing customer, which recommendations customers can and often

do reject, about how to set various terms of a lease for an apartment.  In New York, RealPage

offers RMS whose recommendations for a particular property are based on data provided by that

customer, such as number of vacant units (current or forecasted) at the customer's property and

the property's rent rolls, as well as on publicly available data.  Especially because RealPage offers

RMS that does not reference any competitor's non-public information when a customer is using

---

[1] Unless stated otherwise, all citations to "§" refer to statutes codified in New York's General
Business Law.

the software, there is no plausible basis to conclude that RealPage's RMS can be used to facilitate any form of collusion among RealPage customers.  In fact, this version of the software is specifically permitted by the U.S. Department of Justice under its proposed antitrust consent decree with RealPage.[2]

6.     The First Amendment protects the "creation and dissemination of information," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011), and it protects the "communicat[ion of] advice derived from specialized knowledge," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010) (quotation marks omitted).  The Statute clearly violates these tenets and thus violates the First Amendment.  Indeed, by flatly banning RealPage's speech in advance, the Statute imposes an invalid prior restraint, "the most serious and the least tolerable infringement on First Amendment rights," long condemned as "presumptively unconstitutional" and requiring the government to "carr[y] a heavy burden of showing justification for the prior restraint." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976).

---

[2] The DOJ's proposed consent decree actually allows RealPage to use non-public data in two limited respects:  (1) in the software development phase—before the software is released to customers—to train and optimize the model; and (2) in the rare case where a customer does not have historical data for a property and where that same customer also has no nearby property from which to borrow historical data (i.e., to serve as  a "surrogate"), the software is allowed to borrow historical data from a different customer's property as long as that property is in an entirely different market such that it could not compete with the customer.  *See* Proposed Final Judgment, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Nov. 24, 2025), ECF No. 159-1. Both exceptions have been assessed and recognized as being consistent with US antitrust law.  *See, e.g.*, *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) (holding that the "mere use of algorithmic pricing based on artificial intelligence [machine learning using the "confidential data of many others" to offer "better pricing recommendations"] by a commercial entity, without any allegations about any agreement between competitors—whether explicit or implicit—to accept the prices that the algorithm recommends does not plausibly allege an illegal agreement…"), *aff'd*, 148 F.4th 1069 (9th Cir. 2025).

7.    Before it can go into effect on December 15, the Court should grant a preliminary injunction preventing the Statute's enforcement, facially or, at minimum, as applied to RealPage and its customers.

## PARTIES

8.    Plaintiff RealPage, Inc. is a Delaware corporation with its principal place of business in Richardson, Texas.  RealPage does business throughout the State of New York, including in New York City and New York County.  It licenses its RMS, among other products, to property owners and managers in New York City.

9.    Defendant Letitia James is the Attorney General of the State of New York.  In her official capacity, she is tasked with enforcing the Statute.  *See* § 342.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Because RealPage seeks an "injunction[] to protect rights safeguarded by the Constitution," it has presented a federal question that this Court has jurisdiction to resolve under 28 U.S.C. § 1331. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

11.    RealPage has standing to bring this action.  The Statute will cause RealPage to suffer an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180, (2000).  The "threat of future enforcement" here, which could result in injunctive relief, restitution, criminal penalties and fines up to $1,000,000, or civil penalties, is "substantial" and credib[le]," giving rise to an injury in fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (observing that "[n]othing in this Court's decisions requires a plaintiff who wishes

to challenge the constitutionality of a law to confess that he will in fact violate that law" and finding the threat of future enforcement of a speech regulation sufficient for Article III standing). "[T]he injury is fairly traceable to the challenged action of the defendant"—enacting the Statute and the New York Attorney General's ability to enforce it. *See Laidlaw*, 528 U.S. at 180. And "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" preventing the Statute's enforcement. *Id*. at 181.

12.    RealPage also may challenge the Statute both facially and as applied to RealPage and its customers. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (booksellers may sue over "infringement of the First Amendment rights of bookbuyers").

13.    Ms. James is subject to the personal jurisdiction of this Court via Federal Rule of Civil Procedure 4(k) because she is a New York citizen subject to the jurisdiction of the courts of general jurisdiction of New York, and because she conducts her official duties as Attorney General throughout the State of New York.

14.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), (b)(2), and (b)(3) because Defendants are located in and can be found in this District and because a substantial part of the events giving rise to RealPage's claims for relief occurred in this District.

## BACKGROUND

## I.    REALPAGE'S REVENUE MANAGEMENT SOFTWARE.

15.    RealPage's RMS uses proprietary technology to recommend rental prices based on the subscribing customer's individual strategic objectives for its particular property.

16.    RealPage's RMS features over one hundred different parameters that customers can configure in pursuit of their goals for each property and each floorplan at the property. A customer's configuration defines the bounds upon which the RMS provides advice. Assessing the

customer's configuration is critical to ensuring that the software gives recommendations aligned with the customer's individual asset strategy.

17.    A goal of RealPage's RMS is to help customers optimize revenue, through a combination of occupancy and rent, at each property. Importantly, RealPage's RMS can and does help a customer increase revenue by increasing occupancy—through decreasing rents or keeping them the same—by more efficiently forecasting the customer's own property's supply and demand and more accurately responding to competitive dynamics. RealPage's RMS also helps reduce administrative costs for customers, enables customers to focus more of their resources on resident experience at the property, and enables customers to provide broad array of lease term length and rent amount options that are transparent to residents and that support property owners and managers' compliance with fair housing laws.

18.    RealPage's RMS is built on the fundamental idea that a property's *internal* supply (availability) and *internal* demand (traffic, lease applications, renewals) dynamics are much more important than external factors, such as rents offered by other properties, when recommending rental prices for the subject property.

19.    Historically, RealPage used limited amounts of aggregated, anonymized, non-public lease transaction data (heavily blended with publicly available data) as an input for certain features of its RMS. In response to regulatory concerns and customer feedback about having to incur legal costs to respond to legal inquiries or proceedings—but not because RealPage believed its use to be anticompetitive—RealPage transitioned away from using any non-public competitor data when customers use this software in runtime to generate price recommendations or for any other purpose. RealPage currently offers this version of RMS, along with other versions that also do not use non-public competitor data, to property owners and managers in New York state.

20.     All the antitrust lawsuits that are pending against RealPage are targeted at prior iterations of the software that operated differently and used limited non-public information in providing its advice to customers.  RealPage continues to believe that this use of non-public data in prior iterations of the software led to more efficient and procompetitive pricing, reduced vacancies, and other procompetitive effects than when non-public data is not used.

## II.     NEW YORK ENACTS THE STATUTE, WHICH TARGETS REALPAGE'S SOFTWARE BASED ON THE CONTENT AND VIEWPOINT OF SPEECH.

### A.     Legislative History

21.     On May 13, 2025, New York State Senator Brad Hoylman-Sigal introduced Senate Bill S7882, "AN ACT to amend the general business law, in relation to the use of algorithmic pricing by a landlord for the purpose of determining the amount of rent to charge a residential tenant."  S. 7882.

22.     The Sponsor Memorandum stated in stark, straightforward terms the vast sweep of the bill's restrictions on speech:  "This legislation provides the use of an algorithm or algorithmic device to adjust rental price levels is unlawful collusion."  Sponsor Memorandum, S. 7882, https://www.nysenate.gov/legislation/bills/2025/S7882.     The   Memorandum's   sole   cited "justification" for the bill was a 2022 ProPublica article that contains numerous incorrect and misleading claims about RealPage's RMS.  Many of the ProPublica article's claims have been demonstrated to be incorrect and misleading, and lawyers who brought lawsuits based on this article were forced to withdraw allegations that were shown to be false.

23.     The New York Senate passed S7882 on June 9, 2025.  That same day, Senator Hoylman-Sigal and Assemblymember Linda Rosenthal, the bill's sponsor in the State Assembly, published an opinion piece in which they blamed landlords' use of "real estate management software" for "notable increases in their [constituents'] rents, as well as abnormally long apartment

vacancy periods in their buildings." Linda Rosenthal & Brad Hoylman-Sigal, *Opinion: Algorithms are inflating our rent. It's time to stop them.*, City & State (June 9, 2025), https://tinyurl.com/kdtkzsez. The legislators singled out RealPage for reprisal, writing, "We need to pass a state law prohibiting landlords from using algorithmic price-setting software like RealPage." *Id.*

24. The sponsors did not cite any of the overwhelming number of sources and research concluding that rent increases are primarily driven by a lack of housing supply. *See, e.g.*, Alexei Alexandrov & Laurie Goodman, *Place the Blame Where It Belongs: Lack of Housing Supply is Largely Responsible for High Home Prices and Rents*, Urban Institute (Jan. 2024), https://tinyurl.com/4n6v4dem, at 1 (explaining that "a massive supply shortage is causing high home prices and rents," and that "developers who build high-cost homes and apartments" are a "scapegoat[] that distract[s] from the underlying cause of high home prices and rents"); John Wake, *The Real Reason House Prices Are Skyrocketing: What The Real Estate Industry Won't Tell You*, Forbes (Apr. 1, 2022), https://tinyurl.com/3tpcvpt2 ("Almost everyone agrees the main culprit for our skyrocketing house prices in…the United States is the extremely low number of houses for sale."). Nor did they explain why existing laws that make price collusion illegal, *see, e.g.*, §§ 340–347-a, were insufficient to reach any rental price-fixing conduct that may occur in New York. *See* Cody Taylor, *The Case for Algorithmic Pricing: Consumer Welfare, Market Efficiency, and Policy Missteps*, Mercatus Center, George Mason University (May 14, 2025), https://tinyurl.com/4wran36n (explaining that "[p]ricing algorithms are neutral tools that can be used to benefit businesses and consumers alike" and that "[p]olicymakers and enforcement agencies should go after the bad actors who use algorithms in malicious ways but should not ban or limit the use of the tool itself"). The sponsoring legislators also did not consider evidence that

RMS helps *reduce* housing vacancies by recommending rental prices that better meet demand. *See, e.g., id.* ("Dynamic pricing helps match supply to demand more efficiently by incentivizing consumption during low-demand periods and disincentivizing it when there is an excess of demand relative to supply."); R.J. Rico, *Colorado's governor vetoes landmark ban on rent-setting algorithms*, Associated Press (May 30, 2025), https://tinyurl.com/2x4eemcp (Colorado Governor explaining that "[r]educing market friction through legitimate means that do not entail collusion is good for both renters and landlords," and that "[w]e should not inadvertently take a tool off the table that could identify vacancies and provide consumers with meaningful data to help efficiently manage residential real estate to ensure people can access housing"); Michael I. Krauss, *Antitrust, Market Information, And Rental Housing*, Forbes (June 18, 2024), https://tinyurl.com/5bj2n23m (observing that software like RealPage simply facilitates "knowing the current state of the market," which helps "keep[] lodgings rented (neither vacant because priced too high nor too scarce because priced too low)"); Editorial Board, *The New Housing Inflation Scapegoat*, Wall Street Journal (Sept. 4, 2024), https://tinyurl.com/38tfa388 (observing that "RealPage is merely helping landlords ascertain market rates," and that "[o]ne ironic result" of banning the company's RMS "could be higher rents since landlords may be slower to respond to easing market conditions in areas with growing supply").

25.     The following day (June 10, 2025), S7882 advanced to the Assembly.

26.     On the Assembly floor, Assemblymember Rosenthal reiterated the vast sweep of the bill's restrictions on speech: "This bill would provide that use of an algorithm or algorithmic device to adjust rental price levels is unlawful collusion." Assemblymember Michael J. Fitzpatrick repeatedly asked whether there was any evidence that RMS was being used in a collusive, anticompetitive manner in New York. Assemblymember Rosenthal admitted that nobody had

been proven guilty of such conduct, and she cited no evidence that RMS had been used in such a manner in New York.  Despite lacking any such evidence, Assemblymember Rosenthal baselessly accused RealPage of "orchestrat[ing]" price fixing and collusion.  Assemblymember Fitzpatrick also noted that "price fixing" is "already illegal in the State of New York," highlighting why the law was unnecessary.  Assemblymember Rosenthal's response confirmed the breadth of the bill's restrictions on speech:  "What we are clarifying is…that using an algorithm is also collusion."

27.    Assemblymember Fitzpatrick objected to the premise that use of an algorithm in the manner proscribed by the bill amounted to collusion, explaining that "you're simply using comparable values to establish what I can get for my property," and that it "is no different than what building owners do in…using market conditions to establish prices to rent their properties."

28.    Assemblymember Paul A. Bologna also questioned why the bill's prohibition on using software to analyze data wouldn't apply to the common practice of "mom-and-pop style landlords" using software like ChatGPT to analyze data available on the internet to help them set their rents.  In response, Assemblymember Rosenthal admitted that, under the bill's expansive definition of an "unlawful agreement," S. 7882, using ChatGPT in this way "may fit the profile of price fixing."  But no revisions were made to the bill to account for this admission about the bill's remarkable overbreadth.

29.    Assemblymember Fitzpatrick also noted that "[t]he sponsor does not provide any evidence" that the use of RMS results in collusive fixing of rental prices in New York.  He further explained that, by depriving landlords of a legitimate means of calculating rents, the bill would actually "mak[e] housing unnecessarily more expensive and may take even more units off the market…because owners can't recover the cost to operate their buildings."

10

30.     Assemblymember David DiPietro objected to the bill on similar grounds, explaining that it "does nothing but kill the housing market" by interfering with landlords' ability to recoup on their investment.  The bill passed the Assembly, and it was delivered to Governor Hochul on October 9, 2025.

31.     The Governor signed the bill into law on October 16, 2025.

32.     The same day, the Governor's office issued a press release touting the bill, and featuring a statement from Senator Hoylman-Sigal that "[t]he use of rent-fixing software like RealPage leads to collusion, plain and simple, and artificially increases the cost of housing." Governor Kathy Hochul, *Governor Hochul Signs Legislative Package to Bolster Homeownership and Strengthen Protections for Renters* (Oct. 16, 2025), https://tinyurl.com/bdfke26b.  Senator Hoylman-Sigal's statement cited no evidence that RealPage's RMS —or any other RMS—had been used for collusion or had artificially raised rents, much less in New York.

**B.     The Statute Broadly Outlaws Speech**

33.     The bill is now codified as law at § 340-b.  It is scheduled to take effect on December 15, 2025.

34.     The Statute provides that "[i]t shall be an unlawful violation of this article for a person or entity to knowingly or with reckless disregard facilitate an agreement between or among two or more residential rental property owners or managers to not compete with respect to residential rental dwelling units, *including by operating or licensing a software, data analytics service, or algorithmic device that performs a coordinating function* on behalf of or between and among such residential rental property owners or managers."  § 340-b(2) (emphasis added).

35.     The Statute also provides that it would be "an unlawful agreement" for "a residential rental property owner or manager to knowingly or with reckless disregard set or adjust

11

rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions in one or more of their residential rental properties *based on recommendations from a software, data analytics service, or algorithmic device performing a coordinating function*." § 340-b(3) (emphasis added).

36.    The Statute defines an "Algorithm" as any "computational process that uses a set of rules to define a sequence of operations," and an "Algorithmic device" as "any machine, device, computer program or computer software that on its own or with human assistance performs a *coordinating function*." § 340-b(1)(a)–(b) (emphasis added).

37.    The Statute defines a "Coordinating function" as comprising three steps: "(i) collecting historical or contemporaneous prices, supply levels, or lease or rental contract termination and renewal dates of residential dwelling units from two or more residential rental property owners or managers," "(ii) analyzing or processing th[at] information…using a system, software, or process that uses computation, including by using that information to train an algorithm," and "(iii) recommending rental prices, lease renewal terms, ideal occupancy levels, or other terms and conditions to a residential rental property owner or manager." § 340-b(1)(c). The Statute exempts from this definition any "product used for the purpose of establishing rent or income *limits*" in accordance with various rent control and affordable housing laws. § 340-b(1)(c) (emphasis added).

## III.    THE STATUTE VIOLATES THE FIRST AMENDMENT.

38.    The Statute regulates speech—namely, speech in the form of "recommendations from a software, data analytics service, or algorithmic device performing a coordinating function" that a "residential property owner or manager" might consider when "sett[ing] or adjust[ing] rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions." § 340-b(3). The law equates considering these recommendations with "an unlawful agreement." *Id.*

39.    The Statute provides that "a person or entity"—namely, a software company like RealPage—who "knowingly or with reckless disregard facilitate[s] an agreement to not compete" has broken the law simply by "operating or licensing a software, data analytics service, or algorithm device that performs a coordinating function." § 340-b(2).

40.    The Statute broadly defines a "[c]oordinating function" to cover almost all advice or recommendations of rental terms based on the analysis of data sets.  Specifically, as noted above, the Statute says a "'[c]oordinating function' means (i) collecting historical or contemporaneous prices, supply levels, or lease or rental contract termination and renewal dates of residential dwelling units from two or more residential rental property owners or managers, provided that at least two such residential rental property owners or managers are not wholly-owned subsidiaries of the same parent entity or otherwise owned or managed by the same residential rental property owner or manager." § 340-b(1)(c).  But the Statute then creates a carveout so that software can be used to recommend rental terms the State prefers.  Specifically, it excepts using software or other tools to analyze rent data and give recommendations about rental terms if done "for the purpose of establishing rent or income limits in accordance with" certain State-preferred "rent stabilization" laws or certain "affordable housing program[s]." *Id.*

41.    The First Amendment protects the "creation and dissemination of information" as "speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564, 570 (2011) (collecting cases—and explaining that "information" is "speech" and is the "beginning point for…speech").  It protects the "creation" of information, *id.*, the "dissemination" of information, *id.*, the "use" of information, and information-generating devices, *id.* at 564, 568.

42.    There is no "information" exception—and certainly no "property owner" or "algorithm" exception—rooted in the precedent or history of the First Amendment.  *Sorrell*, 564

13

U.S. at 570; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) ("*NIFLA*") (speech exceptions narrowly defined); *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) ("Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." (alteration and quotation marks omitted)).  Indeed, as the Second Circuit recognized over 20 years ago, "[c]omputer programs are not exempted from the category of First Amendment speech," because "[i]nstructions that communicate information comprehensible to a human qualify as speech whether the instructions are designed for execution by a computer or a human (or both)."  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447–48 (2d Cir. 2001).  The fact that companies like RealPage employ in their software "algorithms to implement th[eir] standards," analyses, and advice about rental data does not cause the First Amendment's protections to fall away.  *NetChoice*, 603 U.S. at 735.  "[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."  *Brown v. Entmt. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).  Information is speech—and its generation and dissemination are protected First Amendment activities.

43.    And there is certainly no exception to the First Amendment when one gives advice based on information.  "[C]ommunicat[ing] advice derived from 'specialized knowledge'" is protected by the First Amendment, and any law limiting such speech and requires "rigorous scrutiny."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–28 (2010).  A law that bars or "condemn[s] less favored viewpoints," for instance, triggers First Amendment scrutiny.  *Upsolve, Inc. v. James*, 155 F.4th 133, 143 (2d Cir. 2025) (upholding statute prohibiting unlicensed practice of law because it "appl[ies] equally to individuals who provide legal advice only to creditors and

those who advise only debtors."). A law that only allows "advice" "from the viewpoint of which the Government approves" constitutes "discrimination against disfavored viewpoints" and "strikes at the heart of the First Amendment." *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1040–41 (E.D.N.Y. 1993).

44.    The Statute suppresses speech by imposing "restrictions on the sale, disclosure, and use of…information." *Sorrell*, 564 U.S. at 564. The Statute burdens the "creation" and "dissemination" of information, *id.*—prohibiting the use of technology to generate rental information, to gather, sort, and analyze that rental information, and to share that rental information with covered audiences, § 340-b(3). The Statute also prohibits the use of information by property owners and managers by equating such, without more, to an illegal agreement "to not compete," § 340-b(2)—thereby imposing "restraints on the way in which the information might be used," *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).

45.    The State cannot ban "purchasing or using" a method of speech as a means of prohibiting protected speech. *Sorrell*, 564 U.S. at 571.

46.    The First Amendment protects mediums of speech—whether ink in pens, printing presses for books, or computers for typists—where they are used to convey advice, information or other forms of speech. The First Amendment also protects means of speech—whether a radio to hear the news, a computer to perform computations, or a search engine to pull and sort results. The State also cannot ban a speech device ("algorithms" and "technology"), *NetChoice*, 603 U.S. at 733 (cleaned up), to prohibit the "creation and dissemination of information," *Sorrell*, 564 U.S. at 570. The "'basic principles'" of the "First Amendment do not vary" when applied to speech in "'ever-advancing technology'"—and when the State seeks to restrict such speech, it necessarily "confronts the First Amendment." *NetChoice*, 603 at 732–33 (quoting *Brown*, 564 U.S. at 790).

47.     The Statute's direct prohibition of speech, and its content-, viewpoint-, and speaker-based restrictions, are subject to strict scrutiny.  The Statute prohibits the "use" and "creation and dissemination of information," which are core "speech" activity "within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 564, 570.

48.     The unconstitutional nature of that speech restriction is exacerbated by other features of the Statute.  The speech restrictions of the Statute are content-based—they prohibit data-driven "recommendations" made to "residential property owner[s] or manager[s]" about "set[ting] or adjust[ing] rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions," equating such recommendations under the Statute to "facilitat[ing]" an illegal "agreement." § 340-b(2)–(3); *see Sorrell*, 564 U.S. at 564; *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991).

49.     The Statute's restrictions are also viewpoint-based, as they bar RealPage from providing data-driven rental recommendations and bar property owners and managers from receiving this advice, but not if the advice and recommendations in question touch upon setting rents "in accordance with" certain State-preferred housing programs.  § 340-b(1)(c).  In other words, the Statute is meant to dissuade certain "messages"—in this case, recommendations to adjust rents in accordance with data-driven analysis—that are deemed "in conflict with the goals of the state," which constitutes "viewpoint discrimination."  *Sorrell*, 564 U.S. at 565 (quotation marks omitted).

50.     The speech restrictions are also user-based—they prohibit particular speech activities for particular actors (i.e., "residential property owner[s]" and "manager[s]").  *See, e.g.*, § 340-b(2)–(3); *Sorrell*, 564 U.S. at 564; *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 586 (1983).  But there is no prohibition on tenants using data-driven

software or analytic tools to get recommendations about rental terms.  In other words, under the Statute, RealPage violates the law if its RMS recommends to a property owner to set rent at a certain rate, but there is no violation of law if a tenant uses a software tool like ChatGPT to conduct an analysis of rental data available online and get recommendations for what rental terms to negotiate for.  Just as "the First Amendment stands against attempts to disfavor certain subjects or viewpoints…[p]rohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

51.    Additionally, by penalizing advice and information so broadly and so severely— including through felony prosecution and potentially crippling monetary penalties, *see* § 341—the Statute violates the First Amendment by chilling protected speech.  By imposing draconian liability for potentially any advice on rental pricing one gives or receives via data analysis, the Statute's borderless prohibitions all but guarantee that "[a] speaker [will] be unsure about the side of [the] line on which his speech falls" and will engage in "self-censorship."  *Counterman v. Colorado*, 600 U.S. 66, 75 (2023).  Speakers "tend to make only statements which 'steer far wider of the unlawful zone,'" and by zoning as widely as it does, the Statute "dampens the vigor and limits the variety of public debate" and discourse.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

52.    The Statute's various speech restrictions are "presumptively unconstitutional"— and subject to "strict scrutiny."  *Reed*, 576 U.S. at 163 (collecting cases).

53.    No strict-scrutiny exception—such as the "commercial speech" exception—applies here.  Commercial speech is generally "speech that does no more than propose a commercial transaction."  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (citing *Cent. Hudson*

*Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)).  That exception is inapplicable here, and provides no basis for reduced constitutional scrutiny of the Statute's sweeping speech restrictions.

54.    The Statute is far removed from the domain of proposed commercial transactions. "'[T]he test for identifying commercial speech'" is "the proposal of a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (quoting *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473–74 (1989)) (emphasis omitted); *see also Cent. Hudson*, 447 U.S. at 564–66.  But the speech targeted here—the generation and dissemination of information about rental practices, and recommendations and advice on those rental practices—does not propose *any* transaction between the speaker (RealPage) and another party (the owner or manager of a property) and certainly does not "merely" propose such a transaction.  The Statute thus prohibits speech that "give[s] advice" from a "disfavored viewpoint[]," *Sale*, 823 F. Supp. at 1041—here, advice to landlords about how to price their rental units and set other terms.  Surely the State cannot avoid constitutional scrutiny when it bans speech recommending one product over another—say, an article from Consumer Reports or Wirecutter about which headphones are the best value—simply because the advice has some bearing on a potential transaction.  This is no different in character than the advice a lawyer or a tax advisor might provide regarding a transaction.  So too here, where RealPage's software offerings provide advice and analysis about how a landlord or property manager should go about renting housing.

55.    Nor does the speech constitute an advertisement.  On the contrary, the banned speech is the provision of advice and information to a business—a subject that is distinct from commercial advertising.

56. The Statute fails strict scrutiny because the City cannot "prov[e] that the [laws] are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163). Even if the Statute were meant to serve a compelling state interest, the Statute is not "narrowly tailored to achieve a compelling government interest," *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018). To meet strict scrutiny, the State carries the "obligation to prove that [any] alternative[s] will be ineffective to achieve its goals." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *accord, e.g.*, *Dorman v. Satti*, 862 F.2d 432, 437 (2d Cir. 1988) (statute "cannot withstand strict scrutiny" if it is not "properly tailored"). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it" instead of suppressing speech. *Playboy*, 529 U.S. at 815.

57. First, there is no evidence that banning RealPage's RMS would lower rental prices or achieve the Statute's stated goals. The Statute thus does not even advance the State's interests, let alone do so in a narrowly tailored fashion.

58. Second, the Statute fails narrow tailoring because the State could have pursued its objectives through less burdensome alternatives that do not restrict speech, such as enforcing existing antitrust laws; requiring landlords to disclose past and present rental prices publicly; or adopting other regulatory measures that actually go after agreements to fix rent prices in restraint of trade instead of simply equating certain speaker-, content-, and viewpoint-based speech with agreements in restraint of trade. *See Playboy*, 529 U.S. at 816 (identifying other means of achieving stated government interests that would not offend the Constitution); *accord NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024) (same); *see also, e.g.*, *Citizens United*, 558 U.S. at 361 ("more speech, not less, is the governing rule" under our "law and tradition"). Rather than restrict speech, the "[State] could have" assessed the viability of "less restrictive means" to

address landlord misconduct, including by "relying on existing…laws that prohibited related…conduct." *NetChoice*, 113 F.4th at 1121; *accord Playboy*, 529 U.S. at 816 (identifying existing law that would have achieved stated goals). That is particularly true because collusion to fix prices, when it actually exists, is already a *per se* violation of antitrust laws (e.g., the Sherman Act, 15 U.S.C. § 1), and would be subject to a broad array of New York-specific consumer protections and laws. New York already has one of the most robust State pro-competition legal regimes in the country, ranging from the Donnelly Act, § 340, which mirrors the Sherman Act; § 349, which provides broad private rights of action against deceptive acts and practices; and the AG's uniquely powerful authority under Executive Law § 63(12) to seek redress for any "persistent fraud or illegality." The State has not suggested these laws are not working.

59.    Third, the Statute fails narrow tailoring because it is vastly overbroad. The Statute could have potentially imposed narrow restrictions focused on improper or unlawful conduct, such as where property owners *actually collude* via software tools. Instead, it makes it "an unlawful violation of this article" simply to set rental terms "based on recommendations from…software." § 340-b(3). The Statute's carveout for State-preferred affordable housing programs does not make things any better. It inflicts viewpoint discrimination by exempting speech not "in conflict with the goals of the state," *Sorrell*, 564 U.S. at 646, and even with the carveout the Statute still "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep," *United States v. Hansen*, 599 U.S. 762, 769 (2023) (internal quotation marks omitted). For instance, "[a]pproximately one million of New York City's 2.3 million rental units are considered to be 'market rate,'" meaning they are "available on the private market without any regulation as to how much rent can be charged." *Housing Types*, NYC Rent Guidelines Board, https://tinyurl.com/r5aaz3yu (last visited Nov. 25, 2025). That means landlords and property

managers responsible for these approximately one million units are simply banned from receiving data-driven recommendations about their business from software like that made by RealPage.

60.    The Statute's overbreadth encourages selective and discriminatory enforcement. A law that "sweeps within its ambit…activities that in ordinary circumstances constitute an exercise of freedom of speech…readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, result[ing] in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill v. State of Alabama*, 310 U.S. 88, 97–98 (1940); *see also Hulinsky v. County of Westchester*, 2025 WL 835646, at *12 (S.D.N.Y. Mar. 14, 2025) (quoting *Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970)) (a statute that gives "law enforcement…unbridled discretion" to police "'only that expression which…officials will tolerate'" infringes upon "constitutionally protected speech").

61.    The Statute declares that software performs an illegal "coordinating function," § 340-b(1)(b), if it "(i) collect[s]…prices…from two or more…owners" of property, "(ii) analyz[es] or process[es] th[at] information…using…software[] or…computation…and (iii) recommend[s] rental prices…or other lease terms and conditions to a residential rental property owner or manager," § 340-b(1)(c). Thus, by the Statute's own text, a small property owner who uses Microsoft Excel (a "computer program"), "collects" in it public rent data about two or more properties from the properties' public websites or Zillow (i.e., "prices…from two or more…owners"), "analyz[es]" it using "computation" (e.g., Excel's =AVERAGE function), and uses that to inform a "recommendation" about what rent to put in a lease has performed an illegal "coordinating function" in violation of the Statute, which subjects her to a Class E felony

prosecution under § 341.  The Statute thus vests selective enforcement authority in the Attorney General to decide who to go after and who to spare.

62.     Even if the Statute were treated as a regulation of commercial speech, it would fail. A statute that regulates commercial speech will generally be reviewed under intermediate scrutiny—which requires an important government interest, and means that are substantially related to directly advancing that interest.  *Cent. Hudson*, 447 U.S. at 564–66.  Under intermediate scrutiny, the State must establish that the Statute will directly advance a substantial government interest and that it is narrowly drawn to achieve that interest.  *See, e.g.*, *id.* at 564.  This is no toothless standard: "[B]ans that target truthful, nonmisleading commercial messages…often serve only to obscure an 'underlying government policy' that could be implemented without regulating speech."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502–03 (1996).  In doing so, bans on truthful speech and advice "impede debate over central issues of public policy."  *Id.* at 503.

63.     The Statute—with its broad and vague speech restrictions and lack of a clear connection to any of the State's stated interests—abjectly fails intermediate scrutiny.  Perhaps most critically, the Statute is not "narrowly drawn."  *In re R.M.J.*, 455 U.S. 191, 203 (1982); *Central Hudson*, 447 U.S. at 565.  On the contrary, it is astonishingly broad—combining sweeping breadth and confusing vagueness to sweep in wide swaths of legitimate speech activity.  The Statute covers any and all software-based "recommendations" made to landlords and property owners—with no regard to whether the information on which the recommendation is based is public and whether the advice is used for legitimate and lawful conduct.  It even goes so far as to ban using *public* information to *test and develop* a software tool ("train an algorithm," § 340-b(1)(c)(ii)), even if the tool uses no actual price information in its runtime (i.e., when a customer uses it).  But the State "cannot regulate speech that poses no danger to the asserted state interest," nor can it "suppress

information when narrower restrictions on expression would serve its interest as well." *Cent. Hudson*, 447 U.S. at 565.

64.    Nor can the State show that the Statute will materially benefit rental prices, prevent collusion among competitors, or improve the rental market—let alone that the full sweep of the State is necessary to further those goals, when other options besides the restriction of speech are available.  The State must provide a "nonhypothetical justification," *NIFLA*, 585 U.S. at 777, and show that the "harm" it seeks to remedy is more than just "purely hypothetical" and that the speech "restrictions will in fact alleviate [the harm] to a material degree," *Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  But the State cannot make such a showing— and certainly not to the degree necessary to justify the full sweep of the statute, or its specific application to RealPage.  The Statute thus fails even lower levels of First Amendment scrutiny.

65.    In fact, the New York Attorney General investigated RealPage's RMS between 2023 and 2024 and discontinued its investigation without action after RealPage's full cooperation with the Attorney General's inquiry.

66.    If allowed to go into effect, the Rent Advice Statute—which suppresses constitutionally protected speech—will cause RealPage irreparable harm.  "The loss of First Amendment freedom, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  RealPage and its customers suffer irreparable harm because the only way to comply with the Statute is to cease engaging in and receiving protected speech—RealPage and all other RMS providers will have to stop licensing or materially water down (by eliminating the use of third-party public data in its recommendations) its advice-giving software in New York, or RealPage, other RMS providers, and their customers all risk felony prosecutions and significant financial penalties.  Given the severity of the Statute, RealPage

already advised its New York customers that the Statute prohibits "the sale, distribution, and use of [its] pro-competitive software" and expects to lose business as a result.

## FIRST CLAIM FOR RELIEF

### Violation of the First Amendment to the U.S. Constitution Under 42 U.S.C. § 1983, Facially and As-Applied to RealPage and Its Customers

67.     RealPage realleges and incorporates by reference paragraphs 1 through 66 above.

68.     The Statute broadly prohibits the dissemination of information, in violation of the First Amendment to the United States Constitution.  It suppresses speech by imposing "restrictions on the sale, disclosure, and use of…information."  *Sorrell*, 564 U.S. at 563–64.  It burdens the "creation" and "dissemination" of information—prohibiting the use of technology to generate rental information, to gather, sort, and analyze that rental information, and to make recommendations about that rental information with covered audiences.  It targets viewpoints by carving out from its prohibitions the use of software-based rent recommendations to comply with certain State-preferred housing programs, while at the same time making it illegal for landlords and property managers to employ those tools to get recommendations for market-rate housing. § 340-b(1)(c).  It also prohibits "residential property owners or managers" from using software-backed rental market recommendations, § 340-b(2)–(3)—imposing "restraints on the way in which the information might be used," *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times*, 467 U.S. at 32), while at the same time allowing tenants to use software or algorithmic tools to get rental market recommendations.

69.     The Statute is invalid, both facially and as applied.  It is facially invalid under the First Amendment overbreadth doctrine because it "prohibits a substantial amount of protected speech" "relative to" any "legitimate sweep" it may have.  *United States v. Williams*, 553 U.S. 285, 292 (2008).

70. The Statute is facially overbroad because it forces providers of software tools that can advise property owners or managers on rental terms, including based on public data, to chill or cease engaging in a substantial amount of constitutionally protected speech.

71. The Statute has no legitimate sweep because it seeks to unlawfully chill protected speech. Even assuming *arguendo* that the Statute has some legitimate sweep, it is unconstitutional in most applications since it reaches all manner of data-backed advice to property owners and managers.

72. Moreover, the law is unconstitutional as applied to RealPage and its customers. Though the State and the Statute's sponsors have alleged that RealPage's RMS can be used for price collusion between RealPage's customers, that is not plausible, especially given that a customer does not ever have access to any competitor's non-public data in RealPage's RMS. The Statute prohibits RealPage's constitutionally protected provision of analysis and advice.

73. The Statute is subject to strict scrutiny. It prohibits the "use" and "creation and dissemination of information"—core "speech" activity. *Sorrell*, 564 U.S. at 564. These prohibitions are content-based and viewpoint-based speech restrictions that are "presumptively unconstitutional" and subject to "strict scrutiny." *Reed*, 576 U.S. at 163 (collecting cases). And it does not regulate commercial speech because it neither proposes a commercial transaction nor constitutes an advertisement. *Cent. Hudson*, 447 U.S. at 564.

74. The Statute fails strict scrutiny. It fails narrow tailoring because the State could have pursued its stated objectives of lowering rental prices and addressing collusion among competitors through less burdensome alternatives that do not involve restricting speech—for example, encouraging the increase in housing supply, enforcing existing antitrust laws, or other regulatory measures that are not targeted at speaker-based and content-based speech activity. *See,*

*e.g.*, *NetChoice*, 113 F.4th at 1121; *accord Playboy*, 529 U.S. at 816 (identifying existing law that would have achieved stated goals).  It also fails narrow tailoring because it is overbroad.  Its sweeping speech restrictions—including its application to all "algorithms" that analyze rental market data to make recommendations—go far beyond what is necessary to serve any compelling state interest in fighting collusion and constraining rent increases.

75.    Even under the *Central Hudson* test for regulations of commercial speech, the Statute still is unconstitutional.  To survive intermediate scrutiny, the State must establish that the Statute will directly advance a substantial government interest and is narrowly drawn to achieve that interest.  *See, e.g.*, *Cent. Hudson*, 447 U.S. at 564.  Most critically, the Statute is not "narrowly drawn," *R.M.J.*, 455 U.S. at 203; *Cent. Hudson*, 447 U.S. at 565—to the contrary, it is astonishingly broad.  Nor does the State have evidence to support a "nonhypothetical justification" that the Statute will materially improve rental prices or occupancy levels or prevent competitor collusion— much less that the full sweep of the Statute is necessary to directly further those goals, when other options besides the restriction of speech are available.  *See NIFLA*, 585 U.S. at 777; *Playboy*, 529 U.S. at 815 ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it" instead of suppressing speech.).

76.    For these reasons, the Statute violates the First Amendment to the United States Constitution, which protects the freedom to engage in speech and disseminate information—even information that the government views unfavorably.

77.    42 U.S.C. § 1983 provides a civil cause of action to any person who is deprived of rights guaranteed by the United States Constitution or federal law, by another person, under color of State law.

78.    The State, acting under color of state and local law, and through its enactment and

threatened enforcement of the Statute as alleged, has deprived and will deprive RealPage of its rights under the First Amendment to the Constitution of the United States.

## SECOND CLAIM FOR RELIEF

## Attorneys' Fees and Costs Under 42 U.S.C. § 1988

79.     RealPage realleges and incorporates by reference Paragraphs 1 through 78 above.

80.     Under 42 U.S.C. § 1988(b), "[i]n any proceeding to enforce" 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee as part of its costs."  Additionally, the court "may include expert fees as part of the attorney's fee."  42 U.S.C. § 1988(c).

81.     RealPage is entitled to reasonable attorneys' fees, including expert fees and other costs, in this action and requests that the Court award such fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

An actual controversy has arisen between the parties, entitling RealPage to legal, declaratory, and injunctive relief.

WHEREFORE, RealPage prays that this Court:

(A)     Enter a judgment declaring that the State's ban on the use of software or algorithms to analyze rental data and make rental term recommendations to property owners or managers, codified at New York General Business Law § 340-b, impermissibly abridges RealPage's First Amendment rights and is invalid facially and as applied to RealPage and its customers, *see* 28 U.S.C. § 2201;

(B)     Enter a judgment declaring that the State's ban on the use of software or algorithms to analyze rental data and make rental term recommendations to property owners or managers, codified at New York General Business Law § 340-b, violates the Due Process Clause both facially

27

and as applied to RealPage and its customers, *see* 28 U.S.C. § 2201;

(C)    Enter a preliminary, and ultimately permanent, injunction barring the New York Attorney General, or anyone acting in concert with her, from enforcing or causing to be enforced New York General Business Law § 340-b, in order to prevent imminent and irreparable injury to RealPage and harm to the public;

(D)    Grant RealPage such relief as it deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

Respectfully submitted,

November 25, 2025                    By:  /s/ *Theodore J. Boutrous, Jr.*

Theodore J. Boutrous Jr.
  tboutrous@gibsondunn.com
Jay P. Srinivasan (*pro hac vice forthcoming*)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger  (*pro hac vice forthcoming*)
  bhamburger@gibsondunn.com
Alexander N. Harris  (*pro hac vice forthcoming*)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Ave.
  Los Angeles, CA  90071-3197
  Telephone:   213.229.7000
  Facsimile:    213.229.7520

Connor S. Sullivan
  cssullivan@gibsondunn.com
Jacob U. Arber
  jarber@gibsondunn.com
Michael Klurfeld
  mklurfeld@gibsondunn.com
Iason Togias
  itogias@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000

*Attorneys for Plaintiff RealPage, Inc.*