UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REALPAGE, INC.,<br><br>                Plaintiff,<br><br>     v.<br><br>LETITIA JAMES, in her official capacity as<br>the Attorney General of the State of New<br>York,<br><br>                Defendant. | Case No. 1:25-cv-9847-VEC<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF REALPAGE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................4

    I.      RealPage Provides Advice About Renting Properties. ............................................4

    II.     New York Enacts the Rent Advice Statute, Targeting RealPage and
              Making It Illegal to Provide or Receive Rental Recommendations Via
              Software. ...........................................................................................................5

LEGAL STANDARD .....................................................................................................8

ARGUMENT .................................................................................................................9

    I.      RealPage Is Likely to Prevail on the Merits. ........................................................9

           A.      The Rent Advice Statute Violates the First Amendment. ..........................11

                  1.      The Rent Advice Statute Restricts Speech. ...................................11

                  2.      The Rent Advice Statute Fails Strict Scrutiny. ............................16

                  3.      The Rent Advice Statute Does Not Regulate "Commercial
                        Speech" and in Any Event Would Fail Intermediate
                        Scrutiny. ........................................................................................19

                  4.      The Rent Advice Statute Cannot Be Justified Based on the
                        Claim That RealPage's Software Violates Existing
                        Antitrust Law. ................................................................................23

    II.     The Irreparable Harm to RealPage and the Public Interest Strongly
              Support Immediate Relief. .................................................................................26

CONCLUSION...............................................................................................................28

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Agudath Israel of Am. v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ........................................................................4, 26, 27

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
  2023 WL 6006525 (S.D.N.Y. July 31, 2023) ...............................................25

*Bronx Household of Faith v. Board of Educ. of City of N.Y.*,
  331 F.3d 342 (2d Cir. 2003) ........................................................................4, 26

*Brooklyn Branch of NAACP v. Kosinski*,
  657 F. Supp. 3d 504 (S.D.N.Y. 2023) .........................................................24

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) ....................................................................................15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 565 (1980) ....................................................................................23

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ..........................................................................14, 15, 17

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
  2024 WL 4356188 (D.N.J. Sep. 30, 2024) ..................................................25

*Counterman v. Colorado*,
  600 U.S. 66 (2023) ...................................................................................2, 16

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................3, 26

*Erie County v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) .......................................................................25

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ....................................................................................11

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) .................................................................3, 22

*Greater New Orleans Broad. Ass'n v. United States*,
  527 U.S. 173 (1999) ....................................................................................21

*Haitian Ctrs. Council, Inc. v. Sale*,
  823 F. Supp. 1028 (E.D.N.Y. 1993) ........................................................12, 14

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ........................................................................2, 10, 11, 12

i

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Hulinsky v. County of Westchester,*
   2025 WL 835646 (S.D.N.Y. Mar. 14, 2025) .................................................19

*Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy,*
   512 U.S. 136 (1994) ..............................................................................26

*Kinney-Coastal Oil Co. v. Kieffer,*
   277 U.S. 488 (1928).................................................................................9

*Lackey v. Stinnie,*
   604 U.S. 192 (2025)...............................................................................27

*Long Island Vietnam Moratorium Comm. v. Cahn,*
   437 F.2d 344 (2d Cir. 1970)....................................................................19

*Matal v. Tam,*
   582 U.S. 218 (2017) ..............................................................................20

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983)...............................................................................14

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024).........................................................................15, 17

*N.Y. Progress & Prot. PAC v. Walsh,*
   733 F.3d 483 (2d Cir. 2013)..............................................................4, 9, 26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
   585 U.S. 755 (2018)..........................................................................16, 25

*Neb. Press Ass'n v. Stuart,*
   427 U.S. 539 (1976)................................................................................9

*NetChoice, LLC v. Bonta,*
   113 F.4th 1101 (9th Cir. 2024) .................................................................17

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964)...........................................................................2, 16

*Nken v. Holder,*
   556 U.S. 418 (2009)...............................................................................27

*Ohio v. Am. Express Co.,*
   585 U.S. 529 (2018)..........................................................................24, 26

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)...............................................................................12

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)..........................................................2, 10, 12, 13, 16

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ................................................................................................20

*Rosenberger v. Rector & Vistors of Univ. of Va.*,
    515 U.S. 819 (1995) ...........................................................................................12, 13

*Safelite Grp., Inc. v. Jepsen*,
    764 F.3d 258 (2d Cir. 2014) ..................................................................................21

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ...............................................................................................13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................2, 10, 11, 12, 13, 14, 15, 16, 19, 21

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*,
    190 F. Supp. 2d 577 (S.D.N.Y. 2002) ....................................................................8

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...............................................................................................26

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) .................................................................................................19

*United States v. Hansen*,
    599 U.S. 762 (2023) ....................................................................................2, 10, 19

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .....................................................................................3, 17, 24

*United States v. Stevens*,
    559 U.S. 460 (2010) ...............................................................................................19

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ...............................................................................................20

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ...............................................................................................27

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ..................................................................................15

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .....................................................................................9, 20, 27

*Volokh v. James*,
    148 F.4th 71 (2d Cir. 2025) ..........................................................................4, 9, 20, 27

*Wandering Dago, Inc. v. Desito*,
    879 F.3d 20 (2d Cir. 2018) ...............................................................................20, 21

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ........................................................................................10

**Statutes**

15 U.S.C. § 1 ...............................................................................................................17

N.Y. Gen. Bus. Law § 340-b ....................................1, 5, 6, 7, 11, 13, 14, 15, 18, 20

N.Y. Gen. Bus. Law § 341 ............................................................................................8

N.Y. Gen. Bus. Law § 342 ............................................................................................8

N.Y. Gen. Bus. Law § 342-a .........................................................................................8

N.Y. Gen. Bus. Law § 342-b .........................................................................................8

**Rules**

Fed. R. Civ. P. 65 ..........................................................................................................8

## INTRODUCTION

This case challenges a recently enacted New York statute that imposes a sweeping, unconstitutional ban on lawful speech—expressly motivated by an intent to prohibit Plaintiff RealPage, Inc. from providing advice to property owners and managers.  The statute, codified at New York General Business Law § 340-b (the "Rent Advice Statute" or the "Statute"), makes it unlawful to "operat[e] or licens[e] a software, data analytics service, or algorithmic device that" collects and analyzes rental market data (whether public or not) and uses it to make "recommendations" to "residential property owner[s] or manager[s]" about how to "set or adjust rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions." § 340-b(3).[1]  The Statute also declares it "an unlawful agreement" whenever a "rental property owner or manager…set[s] or adjust[s] rental prices…or other lease terms…based on recommendations from…software" like RealPage's, *id.*, and makes it illegal for RealPage even to provide its software by defining such to be "facilitat[ing] an agreement…not to compete," § 340-b(2).

The Statute is an overbroad speech ban—unconstitutional both facially and as applied to RealPage, to the software it makes, and to the customers who use its software.  While nominally designed to prevent "agreement[s]…not to compete," § 340-b(2), the Statute, unlike existing antitrust laws, does *not* require any actual agreement to impose significant civil and even criminal penalties.  Rather, it ordains that an unlawful agreement arises whenever a property owner or manager receives a recommendation from software that analyzes rental market data.  As one of the bill's sponsors conceded, the Statute "may" (and does) make it illegal for "mom-and-pop style landlords" to use "ChatGPT" to analyze data available on the internet to help them set their rents.

---

[1] Unless stated otherwise, all citations to "§" refer to statutes codified in New York's General Business Law.

Ex. A at 161–63.[2]  That unjustifiable ban on speech violates the First Amendment.

RealPage is likely to succeed on the merits.  The Rent Advice Statute imposes overbroad content-, viewpoint-, and speaker-based restrictions on constitutionally protected speech that are not narrowly tailored to any State interest.  The Statute's "restrictions…depend entirely on the communicative content" of data-backed rental recommendations and thus effect "a content-based regulation of speech."  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).  The Statute also "burdens disfavored speech by disfavored speakers" by making it illegal for property owners and managers to receive—and RealPage to provide—data-backed recommendations on rental terms.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).  By imposing overbroad prohibitions, the Statute subjects a broad range of speech to severe penalties—including speech irrelevant to preventing purported collusion, such as using "ChatGPT" to analyze data available on the internet.  Ex. A at 161–62.  For these reasons, the Statute creates an impermissible "chilling effect" on protected expression as speakers try to avoid the significant liability it imposes, violating the First Amendment.  *Counterman v. Colorado*, 600 U.S. 66, 75, 78 (2023).  The Statute unjustifiably invades the "breathing space" for free expression that the First Amendment was enacted to protect.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

Because it prohibits the "creation and dissemination of information," *Sorrell*, 564 U.S. at 564, and "expert advice or assistance," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 8, 26–27 (2010), the Statute must satisfy the exacting constitutional test of "strict scrutiny" to survive.  But the State cannot establish that the Rent Advice Statute is narrowly tailored to serve any compelling governmental interests in preventing rental market collusion or stemming rising rental prices.  To the contrary, the Statute "prohibits a substantial amount of protected speech relative to" any

---

[2] Citations to "Ex. __" refer to exhibits to the Declaration of Michael Klurfeld.

"plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). And by adopting the Statute, the State disregarded obvious, effective alternatives, in favor of simply banning disfavored speech. But "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). Here, rather than categorically banning speech based on a perceived viewpoint, the State could craft a statute that targets actual price collusion, or simply enforce existing antitrust laws, which already make collusion illegal.

The State may try to justify the Statute by claiming that RealPage's software violates antitrust laws by facilitating price-fixing. Not so. The New York State Attorney General already investigated RealPage's software and discontinued its investigation without action after RealPage's full cooperation. Declaration of Stephen Weissman ("Weissman Decl.") ¶¶ 1–4. That's because RealPage's software does not violate antitrust law. Rather than "restrain[ing] the market for [housing] rentals," it provides a "means by which competitors might compete," since "pricing one's [rental housing] in a manner calculated to maximize profits is how one competes." *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1082–83 (9th Cir. 2025). Indeed, RealPage's revenue management software cannot be used for price coordination: No customer ever receives access to another customer's data, and the current versions of RealPage's software "do not use any non-public competitor data…to generate price recommendations." Declaration of Amy Dreyfuss ("Dreyfuss Decl.") ¶ 20. Independently, because existing law already prohibits the collusion purportedly targeted by the Statute, the Constitution does not permit a new law purporting to do the same by broadly banning speech. *Playboy*, 529 U.S. at 812.

The remaining factors favor a preliminary injunction. The "loss of First Amendment freedom, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976).  Absent preliminary injunctive relief, RealPage faces irreparable harm in having to choose either to cease speaking or risk substantial penalties for engaging in speech.  Likewise, the public will be "irreparably injured by the legislature's infringement on First Amendment freedoms and any resulting chilling effect on expression." *Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025).  Courts routinely preliminarily enjoin laws that burden speech.  *See, e.g.*, *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013) ("*NYPPP*"); *Bronx Household of Faith v. Board of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

This Court should preliminarily enjoin the Rent Advice Statute, facially or at least as applied to RealPage and its customers, while litigation continues.

## BACKGROUND

## I.    RealPage Provides Advice About Renting Properties.

Plaintiff RealPage, Inc. provides a broad portfolio of software to help its customers— including owners and managers of rental properties—better operate in their communities. Dreyfuss Decl. ¶ 2.  Some of RealPage's software, known as revenue management software ("RMS"), evaluates internal supply and demand data from a given property, together with publicly available rent data from other properties, to generate personalized price recommendations that align with the customer's strategy for the property.  *Id.* ¶¶ 2–5.  Each customer's unique strategy is expressed in the software through more than 100 customizable parameters.  *Id.* ¶ 5.  Based on these customer-specific customizations, not any common process, the software makes rent price recommendations —including decreases when the subject property's availability (supply) and leasing activity (demand) warrant it.  *Id.* ¶ 6.  Customers retain and have always retained complete discretion over their pricing decisions—they are free to accept or reject any recommendation made by the software and in fact set prices that deviate from the software's recommendations a

significant percentage of the time.  *Id.* ¶¶ 8, 22–24; Declaration of Lorin Hitt ("Hitt Decl.") ¶¶ 36–46.

RealPage does not engage, and has never engaged, in any kind of price-fixing; nor has it ever facilitated price-fixing.  Compl. ¶¶ 5 & n.2, 26.  Nor can RealPage's RMS facilitate price-fixing—the current versions of RealPage's RMS do not use any non-public competitor data when customers use this software to generate price recommendations or for any other purpose, and only use non-public data of other properties in the narrow respects specifically permitted by the U.S. Department of Justice under its proposed antitrust consent decree with RealPage.  Dreyfuss Decl. ¶¶ 15–18.  RealPage's RMS does not and has never allowed customers visibility into what any other customer is doing, and as such "could not have been"—and still cannot be—used "to coordinate, collude, or conspire with each other." *Id.* ¶ 19.  And, RealPage's RMS historically and currently has been utilized by only a very small fraction of apartment units, both across the State and in any particular city, making any collusion further implausible.  Hitt Decl. ¶¶ 23–30.

## II.   New York Enacts the Rent Advice Statute, Targeting RealPage and Making It Illegal to Provide or Receive Rental Recommendations Via Software.

On October 16, 2025, New York enacted Senate Bill S7882.  Compl. ¶ 31.  The bill added Section 340-b, which prohibits property owners and managers from receiving, and prohibits companies like RealPage from providing recommendations about rental prices or other rental terms based on analyzed data.  Specifically, the Rent Advice Statute makes it unlawful "for a residential rental property owner or manager to knowingly or with reckless disregard set or adjust rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions…based on recommendations from a software, data analytics service, or algorithmic device performing a coordinating function."  § 340-b(3).  The Statute also deems it unlawful "facilitat[ion]" to offer software that provides data-backed recommendations to "residential rental property owners or

managers" through a so-called "coordinating function," § 340-b(2). These dual speech prohibitions have expansive sweep, because the illegal "[c]oordinating function" covers any software that collects rental market data (including publicly available data), analyzes that data, and makes a recommendation even in part based on that analysis. § 340-b(c).

The Statute—which was designed to target RealPage, Ex. B (op-ed by Statute's bill sponsors calling for RealPage's prohibition)—bans protected speech. For example, as one of the bill's sponsors conceded on the Assembly floor, the common practice of "mom-and-pop style landlords" using tools like "ChatGPT" to analyze data available on the internet to help set rents "may fit the profile of price fixing" as the Statute defines it. Ex. A at 161–63. Through its expansive definitions, the Statute prohibits licensing or using software, or other algorithmic tools, that provide information and data-backed recommendations to property owners and managers. The Statute makes it "unlawful" to "facilitate an agreement between or among two or more residential rental property owners or managers to not compete with respect to residential rental dwelling units, including by operating or licensing a software, data analytics service, or algorithmic device that performs a coordinating function," and it declares that "[i]t shall be an unlawful agreement" to "set or adjust rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions in one or more of their residential rental properties based on recommendations from a software, data analytics service, or algorithmic device performing a coordinating function." § 340-b(2)–(3).

The Statute defines "coordinating function" as performing three subfunctions:

(i) collecting historical or contemporaneous prices, supply levels, or lease or rental contract termination and renewal dates of residential dwelling units from two or more residential rental property owners or managers…;

(ii) analyzing or processing the information described in subparagraph (i) of this paragraph using a system, software, or process that uses computation, including by using that information to train an algorithm; and

6

(iii) recommending rental prices, lease renewal terms, ideal occupancy levels, or other lease terms and conditions to a residential rental property owner or manager.

§ 340-b(1)(c).  However, the Statute exempts from its "coordinating function" definition anything used to support the State's prerogatives of "establishing rent or income limits in accordance with" various government-preferred regulations and programs, such as New York's "rent stabilization law…or an affordable housing program administered by a federal, state, or local government."  *Id.*

The stated purpose of the Statue is to address "notable increases" in New Yorkers' rents and "abnormally long apartment vacancy periods" in buildings.  Ex. B.  But bill sponsors provided scant evidence that use of RMS in New York—whether from RealPage or otherwise—caused increases in rents or housing vacancies.  *See id.*  When pressed on the Assembly floor about whether there was evidence that software was used for rental price collusion in New York, the sponsoring Assemblymember conceded that nobody had been proven guilty of such conduct.  Ex. A at 147.

The bill's sponsors also disregarded significant evidence demonstrating that rent increases, particularly in New York, are primarily driven by low housing supply, not software, and that the real solution to rising rents is allowing more residential construction.  *See, e.g.*, Ex. C at 1 (Urban Institute article explaining that "a massive supply shortage is causing high home prices and rents," and that "developers who build high-cost homes and apartments" are a "scapegoat[] that distract[s] from the underlying cause of high home prices and rents"); Ex. D ("Almost everyone agrees the main culprit for our skyrocketing house prices in…the United States is the extremely low number of houses for sale.").

Nor did the bill's sponsors explain why existing prohibitions on price collusion were inadequate to reach any rental price-fixing that may be occurring.  *See* Ex. E at 8 (explaining that "[p]ricing algorithms are neutral tools that can be used to benefit businesses and consumers alike"

and that "[p]olicymakers and enforcement agencies should go after the bad actors who use algorithms in malicious ways but should not ban or limit the use of the tool itself"). One bill sponsor even confirmed the bill merely attempted to "clarify[]…that using an algorithm is also collusion," which is already illegal if used to form an agreement in restraint of trade. Ex. A at 157.

The Statute vests the New York Attorney General with sweeping enforcement power. Under the relevant penalty provisions, a violation is a class E felony punishable, for a corporation, by a fine of up to $1 million, and for a natural person, a fine of up to $100,000 and up to four years' imprisonment. § 341. Additionally, the Attorney General may bring a civil action "to recover a penalty in the sum specified in section 341 for the doing…of any act" declared illegal, § 342-a—meaning up to $1 million per unlawful act for a corporation—and may seek injunctive relief and damages on behalf of any political subdivision or public authority who requests the Attorney General's involvement, §§ 342, 342-b. The Statute thus couples sweeping prohibitions on speech with felony liability, jail time, potentially crippling fines and penalties, plus damages and injunctive relief. Because of this, RealPage has already advised its New York customers that the Statute prohibits "the sale, distribution, and use of [its] procompetitive software" and expects to lose significant business as a result. Dreyfuss Decl. ¶ 27.

## LEGAL STANDARD

A party seeking a preliminary injunction against "government action taken in the public interest pursuant to a statute or regulatory scheme…must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Volokh*, 148 F.4th at 82. "Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *NYPPP*, 733 F.3d at 487.

8

## ARGUMENT

The Rent Advice Statute is unconstitutional facially and as applied to RealPage and its customers. Its overbroad speech restrictions suppress First Amendment freedoms. Indeed, by flatly banning RealPage's speech in advance, the Statute imposes an invalid prior restraint, "the most serious and the least tolerable infringement on First Amendment rights," long condemned as "presumptively unconstitutional" and requiring the government to "carr[y] a heavy burden of showing justification for the prior restraint." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976).

This Court should issue a preliminary injunction to protect the rights of RealPage, its customers, and others within New York while this litigation proceeds. Absent injunctive relief, RealPage and others face the dilemma of either self-censoring or subjecting themselves to crippling penalties and criminal prosecution for engaging in constitutionally protected speech and expression. The Court should enjoin the New York Attorney General from enforcing the facially unconstitutional Statute in its entirety. At minimum, the Court should enjoin its enforcement against RealPage and its customers so that RealPage can provide constitutionally protected advice and its customers can receive it without either facing the threat of criminal prosecution. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both."); *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928) ("[A]warding relief to one party may impose conditions protecting and giving effect to correlative rights of the other.").

## I.    RealPage Is Likely to Prevail on the Merits.

RealPage is likely to succeed in showing that the Statute is unconstitutional both facially and as applied to it and its customers. "In the ordinary case, it is all but dispositive to conclude

that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571. The Statute flunks that test: It imposes content-, viewpoint-, and speaker-based restrictions on speech, *see, e.g.*, *Reed*, 576 U.S. at 163 (a statute is "content based if a law applies to particular speech because of the topic discussed or the idea or message expressed"); *id.* at 168 (government "discriminat[es] among viewpoints" when regulation is based on "the opinion or perspective of the speaker"), and infringes on the right to create and disseminate information and advice, *see, e.g.*, *Sorrell*, 564 U.S. at 568, 570 ("information"); *Holder*, 561 U.S. at 26–27 ("advice"). The Statute is also facially overbroad because it "prohibits a substantial amount of protected speech relative to" any "legitimate sweep" it may have. *Hansen*, 599 U.S. at 769–70. It outlaws commonplace expressive activity, including using "ChatGPT" to analyze data available on the internet to help a "mom-and-pop style landlord[]" get advice about how to set their rents. Ex. A 161–63; *see also* Compl. ¶¶ 7–8, 51, 54, 60, 65–66. And the Statute is unconstitutional as applied to RealPage and its customers because it makes it illegal for RealPage to provide software that advises its customers or for its customers to receive such advice.

In light of the plainly unconstitutional sweep of the Statute, "the burden shifts to the State to show that it is likely to succeed in defending the challenged [law] under strict scrutiny." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021). The State cannot meet its burden under any form of heightened scrutiny, let alone show that the Statute's speech restrictions must be imposed during the pendency of this litigation. The Statute's sponsors were animated by bare allegations that RealPage's software facilitates collusion. Ex. B. That's wrong: RealPage's software never shows a customer a competitor's pricing or data, meaning the software cannot be used "to coordinate, collude, or conspire." Dreyfuss Decl. ¶¶ 19, 21. Any theory of collusion is made even more implausible here given the minimal use of RealPage's RMS in New York both

historically and currently.  Hitt Decl. ¶¶ 23–30.  And, if that were not enough, the evidence is undisputed that customers of RealPage RMS reject the software's recommendations a significant percentage of the time.  *Id.* ¶¶ 36–46.

A.    **The Rent Advice Statute Violates the First Amendment.**

The Statute, by equating data-backed "recommendations from…software" with illegal "facilitat[ion]" of "an agreement…to not compete," § 340-b(2)–(3), violates the First Amendment's protection for the creation and dissemination of information.  It imposes content-, viewpoint-, and speaker-based restrictions on speech, and it fails any level of heightened scrutiny under the First Amendment.

1.    <u>**The Rent Advice Statute Restricts Speech.**</u>

The First Amendment protects the "right to speak"—and the "creation and dissemination of information are speech within the meaning of the First Amendment," *Sorrell*, 564 U.S. at 568, 570.  "Information" is protected by the First Amendment whether it is profound or mundane— even "beer labels" and "credit report[s]" are protected.  *Id.* at 570 (internal quotation marks omitted).  "Facts, after all, are the beginning point of much of the speech that is most essential to advance human knowledge and conduct human affairs."  *Id.*  And true facts, like the information processed and presented by RealPage's RMS, are covered by core First Amendment protections. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–41 (1974).

The First Amendment also protects giving "advice."  *Holder*, 561 U.S. at 9, 26–27 (statute subject to First Amendment scrutiny where it prohibited certain "expert advice or assistance"). Sensibly so:  Advice conveys a viewpoint about what should be done, a kind of communication the First Amendment protects.

The First Amendment's protections are especially powerful where the government seeks to restrict speech based on viewpoint.  As the Supreme Court has repeatedly instructed, "[w]hen

the government targets…particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Vistors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) ("The First Amendment does not permit [government] to impose special prohibitions on those speakers who express views on disfavored subjects."). Barring "advice" "because of [its] viewpoint…strikes at the heart of the First Amendment." *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1041 (E.D.N.Y. 1993).

The Constitution also prohibits content-based regulations. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. In *Reed v. Town of Gilbert*, the Supreme Court confirmed that a town's "Sign Code," which "govern[ed] the manner in which people may display outdoor signs…based on the type of information they convey," imposed "content-based regulations of speech that cannot survive strict scrutiny." *Id.* at 159. This was so because the Sign Code imposed restrictions that "depend[ed] entirely on the communicative content of the sign." *Id.* at 164.

Both facially and as applied to RealPage and its customers, the Statute imposes content- and viewpoint-based "restrictions on the sale, disclosure, and use of…information," *Sorrell*, 564 U.S. at 563–64, and on giving "advice" about those topics, *Holder*, 561 U.S. at 26–27. The Statute imposes content-based restrictions because it makes it illegal to "set or adjust rental prices" or "other lease terms and conditions…based on recommendations from [] software" that collects and analyzes data to inform the recommendation. § 340-b. In other words, the Statute "applies to particular speech because of the topic discussed"; its "restriction[]…depend[s] entirely on the communicative content" of RealPage's software. *Reed*, 576 U.S. at 163–64. Just as the offending law in *Reed* discriminated among signs based on whether they related to church services, the

Statute discriminates among software-based speech based on whether it makes recommendations about rental prices and lease terms. *Cf., e.g.*, *Sorrell*, 564 U.S. at 564 (law was "content-based" when it limited "pharmaceutical" information used for business purposes); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108, 116 (1991) (law was "content-based" when prohibited sale of "works describing [convict's] crime").

The Statute also engages in viewpoint discrimination by regulating speech "based on 'the specific…perspective of the speaker'"—the most "'egregious form of content discrimination.'" *Reed*, 576 U.S. at 168 (quoting *Rosenberger*, 515 U.S. at 829). The *Sorrell v. IMS Health Inc.* Court considered a Vermont law that prohibited "pharmacies from disclosing [prescriber-identifying information] for marketing purposes," but provided "exceptions" for disclosures made "for 'health care research'" or for various other "purposes 'otherwise provided by law.'" 564 U.S. at 559–60. The law engaged in "viewpoint discrimination" because it prevented those involved in "marketing…brand-name drugs" from "communicating…in an effective and informative manner," while simultaneously condoning communication deemed to serve the preferred "goals of the state." *Id.* at 564–65 (citation omitted).

Here, the Statute bans software that advises on rental terms by defining it to be performing an illegal "coordinating function," § 340-b(1)(b)—essentially equating software, without basis, to a *per se* violation of antitrust law. But like in *Sorrell*, the Statute expressly authorizes software advice to set rents "in accordance with" certain "affordable housing program[s]," including New York's own "rent stabilization law," § 340-b(1)(c). The Statute's "practical effect" is thus to prohibit advice on rental terms that the Statute deems "in conflict with the goals of the state" while allowing speech aligned with State policy goals—just as the *Sorrell* law preferentially treated health care research over commercial drug transactions. 564 U.S. at 565 (citation omitted); *see*

13

*also Sale*, 823 F. Supp. at 1040 (unconstitutional to permit only "advice" presented "from the viewpoint of which the Government approves"). Further, the "[S]tatute's stated purpose[]," *Sorrell*, 564 U.S. at 565, is to target advice given by "software…to consider market data…and…recommend[] rents" in a way that the Statute's legislative sponsors believed was "designed to maximize profits for landlords." Ex. B. In reality, the sponsors do not understand how RealPage's software works—in many cases "the software promptly recommends lowering th[e] price" of units "in accordance with demand…at that property." Dreyfuss Decl. ¶ 6. But even if the sponsors were right, they sought to discriminate against advice expressing the viewpoint that rental market conditions support taking steps to increase profits. And, by illegalizing only advice about rents for *unregulated* units, the Statute restricts profit-oriented speech—while allowing speech focused on governmental rent caps and maintaining or lowering rents.

Beyond content- and viewpoint-discrimination, the Statute also impermissibly imposes "speaker-based restrictions" in violation of the First Amendment. *Sorrell*, 564 U.S. at 563; *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 576 (1983) (use tax was speaker-based where it "impose[d] a special tax on the press"); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."). Here, the Statute prohibits speech from particular speakers and to particular audiences—those who provide software-driven "recommendations" about rental terms to "residential property owners or managers," and the "residential property owners and managers" who receive them. § 340-b(2)–(3). For instance, while a "rental property owner" cannot use RealPage's software to help determine the rent to offer a tenant—or even use an AI chatbot to analyze public data and recommend lease terms—a tenant may employ like tools to negotiate with a property. *See id.* The Statute thus unconstitutionally

14

"burdens disfavored speech by disfavored speakers."  *Sorrell*, 564 U.S. at 564.

The Statute's First Amendment violations are not alleviated just because RealPage's "recommendations" are conveyed via software or "algorithms."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 734 (2024).  The Constitution protects speech regardless of how it is transmitted.  The First Amendment disfavors "[l]aws enacted to control or suppress speech," regardless of whether they attempt to regulate "different points in the speech process," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010), or the "ever-advancing technology" used to convey speech and information, *NetChoice*, 603 U.S. at 733 (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011)).  The First Amendment protects "website[s] [and] mobile app[s]" with feeds of "recommendations…achieved through the use of algorithms," *id.* at 734; "video games," *Brown*, 564 U.S. at 790; and even basic "computer programs," *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447 (2d Cir. 2001).  All of these "convey[]…information," which makes them "'speech' for purposes of the First Amendment."  *Id.*

By "conveying…information," RealPage's software engages in "'speech' for the purposes of the First Amendment."  *Id.*  Banning the means for speech is still a ban on speech—just as government cannot evade First Amendment scrutiny by banning printing presses rather than books, the State cannot evade First Amendment scrutiny by banning software that advises on rents rather than banning the advice itself.  *See Sorrell*, 564 U.S. at 566 ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

Additionally, by penalizing advice and information so broadly and severely, the Statute unconstitutionally chills protected speech.  While the Statute's legislative sponsors may have meant to target only recommendations to raise rents—which would itself constitute unconstitutional viewpoint discrimination—the Statute imposes liability for any data-driven

advice on rental pricing.  Such a borderless prohibition risks the exact sort of "chilling effect" that the Supreme Court has repeatedly warned creates the "hazard of self-censorship."  *Counterman*, 600 U.S. at 75 (citation omitted).  By imposing severe penalties for conduct defined as broadly as using an AI chatbot to assess Zillow data, rational people will "steer far wider of the unlawful zone," abandoning protected speech entirely.  *Sullivan*, 376 U.S. at 279 (citation omitted).

### 2.    The Rent Advice Statute Fails Strict Scrutiny.

Content-, viewpoint-, and speaker-based restrictions on speech like the Statute are "presumptively unconstitutional" and subject to "strict scrutiny."  *Reed*, 576 U.S. at 157, 163; *Sorrell*, 564 U.S. at 564–65.  Here, where the Statute "is content based and…viewpoint discriminatory," that is "all but dispositive."  *Sorrell*, 564 U.S. at 571.

The Statute fails strict scrutiny because the State cannot "prove[] that the [Statute] [is] narrowly tailored to serve compelling state interests."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (citation omitted) ("*NIFLA*").  The stated purpose of the Statute is to stop collusive pricing and keep rental prices under control.  Even if these constitute sufficiently compelling state interests, the Statute in "a substantial number of [its] applications [is] unconstitutional," *NetChoice*, 603 U.S. at 723 (quotation marks omitted).  It is unconstitutional as applied to RealPage and its customers—RealPage's software *cannot* be used for price collusion, Dreyfuss Decl. ¶¶ 19, 25; Hitt Decl. ¶¶ 31–35, meaning the Statute's application to RealPage's software *does not* advance the State's claimed interests.  And the State cannot meet its "obligation to prove that [any] alternative[s] will be ineffective to achieve its goals."  *Playboy*, 529 U.S. at 816.  "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it" instead of suppressing speech.  *Playboy*, 529 U.S. at 815; *see, e.g.*, *id.* at 816 (finding that an already existing statute "was capable of serving as an effective, less restrictive means of reaching the Government's goals.").

16

First, the Statute fails narrow tailoring because the State could have pursued its objectives through less burdensome alternatives that do not restrict speech, such as encouraging an increase in housing supply; enforcing existing antitrust laws; or adopting regulatory measures that actually target rental prices and price-fixing agreements instead of equating certain content-, viewpoint-, and speaker-based speech with agreements in restraint of trade. *Playboy*, 529 U.S. at 816; *accord NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (state could have "rel[ied] on existing criminal laws that prohibit related unlawful conduct"); *see also, e.g.*, *Citizens United*, 558 U.S. at 361 ("more speech, not less, is the governing rule" under our "law and tradition"). *Playboy* is particularly instructive: There, the Supreme Court struck down one subsection of a statute for imposing content-based restrictions when another, less restrictive subsection could serve as an adequate alternative. 529 U.S. at 827. So too here: Collusion to fix prices, when it actually exists, is already a violation of federal antitrust laws (*e.g.*, the Sherman Act, 15 U.S.C. § 1). It is also illegal under various New York laws that neighbor (and pre-date) the Rent Advice Statute, including the Donnelly Act, § 340, which is similar to the federal Sherman Act; § 349, which provides broad private rights of action against deceptive acts and practices; and the Attorney General's authority under Executive Law § 63(12) to seek redress for any "persistent fraud or illegality." The State has not suggested these laws fail to reach actual property owner or manager agreements not to compete, whether they come about through software or otherwise. And the Statute's sponsors have not identified any instances of RMS being used in a collusive, anticompetitive manner in New York. Ex. A at 147. To the contrary, the State Attorney General investigated RealPage's RMS in 2022 and 2023 and, after receiving full cooperation and information from RealPage, discontinued its investigation without action. Weissman Decl. ¶¶ 2–4.

17

Second, the Statute fails narrow tailoring because it is vastly overbroad.  The Statute could have potentially imposed narrow restrictions focused on improper or unlawful conduct, such as where property owners and managers actually agree to fix prices via software.  Instead, it makes it "an unlawful violation" simply to "operat[e] or licens[e] a software" that recommends rental prices or terms, or to set rental terms "based on recommendations from [] software" that analyzes data. § 340-b(2)–(3).  The Statute's prohibition applies even when advice or recommendations are based solely on publicly available data so long as the data comes "from two or more residential property owners or managers." § 340-b(1)(c)(i).  The Statute's sponsor even acknowledged that the Statute would probably prohibit "mom-and-pop style landlords" from using "ChatGPT" to analyze data from "Zillow"—even though the Statute's sponsor *also* conceded that activity "*is not actually colluding with other landlords.*" Ex. A at 161–62 (emphasis added).  But the Statute still prohibits these recommendations.

The Statute's overbreadth worsens its chilling effects.  *See supra* at 16.  The Statute illegalizes everything from major corporate landlords employing cutting-edge algorithms to analyze rental market data to the owner of a single rental unit using Excel's =AVERAGE function on StreetEasy's listings of neighborhood rents.  *See* § 340-b(1)(c).  And it is no defense for the State to say it won't pursue the mom-and-pop offenders at the bottom of the continuum.  "[T]he First Amendment protects against the government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).  Either the Statute illegalizes an overbroad swath of expression or it vests the State with unbridled discretion to select which speech to penalize.  And when a law gives "law enforcement…unbridled discretion" to police "'only that expression which…officials will tolerate,'" that infringes upon "constitutionally protected speech." *Hulinsky v. County of Westchester*, 2025 WL 835646, at *12 (S.D.N.Y. Mar. 14, 2025)

(quoting *Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970));
*accord Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940).

The Statute's carveout for advice about complying with State-preferred affordable housing
programs does not lessen its overbreadth problem.   Rather, it confirms the Statute inflicts
viewpoint discrimination by exempting speech not "in conflict with the goals of the state," *Sorrell*,
564 U.S. at 565 (citation omitted), and "prohibits a substantial amount of protected speech relative
to" any "plainly legitimate sweep," *Hansen*, 599 U.S. at 770 (quotation marks and citation
omitted).   "Approximately one million of New York City's 2.3 million rental units are considered
to be 'market rate,'" meaning they are "available on the private market without any regulation as
to how much rent can be charged."  Ex. F.  Property owners and managers responsible for these
approximately one million units are simply banned from receiving data-driven recommendations
about their business from software like RealPage's.

### 3.    The Rent Advice Statute Does Not Regulate "Commercial Speech" and in Any Event Would Fail Intermediate Scrutiny.

The State may argue that the Rent Advice Statute only polices "commercial speech" and
thus need only satisfy intermediate scrutiny.  That argument fails.  The Statute regulates far more
than "commercial speech," engages in impermissible viewpoint discrimination, and cannot survive
even intermediate scrutiny.

Commercial speech is generally "speech that does no more than propose a commercial
transaction."  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (citing *Va. State Bd.
of Pharm.*, 425 U.S. at 762).  The speech targeted here—the generation and dissemination of
information about rental practices and recommendations and advice on those rental practices—
does not propose any transaction between the speaker (RealPage) and another party (the property
owner or manager).  The State cannot avoid constitutional scrutiny when it bans speech

recommending one product over another—say, an article from Consumer Reports or Wirecutter about which headphones are the best value—simply because the advice has some bearing on a potential transaction. *See Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech."); *see also Volokh*, 656 F. Supp. 3d at 442–43. Yet the Statute makes it illegal for RealPage to provide "residential rental property owners or managers" with "recommendations from [its] software" about their rental practices. § 340-b(2)– (3). The Statute outlaws receiving advice, not how property owners and managers might act. The Statute is not a neutral commercial-advertisement regulation—it is a broad restriction on the free flow of information.

Even if the Statute is viewed as a regulation of commercial speech (it's not), "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context." *Wandering Dago, Inc. v. Desito*, 879 F.3d 20, 39 (2d Cir. 2018); *accord Matal v. Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring) ("Commercial speech is no exception" to "the First Amendment"). In *Desito*, the Second Circuit held that the government engaged in viewpoint discrimination by denying a food truck license because it determined the truck's "use of ethnic slurs" in its branding "was 'offensive.'" 879 F.3d at 31. After confirming that the government had engaged in viewpoint discrimination because it had acted "based on the government's disapproval of the speaker's choice of message," the Court explained that "viewpoint discrimination…violates the First Amendment unless it is narrowly tailored to achieve a compelling government interest," i.e., unless is satisfies strict scrutiny. *Id.* at 32, 39 (quotation marks omitted). So too here: The Statute disapproves of messages regarding recommended rents based on factors, including publicly available data, while allowing messages that support

20

government-imposed rent caps; it "target[s] those speakers and their messages for disfavored treatment." *Sorrell*, 564 U.S. at 565. It is subject to strict scrutiny, which the Statute cannot pass. *See supra* at 16.

Regardless, even if the Statute did restrict only "commercial speech," it still cannot survive "intermediate scrutiny." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014). To pass intermediate scrutiny, the State "bears the burden" to show that the Statute (1) is premised on a "substantial" "asserted government interest," (2) "directly advances the governmental interest asserted," and (3) "is not more extensive than is necessary to serve that interest." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183–84 (1999) (citation omitted).

First, the Statute does not "directly advance[]" any government interest. To the extent the interest is regulating rental prices, the Statute does not actually do so—it bans information and advice about rental pricing without regard to how it is used or what prices are ultimately set. Nor does it directly advance a goal of lowering housing prices—academics and policy wonks all agree the real driver of rising housing costs is a lack of supply, which the Statute does not address. *See supra* at 7. If anything, the Statute makes it costlier to supply housing—as one Assemblymember observed, the Statute "kill[s] the housing market" by making it harder for property owners and managers to make enough money "to keep up with the maintenance and the taxes" necessary to keep their units on the market. Ex. A at 166.

Nor does the Statute advance any interest in making the housing market more efficient. Algorithmic pricing tools like RealPage's RMS are *pro*competitive. As the Ninth Circuit recently explained in a case involving an analogous RMS product, RMS "do[es] not restrain trade in the market for [housing] rentals"—it provides a "means by which competitors might compete," since "pricing one's [rental housing] in a manner calculated to maximize profits is how one competes."

21

*Cendyn Grp.*, 148 F.4th at 1082–83.  The *Cendyn* plaintiffs claimed it was anticompetitive for Las Vegas hotel room lessors to use RMS from the same vendor to obtain algorithmic pricing recommendations based on the lessors' "granular pricing and occupancy data" and asserted that the adoption of RMS led to "artificially inflated prices for hotel rooms."  *Id.* at 1076–79.  The Ninth Circuit rejected this claim because "the provision of pricing information does not affect the incentive to compete" and instead enables lessors to "make better informed decisions regarding their offerings."  *Id.* at 1084.  Lessors need not "turn a blind eye to information simply because its competitors are also aware of that same information."  *Id.* at 1084.  The same is true for pricing residential housing.  Yet the Statute bars software recommendations based even on *public* information about rental terms.  Such a law ultimately harms tenants:  Algorithmic pricing tools allow property owners and managers to respond efficiently to shifts in demand, meaning there is more housing on the market and fewer vacancies.  *See, e.g.*, Ex. E at 4 (algorithmic price discovery "helps match supply to demand more efficiently by incentivizing consumption during low-demand periods and disincentivizing it when there is an excess of demand relative to supply"); Ex. G (Colorado Governor explaining, in vetoing a bill, that "[w]e should not inadvertently take a tool off the table that could identify vacancies and provide consumers with meaningful data to help efficiently manage residential real estate to ensure people can access housing"); Ex. H (software like RealPage simply facilitates "knowing the current state of the market," which helps "keep[] lodgings rented (neither vacant because priced too high nor too scarce because priced too low)"); Ex. I (Wall Street Journal op-ed observing that "RealPage is merely helping landlords ascertain market rates," and that "[o]ne ironic result" of banning the company's RMS "could be higher rents since landlords may be slower to respond to easing market conditions in areas with growing supply").  Whatever interest the State hopes to promote, banning procompetitive tools like

RealPage's software cannot directly advance it.

Second, the Statute sweeps far more broadly than necessary.  "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort."  *United States v. Caronia*, 703 F.3d 149, 168 (2d Cir. 2012) (citation omitted).  Here, as discussed *supra* at 18, the State has "[n]umerous, less speech-restrictive alternatives" for policing supposed price collusion, *Caronia*, 703 F.3d at 167, such as enforcing existing antitrust law.  But the Statute sweeps far wider, forbidding property owners and managers from receiving certain advice on rental terms, regardless of whether they do so for legitimate, lawful purposes.  And RealPage's software does not pose the risks the State worries about—the software "recommends lowering…price[s]" when the data supports it, and its current software "do[es] not use any non-public competitor data…to generate price recommendations or for any other purpose," meaning it is impossible to use its software "to coordinate, collude, or conspire."  Dreyfuss Decl. ¶¶ 6, 19, 20. The State "cannot regulate speech that poses no danger to the asserted state interest," nor can it "suppress information when narrower restrictions on expression would serve its interest as well." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 565 (1980).

### 4. The Rent Advice Statute Cannot Be Justified Based on the Claim That RealPage's Software Violates Existing Antitrust Law.

If the State tries to justify the Statute's speech restrictions on the notion that RealPage's software can be used in anticompetitive ways, this is both wrong and insufficient to defeat RealPage's motion.

Where existing law "serve[s] as an effective, less restrictive means of reaching the Government's goals," a new law that restricts speech to achieve the same goal violates the First Amendment.  *Playboy*, 529 U.S. at 816; *accord, e.g.*, *Brooklyn Branch of NAACP v. Kosinski*, 657 F. Supp. 3d 504, 529 & n.14 (S.D.N.Y. 2023) (statute prohibiting offering food and drinks to

people waiting in line to vote failed strict scrutiny because "voter intimidation" was "already regulated by New York's" existing statutes).  Here, price-fixing agreements are already illegal under state and federal law.  *Supra* at 17.  The legislative record concedes as much:  The Statute is merely an attempt to "clarify[]...that using an algorithm is also collusion."  Ex. A at 157.  Where targeted conduct is already illegal, the State cannot use it to justify an overbroad speech restriction.

In any event, the State cannot prove that RealPage's software violates antitrust law.  The U.S. Department of Justice recently settled its antitrust claims against RealPage through a proposed consent decree.  That proposed consent decree allows RealPage to license current and planned versions of RMS—the versions that the Rent Advice Statute would ban—across the United States because the lawsuit's theories of antitrust harm were fully addressed by the proposed decree.  Ex. J.  The State of Nevada has likewise settled and dismissed its antitrust lawsuit against RealPage. Ex. K.  While other lawsuits against RealPage remain pending, all of them target prior versions of RealPage's software that meaningfully differ from the operative versions implicated by the Statute, and none of those lawsuits can succeed on the merits.

For RealPage's RMS to constitute or facilitate an antitrust violation, the law requires an agreement that unreasonably restrains trade.   This requires both (i) an agreement between independent entities, and (ii) likely anticompetitive effects that outweigh likely procompetitive effects.  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018).  Here, the State can show neither. RealPage's software licenses are "ordinary sales contract[s]" that "do not restrain trade in the market for [housing] rentals" because they "do not restrain competition among [lessors] in th[ose] market[s], nor do they restrain the [lessors'] abilities to compete in th[ose] market[s]."  *Cendyn*, 148 F.4th at 1082–83.  "[T]he software is not an input that goes into the production of [housing] for rentals" and "is not a restraint of [a lessor's] ability to price its [] rentals."  *Id.* at 1082.  "[T]he

provision of [] pricing information" to lessors "does not affect the incentive to compete in th[e] market." *Id*. at 1084. Rather, RealPage's "revenue management software" is simply a "tool in the struggle for commercial advantage" and a "means by which competitors might compete." *Id*. at 1083.

Nor is there any evidence from which to infer an unlawful agreement between RealPage's customers to delegate price-setting to RealPage or adopt RealPage's price recommendations. RealPage's customers adopted different versions of RealPage's three separate RMS products at different times, over a two-decade period, based on their unique business needs, in response to different and evolving market conditions. *See Park Irmat Drug Corp. v. Express Scripts Holding Co*., 911 F.3d 505, 516–17 (8th Cir. 2018) (actions six months apart under dissimilar circumstances did not support inference of illegal agreement); *In re Musical Instruments & Equip. Antitrust Litig*., 798 F.3d 1186, 1193 (9th Cir. 2015) (inference of illegal agreement requires "competitors adopting *similar* policies around the *same* time" (emphases added)). And it is simply implausible that lessors could use RealPage's software for price coordination. The recommendations made by RealPage's RMS are highly individualized, based on over 100 parameters set by the customer to reflect the customer's unique asset strategy for the particular property and floorplan. Dreyfuss Decl. ¶¶ 5, 12. No customer ever receives access to another customer's data or recommendations, and the recommendations vary lessor-to-lessor, property-to-property, floorplan-to-floorplan, and unit-to-unit. *Id.* ¶¶ 13, 19; Hitt Decl. ¶ 35. And RealPage customers deviate from RealPage's recommendations a significant percentage of the time. Hitt Decl. ¶¶ 36–46; *see Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *2, *5 (D.N.J. Sep. 30, 2024) (price coordination via software "quite implausible" where users could reject recommendations at their discretion).

Further, even if the State could prove the existence of an agreement restraining trade, it

could not show anticompetitive effects, an indispensable element of an antitrust violation.  *See Am. Express*, 585 U.S. at 541.  Very few rental units in New York receive rent recommendations from RealPage's software.  Hitt Decl. ¶¶ 23–30.  RealPage's RMS combined penetration rate across the State is approximately 2% for rental units and 3% for rental units in buildings with five or more units, and there is no geographic area within the State in which the combined penetration rate of RealPage's RMS exceeds 21%.  *Id.* ¶¶ 28–29.  With such low penetration rates, any attempted pricing conspiracy would be an "exercise in futility."  *Erie County v. Morton Salt, Inc.*, 702 F.3d 860, 872 (6th Cir. 2012); *see In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 n.22 (S.D.N.Y. July 31, 2023) ("market share of between 30 and 40%" insufficient for market power); Hitt Decl. ¶¶ 23, 30.  Without market penetration far beyond what RealPage has ever achieved, there can be no anticompetitive effects.  Hitt Decl. ¶¶ 23–30; *see also United States v. Visa USA, Inc.*, 344 F.3d 229, 237 (2d Cir. 2003) (a plaintiff "must demonstrate that the defendant conspirators have 'market power' in a particular market for goods or services.").  The Statute thus cannot be constitutionally applied to RealPage.

*    *    *

The Statute fails any level of First Amendment scrutiny.  The State cannot meet its burden of showing a "harm" to be remedied that is more than "purely hypothetical" or that the Statute's speech "restrictions will…alleviate [any harm] to a material degree."  *Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994).  The State cannot make such a showing, either as to the full sweep of the Statute or its application to RealPage and its customers.

## II.    The Irreparable Harm to RealPage and the Public Interest Strongly Support Immediate Relief.

The Rent Advice Statute—which suppresses constitutionally protected speech—will cause RealPage irreparable harm.  "The loss of First Amendment freedom, for even minimal periods of

26

time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Courts have repeatedly granted preliminary injunctions against similar government infringements on freedom of speech. *See, e.g.*, *Agudath Israel*, 983 F.3d at 637; *NYPPP*, 733 F.3d at 487; *Bronx Household*, 331 F.3d 342. The Statute would irreparably harm RealPage and its customers by forcing them to stop speaking and receiving protected speech—RealPage will have to stop licensing or materially diminish its advice-giving software in New York, or it risks felony prosecutions and significant financial penalties (penalties its customers would also face). Dreyfuss Decl. ¶ 26; § 341. Given the severity of the Statute, RealPage already advised its New York customers that the Statute prohibits "the sale, distribution, and use of [its] pro-competitive software" and expects to lose business as a result. Dreyfuss Decl. ¶ 27. In other words, denying relief now "would impose a substantial hardship on [RealPage], forcing [it] to choose between refraining from [protected] speech on the one hand, or engaging in that speech and risking costly…proceedings and criminal prosecution on the other." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014).

The public interest and the balance of the equities also favor immediate relief against the enforcement of the unconstitutional Statute. Where the "[g]overnment is the opposing party," the balance of equities and public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]f the statute is likely unconstitutional, the public is irreparably harmed by the legislature's infringement on First Amendment freedoms and any resulting chilling effect on expression." *Volokh*, 148 F.4th at 82.

The balance of equities and the public interest tip strongly in RealPage's favor because the State has no interest in "maintaining an unconstitutional policy." *Agudath Israel*, 983 F.3d at 637. The Statute harms the public interest by staunching "the free flow of information," *Va. State Bd. of Pharm.*, 425 U.S. at 65, in violation of the public's "First Amendment right to receive

information and ideas," *id.* at 757 (internal quotation marks omitted).  Moreover, there can be no pressing need to enforce the Statute—there is no evidence that software-based price collusion is actually happening, and even if it were, existing law, including antitrust and consumer-protection law, already bars price collusion.  A preliminary injunction—even if limited to RealPage's RMS and its customers—would simply "preserve the relative positions of the parties until a trial on the merits can be held."  *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

## CONCLUSION

RealPage respectfully requests that this Court issue a preliminary injunction barring the enforcement of New York General Business Law § 340-b.  At a minimum, the Court should enjoin enforcement of the Statute against RealPage and its customers.

Respectfully submitted,

December 5, 2025

By:  /s/ *Theodore J. Boutrous, Jr.*

Theodore J. Boutrous Jr.
   tboutrous@gibsondunn.com
Jay P. Srinivasan (*pro hac vice pending*)
   jsrinivasan@gibsondunn.com
Bradley J. Hamburger (*pro hac vice*)
   bhamburger@gibsondunn.com
Alexander N. Harris (*pro hac vice pending*)
   aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Ave.
   Los Angeles, CA  90071-3197
   Telephone:   213.229.7000

Connor S. Sullivan
   cssullivan@gibsondunn.com
Jacob U. Arber
   jarber@gibsondunn.com
Michael Klurfeld
   mklurfeld@gibsondunn.com

Iason Togias
    itogias@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000

*Attorneys for Plaintiff RealPage, Inc.*

## **WORD COUNT CERTIFICATION**

I, Theodore J. Boutrous Jr., an attorney duly admitted to practice law before this Court, hereby certify pursuant Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Rule 7.1(c) because it contains 8748 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
        December 5, 2025

*/s Theodore J. Boutrous Jr.*
Theodore J. Boutrous Jr.
