UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REALPAGE, INC.,

                                    Plaintiff,

            - against -                                    Case No. 1:25-cv-9847 (VEC)

LETITIA JAMES, in her official capacity as the
Attorney General of the State of New York,

                                    Defendant.


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION TO DISMISS THE COMPLAINT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**


                         LETITIA JAMES
                         Attorney General
                         State of New York
                         28 Liberty Street
                         New York, New York 10005
                         Tel.: (212) 416-8673


YUVAL RUBINSTEIN
Special Litigation Counsel
    of Counsel

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................ 3

    A.    Pricing Algorithms Facilitate Hub-and-Spoke Arrangements That Distort Market Competition ................................................................................ 3

    B.    October 25, 2022 *ProPublica* Article ........................................................ 5

    C.    Plaintiff and its Landlord Clients Face a Flurry of Scrutiny and Lawsuits ............... 6

    D.    S.7882 is Enacted on October 16, 2025 ..................................................... 7

STANDARDS OF REVIEW ........................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.      PLAINTIFF'S FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW ......... 9

    A.    S.7882 Does Not Restrict Any Protected Speech ....................................... 9

    B.    Plaintiff's Challenge to S.7882 Both Facially and As Applied to Plaintiff's Landlord Clients Fails As a Matter of Law ............................... 12

II.    PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION MUST BE DENIED ................................................................................................... 13

    A.    Plaintiff Fails to Establish a Clear or Substantial Likelihood of Success on the Merits of its First Amendment Claim ..................................... 14

          1.    S.7882 Satisfies Intermediate Scrutiny Under *Central Hudson* ............. 14

          2.    S.7882 is Not Subject to Strict Scrutiny .................................... 21

          3.    Plaintiff's Purported Antitrust Analysis is Immaterial to the Constitutionality of S.7882 ................................................. 23

    B.    The Remaining Preliminary Injunction Factors Weigh Decisively in Defendant's Favor ................................................................... 25

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

CASES                                                                                         Page(s)

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .....................................10

*Am. Medical Ass'n v. FTC*, 638 F.2d 443 (2d Cir. 1980) ...............................................................21

*Am. Medical Ass'n v. FTC*, 455 U.S. 676 (2009) ...........................................................................21

*Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011).....................................8

*Anderson v. Treadwell*, 294 F.3d 453 (2d Cir. 2002) ....................................................................15

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ........................................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................8

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ......................................................................24

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)....................................18, 19, 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................8

*Boelter v. Hearst Communications, Inc.*, 192 F.Supp.3d 427 (S.D.N.Y. 2016).....................15, 17

*Bordell v. General Electric, Inc.*, 922 F.2d 1057 (2d Cir. 1991).....................................................12

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ...........................................................21, 22

*California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972).............................10

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ................... *passim*

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018).....................................................12

*Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94 (2d Cir. 2010)............................14

*Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540 (2d Cir. 2023)...............12

*CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025) ...................................................................22

*Connecticut Bar Ass'n v. U.S.*, 620 F.3d 82 (2d Cir. 2010) ....................................................15, 16

*Council for Responsible Nutrition v. James*, 2024 WL 1700036 (S.D.N.Y. Apr. 19, 2024)..........25

*Council for Responsible Nutrition v. James*, 159 F.4th 155 (2d Cir. 2025) .......... 16-17, 19, 22, 25

*Duffy v. Yardi Systems, Inc.*, 758 F.Supp.3d 1283 (W.D. Wash. 2024) .......................................17

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ............10

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................................................14, 24

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ....................................9, 10, 12

*Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) ........................................................21

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ................................................ *passim*

*Gibson v. Cendyn Group, LLC*, 148 F.4th 1069 (9th Cir. 2025) ...................................................18

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) .................................13

*Hudson Shore Assoc. Limited Partnership v. New York*, 139 F.4th 99 (2d Cir. 2025) .................12

*Interstate Cir., Inc. v. U.S.*, 306 U.S. 208 (1939) ..........................................................................4

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286
(2d Cir. 1992) .................................................................................................................................10

*Maryland v. King*, 567 U.S. 1301 (2012) .....................................................................................25

*Matal v. Tam*, 582 U.S. 218 (2017) ...............................................................................................16

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ...............................................................8

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ......................................................................3, 18, 25

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...................................................................10, 12

*National Retail Federation v. James*, No. 25 Civ. 5500, 2025 WL 2848212
(S.D.N.Y. Oct. 8, 2025) .................................................................................................................22

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) ...................................................14

*National Soc. of Professional Engineers v. U.S.*, 435 U.S. 679 (1978) .......................................10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) ............................................11

*Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360 (2d Cir. 2025) ........................... 15-16

*N.Y. State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025) ..............................................13

*N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 545 F.Supp.2d 363 (S.D.N.Y.
2008) ...............................................................................................................................................25

*N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) ............15, 25

*Nixon v. Shrink Gov't PAC, Inc.*, 528 U.S. 377 (2000) ...................................................24

*Real Estate Bd. of N.Y., Inc. v. City of New York*, 786 F.Supp.3d 788 (S.D.N.Y. 2025) ...............17

*In re RealPage, Inc., Rental Software Antitrust Litigation*, 709 F.Supp.3d 478 (M.D. Tenn. 2023) ...............................................................................................................6

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ...............................15

*Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006) ...................................................9, 10, 11

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .................................................11, 23

*Sussman v. Crawford*, 488 F.3d 136 (2d Cir. 2007) ...........................................13

*TikTok Inc. v. Garland*, 604 U.S. 56 (2025) .................................................9, 23

*Tyler v. City of Kingston*, 74 F.4th 57 (2d Cir. 2023) ...........................................24

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) .........................................10

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) .............................22

*U.S. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ...................................................4

*U.S. v. Caronia*, 703 F.3d 149 (2d Cir. 2012) .....................................................20

*U.S. v. Rowlee*, 899 F.2d 1275 (2d Cir. 1990) .....................................................10

*Vidal v. Elster*, 602 U.S. 286 (2024)...............................................................16

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)................................12, 13

*Volokh v. James*, 656 F.Supp.3d 431 (S.D.N.Y. 2023) .............................................15

*Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) ....................................................15

*Vugo, Inc. v. City of New York*, 931 F.3d 42 (2d Cir. 2019) ...................................*passim*

*Walden v. Kosinski*, 153 F.4th 118 (2d Cir. 2025) ...............................................22

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018) .....................................16

*Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005) .................10, 13

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .........................................................13

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626 (1985)..........22

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I .................................................................................. *passim*

**FEDERAL RULES**

Fed. R. Civ. P. 8 .........................................................................................8

Fed. R. Civ. P. 12(b)(1).................................................................................1, 8

Fed. R. Civ. P. 12(b)(6).................................................................................1, 8, 12

**STATE STATUTES**

N.Y. Gen. Bus. Law § 340-b...........................................................................*passim*

N.Y. Gen. Bus. Law § 340-b(1(c) ...................................................................20

N.Y. Gen. Bus. Law § 340-b(1)(c)(i) – (iii) .....................................................8

N.Y Gen. Bus. Law § 340-b(1)(c)(iii). ............................................................10

N.Y Gen. Bus. Law § 340-b(2) .......................................................................7

N.Y Gen. Bus. Law § 340-b(3). ......................................................................7

**MISCELLANEOUS AUTHORITIES**

Ariel Ezrachi & Maurice E. Stucke, *Sustainable and Unchallenged Algorithmic Tacit Collusion*, 17 NW. J. TECH. & INTELL. PROP. 217 (2020). ......................................4

Robin Feldman & Caroline A. Yuen, *AI and Antitrust: "The Algorithm Made Me Do It"*, 34 COMPETITION J. 1 (2024). ..........................................................................4

Michal S. Gal, *Limiting Algorithmic Coordination*, 38 BERKELEY TECH. L.J. 173 (2023)........................................................................................................3, 17

OECD, *Hub-and-spoke arrangements – Note by the United States* 2 (Nov. 28, 2019), https://tinyurl.com/mwzdbem7. ......................................................................4

Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, FTC (May 23, 2017), https://tinyurl.com/yvyajhdb.....................................................4-5

Defendant Letitia James ("Defendant"), in her official capacity as New York State Attorney General, respectfully submits this memorandum of law in support of her motion to dismiss the Complaint (ECF No. 1), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and in opposition to Plaintiff RealPage, Inc.'s ("Plaintiff") motion for a preliminary injunction (ECF Nos. 19-25), together with the accompanying Declarations of Elinor R. Hoffmann ("Hoffmann Decl.") and Yuval Rubinstein ("Rubinstein Decl.").

## PRELIMINARY STATEMENT

Rent is one of the most significant monthly household expenses, as New Yorkers know all too well, and recent technological advances have proven to be a major factor in making rent more unaffordable. Landlords in New York and throughout the country have relied upon sophisticated pricing algorithms that may enable them to charge much higher rents than a competitive market would yield. Although Plaintiff is by no means the only technology company that landlords have turned to, Plaintiff's unabashed zeal in promoting its software to stifle competition in the rental housing market is particularly egregious.

In October 2022, an investigative website published a lengthy exposé shining the spotlight upon Plaintiff. *See* Heather Vogell, *Rent Going Up? One Company's Algorithm Could be Why*, PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent. The exposé described how Plaintiff's algorithmic software facilitated a "hub-and-spoke" arrangement: Plaintiff's software collected reams of granular data from landlords, which was blended with public data to generate price "recommendations." The landlords utilized these recommendations to hike rents instead of competing with one another for renters' business. Plaintiff itself boasted that these recommendations helped landlords "outperform the market" under the motto "a rising tide lifts all boats." Plaintiff also pressured landlords to adhere to these

"recommendations" lest they offer favorable rental terms to attract business. As one of the architects of Plaintiff's software derisively put it: "[i]f you have idiots undervaluing, it costs the whole system."

The October 2022 exposé triggered a wave of antitrust lawsuits against Plaintiff and its landlord clients throughout the country. The U.S. Department of Justice ("DOJ") soon opened an investigation and filed its own lawsuit against Plaintiff in August 2024. The State of New York is at the forefront of the burgeoning movement to address such anticompetitive conduct at the state level. On October 16, 2025, Governor Hochul signed into law Senate Bill S.7882 ("S.7882"). S.7882 strengthens New York's venerable antitrust statute, the Donnelly Act, by making it unlawful to utilize a pricing algorithm's "coordinating function" to facilitate an agreement amongst two or more landlords not to compete. *See* N.Y. Gen. Bus. Law § 340-b.

Plaintiff filed this lawsuit on November 26, 2025, just two days after it entered a proposed consent judgment with DOJ and nineteen days before S.7882 went into effect. The Complaint alleges that S.7882 violates the First Amendment, both facially and as applied to Plaintiff and its landlord clients, by restricting Plaintiff's algorithmic software from generating price recommendations to landlords. Plaintiff's core argument is that these recommendations merely convey "advice" to landlords, which is protected by the First Amendment.

But Plaintiff's lawsuit fails to get past the starting line, as S.7882 does not restrict any protected speech in the first place. (Point I-A, *infra*.) For over 75 years, the Supreme Court has consistently held that antitrust statutes such as S.7882 do not violate the Free Speech Clause of the First Amendment simply because agreements not to compete are carried out through "means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 504 (1949). Moreover, Plaintiff's

facial challenge to S.7882 fails as a matter of law, and Plaintiff also lacks standing to bring a First Amendment challenge to S.7882 on behalf of its landlord clients. (Point I-B, *infra*.)

Plaintiff's motion for a preliminary injunction is also baseless, as Plaintiff fails to proffer "substantial proof" that it is entitled to such "an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up). First, S.7882 fully satisfies intermediate scrutiny as a permissible regulation of commercial speech. Second, Plaintiff's suggestion that S.7882 is subject to strict scrutiny ignores Supreme Court and Second Circuit decisions rejecting Plaintiff's very argument. Finally, Plaintiff's fallback argument—that the Office of the New York State Attorney General ("OAG") is somehow required to prove that Plaintiff's current software violates federal *antitrust law* to uphold S.7882's *constitutionality*—is both specious and contrary to entrenched First Amendment precedent. (Point II, *infra*.)

In sum, the State's longstanding and "paramount" authority to regulate anticompetitive conduct justifies the enactment of S.7882, and "nothing in the constitutional guarant[ee] of speech" prevents the State from applying this authority to Plaintiff and other technology companies that have wreaked havoc on the housing rental market. *Giboney*, 336 U.S. at 504. Accordingly, the Complaint should be dismissed, with prejudice, and the Court should deny Plaintiff's motion for a preliminary injunction.

## **BACKGROUND**

### A.    **Pricing Algorithms Facilitate Hub-and-Spoke Arrangements That Distort Market Competition**

A pricing algorithm "is a sequence of computational steps that use data inputs to set prices for a product or service." Michal S. Gal, *Limiting Algorithmic Coordination*, 38 BERKELEY TECH. L.J. 173, 179 (2023). The inputted data includes myriad factors, including production costs, prices, production capacity, and storage capacity of rivals. *Id.* In recent years, AI pricing algorithms

have made a "crucial leap forward" based upon their independence from humans as well as their ability to collect and analyze large amounts of data to identify patterns and correlations in new data. Robin Feldman & Caroline A. Yuen, *AI and Antitrust: "The Algorithm Made Me Do It"*, 34 COMPETITION J. 1, 16 (2024).

The increasingly sophisticated AI pricing algorithms can be utilized to facilitate "tacit collusion," whereby entities engage in coordinated activities even without an explicit agreement. Feldman & Yuen, *supra*, at 10. In particular, the algorithms are at the center of a "hub-and-spoke" model, in which "a common intermediary facilitates pricefixing among competitors who use the intermediary's services." Ariel Ezrachi & Maurice E. Stucke, *Sustainable and Unchallenged Algorithmic Tacit Collusion*, 17 NW. J. TECH. & INTELL. PROP. 217, 219 (2020); *see also* Hoffmann Decl., ¶18. Under a hub-and-spoke arrangement, the "hub" creates "collusive efficiency" by reducing the need for coordination among the "spokes," making it more difficult for authorities to detect the collusive conduct. OECD, *Hub-and-spoke arrangements – Note by the United States* 2 (Nov. 28, 2019), https://tinyurl.com/mwzdbem7 (last visited January 8, 2026).[1] Antitrust regulators have emphasized that algorithms facilitating hub-and-spoke arrangements should not be subject to more lenient scrutiny than those facilitated by humans. As a former Chair of the Federal Trade Commission ("FTC") put it:

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

---

[1] The classic example of a hub-and-spoke conspiracy was established in *Interstate Cir., Inc. v. U.S.*, 306 U.S. 208, 215-17 (1939), in which eight film distributors were issued the same letter by a film exhibiter containing the same terms for showing films. The distributors violated antitrust law based upon their "strong motive for concerted action" even without direct evidence of an agreement. *Id.* at 222; *U.S. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) (hub-and-spoke agreements with publishers to sell e-books violated Sherman Act).

Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, FTC (May 23, 2017), https://tinyurl.com/yvyajhdb (last visited January 8, 2026).

### B.    October 25, 2022 *ProPublica* Article

In 2022, an investigative website published a lengthy exposé describing in detail how Plaintiff's algorithmic software had been utilized to "push the highest possible rents on tenants." *See* Rubinstein Decl., Ex. A, Heather Vogell, *Rent Going Up? One Company's Algorithm Could be Why*, PROPUBLICA (Oct. 15, 2022). The article explained how Plaintiff's algorithmic software analyzed a trove of granular data gathered from landlords to arrive at a recommended rent. *Id.* at 1.

The article also discussed the ways in which Plaintiff's software upended the rental market by encouraging landlords to increase rents at the same time under the motto "a rising tide lifts all boats." *Id.* at 5. Property managers who began using Plaintiff's software soon realized that raising rents and leaving some apartments vacant could make them more money. *Id.* at 5, 8, 12. And Plaintiff's executives were scornful of landlords who did not abide by this approach: as one of the architects of Plaintiff's software put it, "[i]f you have idiots undervaluing, it costs the whole system." *Id.* at 5.

Plaintiff touted the ability of its software to help landlords "outperform the market 3% to 7%" and even higher. *Id.* at 1. During a 2021 convention, Plaintiff's vice president boasted that apartment rents had increased 14.5%, and asked a colleague about the role Plaintiff's software played. *Id.* The colleague responded, "I think it's driving it, quite honestly," and added that "[a]s a property manager, very few of us would be willing to actually raise rents double digits within a single month doing it manually." *Id.*

### C.    Plaintiff and its Landlord Clients Face a Flurry of Scrutiny and Lawsuits

The October 2022 exposé subjected Plaintiff's algorithmic software[2] to public scrutiny and also drew the attention of government regulators. DOJ commenced an investigation just one month later. Ex. B, Heather Vogell, *Department of Justice Opens Investigation Into Real Estate Tech Company Accused of Collusion with Landlords*, PROPUBLICA (Nov. 23, 2022), https://www.propublica.org/article/yieldstar-realpage-rent-doj-investigation-antitrust.

Plaintiff and the landlords utilizing its software soon found themselves facing a wave of antitrust lawsuits that were consolidated in Tennessee federal court. *See* Rubinstein Decl., Ex. C, *Goldman, et al. v. RealPage Inc., et al.*, No. 3:23-md-03071 (M.D. Tenn.), September 7, 2023 Second Amended Consolidated Class Action Complaint. Plaintiff and its co-defendants moved to dismiss the lawsuit but were unsuccessful. The district court determined that the "Plaintiffs have plausibly alleged that Defendants engaged in parallel conduct when they each became RealPage RMS clients and began prioritizing raising rent prices over decreasing vacancy rate," and that "[t]his parallel conduct is consistent with RealPage's pledge to its RMS clients that it will help them 'outperform the market,' primarily through raising rent prices." *In re RealPage, Inc., Rental Software Antitrust Litigation*, 709 F.Supp.3d 478, 507 (M.D. Tenn. 2023).

In August 2024, DOJ filed its own antitrust lawsuit against Plaintiff in North Carolina, joined by several states. *See United States et al. v. RealPage, Inc. et al.*, No. 24-cv-710 (M.D.N.C.). The lawsuit described in detail how Plaintiff's algorithmic price recommendations drive up rents across the country, as well as the extraordinary efforts undertaken by Plaintiff to monitor landlords' compliance with its recommendations. *See* Rubinstein Decl., Ex. D, January 7, 2025 Amended

---

[2] Plaintiff's Senior Vice President represents that Plaintiff offers three "revenue management" software products to clients: AI Revenue Management, YieldStar, and Lease Rent Options. ECF No. 23, ¶ 2. Because any distinctions between these three products are not material to Plaintiff's First Amendment claim, Defendant refers to Plaintiff's "software" for ease of reference.

Complaint. On November 24, 2025, Plaintiff entered into a proposed consent judgment that largely restricts Plaintiff's algorithmic software from utilizing nonpublic competitor data in generating price recommendations to landlords. ECF No. 21-10. The proposed consent judgment has not been approved or entered by the district court as of this date and can be terminated as soon as "four years from the date of its entry." *Id.*, ¶ XIV; Hoffmann Decl., ¶ 12.

### D.  S.7882 is Enacted on October 16, 2025

On October 16, 2025, Governor Hochul signed into law S.7882, codified in N.Y. Gen. Bus. Law § 340-b, effective December 15, 2025. The Sponsor's Memos in the Assembly and the Senate cited to the *ProPublica* exposé as well as DOJ's investigation, and emphasized the importance of "crack[ing] down on practices that artificially inflate rents for tenants across the state." *See* Introducer's Memo. in Support, S.7882; Memo. in Support of Legislation, A-1417-B. The statute was intended to "strengthen New York State's antitrust law to prevent companies from employing artificial intelligence, or algorithms to fix market prices." *Id.*

S.7882 makes it unlawful to "facilitate an agreement" by "two or more residential property owner or managers to not compete" by "operating or licensing a software, data analytics service, or algorithmic device that performs a coordinating function on behalf of or between and among such residential rental property owners or managers." Gen. Bus. Law § 340-b(2). In addition, S.7882 makes it unlawful for residential property owners or managers to "set or adjust rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions in one or more of their residential rental properties based on recommendations from a software, data analytics service, or algorithmic device performing a coordinating function." Gen. Bus. Law § 340-b(3).

The unlawful "coordinating function" at the heart of S.7882 consists of three elements: (i) *collecting* information on prices, supply levels and termination and renewal dates of residential

units from two or more property owners or managers; (ii) *analyzing or processing* this information through the use of a "system, software or process that uses computation, including by using that information to train an algorithm," and (iii) *recommending* "rental prices, lease renewal terms, ideal occupancy levels, or other lease terms and conditions" based upon the analyses. Gen. Bus. Law § 340-b(1)(c)(i) – (iii) (emphases added).

## STANDARDS OF REVIEW

Fed. R. Civ. P. 12(b)(1) requires that a complaint be dismissed where the court lacks subject matter jurisdiction. "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In addition, the pleading standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) is applicable to motions to dismiss for lack of standing under Rule 12(b)(1). *See Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

To state a plausible claim under Rules 12(b)(1) and 12(b)(6), a pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the Plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57). The pleading requirements under Rule 8 "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Where a plaintiff has failed to "nudge [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

8

## ARGUMENT

### I.    PLAINTIFF'S FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW

#### A.    S.7882 Does Not Restrict Any Protected Speech

Plaintiff's facial and as-applied constitutional challenge to S.7882 is ripe for dismissal because the Complaint fails to plausibly allege "[a]t the threshold" that the statute is "subject to First Amendment scrutiny" in the first place. *TikTok Inc. v. Garland*, 604 U.S. 56, 67 (2025). It is a foundational principle that a "regulation of conduct" does not violate the right to free speech, even where the "'conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). For example, a law prohibiting a "White Applicants Only" sign "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62. The First Amendment only protects "conduct that is inherently expressive." *Id.* at 66.

In *Giboney*, the Supreme Court upheld the constitutionality of Missouri's antitrust statute, which made it unlawful for any person to "create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition[.]" 336 U.S. at 491 n.1. *Giboney* firmly established that antitrust statutes are constitutionally permissible regulations of conduct, and do not violate the First Amendment merely because agreements not to compete are carried out through "means of language." 336 U.S. at 502. Indeed, *Giboney* cautioned that "[s]uch an expansive interpretation" of the First Amendment "would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Id.*; *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 431

(1990) ("*SCTLA*") ("The most blatant, naked price-fixing agreement is a product of communication, but that is surely not a reason for viewing it with special solicitude.").

The Supreme Court has reaffirmed *Giboney*'s holding in subsequent First Amendment challenges to antitrust statutes. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 514-15 (1972); *National Soc. of Professional Engineers v. U.S.,* 435 U.S. 679, 697-98 (1978); *SCTLA,* 493 U.S. at 428 n.12. And *Giboney* has become a bedrock precedent in First Amendment cases distinguishing between unprotected conduct and protected speech. *See FAIR*, 547 U.S. at 62; *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 296 (2d Cir. 1992); *U.S. v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990); *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 51-53 (1st Cir. 2005).[3]

S.7882 adds a new subsection to the Donnelly Act, New York's antitrust law, to make it unlawful to "facilitate an agreement between or among two or more residential rental property owners or managers to not compete[.]" Gen. Bus. Law § 340-b(2). New York's "power to govern in this field is paramount." *Giboney*, 336 U.S. at 504. Plaintiff is thus barred from challenging S.7882 on the ground that the anticompetitive conduct being regulated is "carried out by means of language." *Id.* at 502. To the extent § 340-b(1)(c)(iii) restricts Plaintiff's algorithmic software[4]

---

[3] In a narrow category of cases, antitrust statutes can be subject to First Amendment challenge under the *Noerr-Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). The *Noerr-Pennington* doctrine generally holds that "[c]oncerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). The doctrine is clearly inapplicable in this case, as the Complaint does not invoke the Petition Clause of the First Amendment, much less allege that Plaintiff is liable under S.7882 for lobbying government officials.

[4] Plaintiff alleges that the pricing recommendations made by its algorithmic software are entitled to First Amendment protection. Compl., ¶ 42. The Court need not decide whether Plaintiff's software can even engage in protected "speech," as the Complaint is subject to dismissal under *Giboney* and its progeny. Defendant, however, reserves the right to argue that a machine learning algorithm "attenuate[s] the connection" between conduct and "human beings' constitutionally protected right" to free speech. *Moody v. NetChoice, LLC*, 603 U.S. 707, 746 (2024) (Barrett, J., concurring).

from "recommending" prices and other rental terms to landlords, this restriction is "plainly incidental to [S.7882's] regulation of conduct." *FAIR*, 547 U.S. at 62.

Even the cases that Plaintiff cites in the Complaint reaffirm *Giboney*'s vitality. In *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 770 (2018), the Supreme Court cited *Giboney* as an example of a case "drawing the line between speech and conduct." And in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), the Court reaffirmed that "*antitrust laws can prohibit 'agreements in restraint of trade'*" because such laws only "impos[e] incidental burdens on speech." 564 U.S. at 567 (quoting *Giboney*, 336 U.S. at 502) (emphasis added). While Plaintiff relies heavily upon *Sorrell* to allege that S.7822 burdens the creation and dissemination of information, Compl. ¶ 44, Plaintiff fails to even address *Sorrell*'s citation to and invocation of *Giboney*. Nor can Plaintiff skip over *Sorrell*'s reaffirmance of *Giboney* simply by dubbing S.7882 the "Rent Advice Statute."

Moreover, Plaintiff's facile comparison between S.7882 and the Vermont statute challenged in *Sorrell* does not hold. Vermont expressly defended its statute, which prohibited pharmacies and other entities from selling or disclosing prescriber information for purposes of marketing, by arguing that the statute "regulates not speech but simply access to information." 564 U.S. at 567. The statute raised constitutional concerns by attempting to "quiet the speech" that Vermont deemed "too persuasive." *Id.* at 578. But S.7882, as well as other federal and state antitrust statutes, are neither designed nor intended to stanch the flow of information or suppress speech deemed too persuasive. It is thus unsurprising that *Sorrell* made crystal clear that any constitutional deficiencies in Vermont's statute did not cast a shadow upon antitrust laws. *Id.* at 567.

In sum, Plaintiff's First Amendment challenge to S.7882 is flatly contrary to more than 75 years of Supreme Court precedent, and "would create a gaping hole in the fabric of [antitrust]

laws" if accepted. *SCTLA*, 493 U.S. at 431-32. The Complaint should be dismissed with prejudice on this basis.

**B.     Plaintiff's Challenge to S.7882 Both Facially and As Applied to Plaintiff's Landlord Clients Fails as a Matter of Law**

The Complaint brings a facial and as-applied challenge to S.7882. *See* Prayer for Relief. But Plaintiff's facial challenge to S.7882 "comes at a cost." *NetChoice*, 603 U.S. at 723. In First Amendment cases, the Supreme Court has imposed a "rigorous standard" whereby a law is facially unconstitutional "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723-24.

The sparse factual allegations presented here focus solely upon S.7882's purported impact upon Plaintiff and its landlord clients. Compl., ¶¶ 15-20. The Complaint fails to even address "the full scope of [S.7882's] coverage" in "all of its applications." *NetChoice*, 603 U.S. at 744. Plaintiff's facial challenge to S.7882 is thus subject to dismissal. *See Hudson Shore Assoc. Limited Partnership v. New York*, 139 F.4th 99, 107 (2d Cir. 2025); *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 553-55 (2d Cir. 2023); *Citizens United v. Schneiderman*, 882 F.3d 374, 383-84 (2d Cir. 2018) (facial challenges subject to Rule 12(b)(6) pleading standard).

Nor does Plaintiff have standing to challenge S.7882 on behalf of its landlord clients. It is well-settled that "litigants are normally prohibited from asserting the legal rights or interests of third parties." *Bordell v. General Electric, Inc.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (cleaned up). However, a "slender exception" to this limitation on third party standing exists "in a narrow class of First Amendment cases." *Id.* Plaintiffs are permitted to assert the rights of third parties in First Amendment cases based upon the premise "that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (cleaned up).

Plaintiff purports to invoke this "slender exception" to challenge S.7882 as applied to its "customers." Compl., ¶ 12. But Plaintiff's attempt to represent the landlords that utilize its software is baseless. The exception only applies to "a pre-enforcement facial challenge." *Am. Booksellers*, 484 U.S. at 392. Plaintiff's facial challenge is deficient as a matter of law, as noted above, and Plaintiff is foreclosed from reframing its facial challenge as an "as-applied" challenge on behalf of these landlords. In any event, the Complaint fails to allege any facts describing the landlords' protected speech that is purportedly affected by S.7882, let alone plausibly show these landlords are "refrain[ing]" from engaging in protected speech due to S.7882's "very existence." *Id.* at 392-93; *Wine and Spirits Retailers*, 418 F.3d at 49-50. Plaintiff is thus barred from proceeding with a facial or as-applied challenge to S.7882 on behalf of these third parties.

## II.    PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION MUST BE DENIED

"The preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (cleaned up). Accordingly, preliminary injunctive relief is "never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (preliminary injunction "should not be granted unless the movant, by a *clear* showing, carries the burden of persuasion") (emphasis in original).  The moving party bears the burden of establishing that (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest. *Winter*, 555 U.S. at 20. And "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must establish a clear or substantial likelihood of success on the merits." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (cleaned up).

A.    **Plaintiff Fails to Establish a Clear or Substantial Likelihood of Success on the Merits of its First Amendment Claim**

1.    **S.7882 Satisfies Intermediate Scrutiny Under *Central Hudson***

S.7882 does not restrict any protected speech in the first place, for the reasons stated in Point I, *supra*. If the Court disagrees, it should find that the statute is, at most, a constitutional regulation of commercial speech. It is well-settled that "[c]ommercial speech is subject to less stringent constitutional requirements than are other forms of speech." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (cleaned up); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 104 n.11 (2d Cir. 2010) (commercial speech requires "less robust protection" than other forms of speech because it is "more durable" and the "offspring of economic self-interest") (cleaned up); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (Supreme Court has "always been careful to distinguish commercial speech from speech at the First Amendment's core").

Regulations of commercial speech are subject to the intermediate scrutiny framework set forth in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980). "Under *Central Hudson*, courts ask whether (1) the expression is protected by the First Amendment; (2) the asserted government interest is substantial; (3) the regulation directly advances the government interest asserted; and (4) the regulation is no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019).

Plaintiff attempts to sidestep the *Central Hudson* framework on two grounds. First, Plaintiff advances the dubious assertion that S.7882 does not regulate commercial speech at all because the "recommendations and advice" generated by Plaintiff's algorithmic software to landlords do not propose a commercial transaction. Plaintiff's Memorandum of Law in Support of Its Motion for a

Preliminary Injunction, ECF No. 20 ("MOL") at 19-20.[5] Plaintiff, however, defines commercial speech too narrowly.

The scope of "commercial speech" has been interpreted capaciously to encompass speech that "propose[s] a commercial transaction" as well as expression involving "the economic interests of the speaker and its audience." *Connecticut Bar Ass'n v. U.S.*, 620 F.3d 81, 93-94 (2d Cir. 2010) (cleaned up); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) (regulation of residential real estate solicitations, which plaintiffs alleged prevented them from providing "invaluable information" to residents, falls "squarely into the category of commercial speech"). Even regulations that are effectively intended to discourage a product's consumption are "clearly commercial speech." *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009) (regulation requiring disclosure of calorie information on restaurant menus).

S.7882 regulates commercial speech twice over. Plaintiff's algorithmic software is licensed to its "customers," as Plaintiff refers to its landlord clients. Plaintiff thus has an "economic interest" in conveying this economically valuable information to them. *Connecticut Bar Ass'n*, 620 F.3d at 94. Plaintiff's algorithmic software also "'facilitat[es]…the proposal of…new commercial transactions' on the part of third parties." *Boelter v. Hearst Communications, Inc.*, 192 F.Supp.3d 427, 445 (S.D.N.Y. 2016) (quoting *Connecticut Bar Ass'n*, 620 F.3d at 95). The pricing recommendations are valuable precisely because they enable landlords to extract higher rents from tenants than a competitive market would bear. *Supra* at 3-5. *Cf. Nat'l Inst. of Fam. & Life Advocs.*

---

[5] Plaintiff quotes a passage in *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988), for the proposition that S.7882 is "inextricably intertwined with otherwise fully protected speech." MOL at 20. But the "fully protected speech" referenced in *Riley* involved charitable solicitations by professional fundraisers, which is simply not comparable to the anticompetitive conduct regulated by S.7882. Plaintiff also errs in citing the district court's decision in *Volokh v. James*, 656 F.Supp.3d 431 (S.D.N.Y. 2023). MOL at 20. The Second Circuit's recent decision noted the online hate speech statute is a valid regulation of commercial speech if it requires companies to neutrally disclose their content moderation policies, "whatever they may be." *Volokh v. James*, 148 F.4th 71, 90 (2d Cir. 2025).

*v. James*, 160 F.4th 360, 374-75 (2d Cir. 2025) (reaffirming broad scope of commercial speech, but determining that statements made by non-profit organization regarding protocol to allegedly reverse effects of medication-induced abortion were noncommercial speech because statements were based upon plaintiffs' moral and religious beliefs rather than economic motivation, plaintiffs did not charge for access to the information, and did not administer the protocol themselves).

Second, Plaintiff asserts that *Central Hudson* is inapplicable because S.7882 constitutes viewpoint discrimination by disapproving of messages regarding recommended rents, while permitting messages that "support government-imposed rent caps." MOL at 20-21. Plaintiff's argument is baseless. It is well-established that "'commercial speech…is a *hardy breed* of expression[.]'" *Connecticut Bar Ass'n*, 620 F.3d at 93 (quoting *Central Hudson*, 447 U.S. at 564 n.6) (emphasis added). Plaintiff's contention that a restriction on price recommendations made by a machine learning algorithm constitutes "egregious" and "blatant" discrimination against Plaintiff (a for-profit firm) as well as its customers is baseless. *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (cleaned up).

The only cases Plaintiff cites are *Matal v. Tam*, 582 U.S. 218 (2017), in which the U.S. Patent and Trademark Office denied a musical group's application to register a trademark deemed disparaging, and *Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018), in which a state agency denied a company's application to participate as a food vendor because its name contained an offensive ethnic slur. In both cases, the plaintiffs sought to use phrases considered derogatory, with the government restrictions on using these phrases determined to be viewpoint-based. *Matal* and *Destito* are thus clearly inapposite to the text and purpose of S.7882.

S.7882 also satisfies each step of the *Central Hudson* analysis. The second prong "is concerned with whether the state's '*asserted* interest is substantial.'" *Council for Responsible*

*Nutrition v. James*, 159 F.4th 155, 164 (2d Cir. 2025) ("*CRN*") (quoting *Vugo*, 931 F.3d at 51) (emphasis in original). In this case, the State's asserted interest in regulating pricing algorithms that drive up residential rents is substantial, and Plaintiff does not appear to challenge this prong. *See also Real Estate Bd. of N.Y., Inc. v. City of New York*, 786 F.Supp.3d 788, 808 (S.D.N.Y. 2025) ("the protection of the consumer is probably the most substantial government interest that can be asserted to regulate commercial speech") (cleaned up).

*Central Hudson*'s third prong requires a showing that "(1) that the asserted harms 'are real' and (2) that [S.7882's] speech restrictions 'will in fact alleviate them to a material degree.'" *CRN*, 159 F.4th at 164 (quoting *Vugo*, 931 F.3d at 52). Defendant "can meet this burden by reference to studies and anecdotes as well as history, consensus, and simple common sense." *CRN*, 159 F.4th at 164 (cleaned up).

The Legislature reasonably relied upon the October 2022 exposé detailing how Plaintiff's software is utilized to thwart competition as well as Plaintiff's pressure tactics on its "customers." Sponsor's Memo, S.7882. The article was replete with troubling anecdotes and, in particular, a number of revealing admissions from Plaintiff's own executives. *Supra* at 5. And the exposé launched a wave of litigation from private plaintiffs and DOJ, which further detailed Plaintiff's unsavory and anticompetitive tactics. *See* Rubinstein Decl., Exs. C. and D. Nor is Plaintiff the only technology company whose algorithmic software has stifled competition in the rental housing market and generated antitrust scrutiny. *See, e.g., Duffy v. Yardi Systems, Inc.*, 758 F.Supp.3d 1283 (W.D. Wash. 2024). Thus, S.7881 addresses a very real harm, and goes to the "root of the problem" by regulating the "conduct which facilitates coordination." Gal, *supra*, at 198; *Boelter*, 192 F.Supp.3d at 449 (restrictions on disclosure of consumer data directly advanced state's interest in protecting consumer privacy).

Plaintiff argues that S.7882 does not directly advance a government interest by claiming that lack of housing supply is the "real driver" of rising housing costs. MOL at 21-22. It is presumptuous and simply incorrect for Plaintiff to baldly assert that "academics and policy wonks all agree" with its argument (MOL at 21); indeed, there is a vast and growing body of academic literature documenting the harmful economic impact to tenants caused by AI pricing algorithms. *Supra* at 3-4. In any event, S.7882 need not resolve each and every cause of rising housing costs to satisfy *Central Hudson*'s third prong. *Vugo*, 931 F.3d at 54 ("The government is not required to make progress on every front before it can make progress on any front.") (cleaned up). Nor can Plaintiff substitute its own self-interested judgment concerning the wisdom of S.7882 for that of the State's elected officials, particularly given the "ample scope of regulatory authority" retained by the State. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989).

Even more remarkable is Plaintiff's far-fetched assertion that its algorithmic software is "procompetitive." MOL at 21. Plaintiff's self-serving argument is particularly dubious given that this lawsuit was filed *two days* after Plaintiff agreed to enter a proposed consent judgment with DOJ on November 24, 2025. ECF No. 21-10; *supra* at 6-7. The smattering of hand-picked articles assembled by Plaintiff that tout the supposed benefits of algorithmic software, MOL at 22, hardly negate the substantial scholarship and evidence demonstrating the anticompetitive effects of algorithmic pricing when utilized to facilitate collusion.[6]

Nor do Plaintiff's supporting declarations proffer "substantial proof" that S.7882 fails to directly advance the State's substantial interest. *Mazurek*, 520 U.S. at 972. Plaintiff's Senior Vice

---

[6] Nor does Plaintiff's citation to *Gibson v. Cendyn Group, LLC*, 148 F.4th 1069 (9th Cir. 2025) advance its argument. MOL at 21-22. The Ninth Circuit emphasized that the plaintiffs were not pursuing on appeal their allegations that the hotels that purchased price recommendation software had engaged in a hub-and-spoke conspiracy. *Id.* at 1079. But Plaintiff's algorithmic software is the very "hub" that facilitates price fixing by landlords, who are the "spokes." *Supra* at 4-5.

President claims Plaintiff's algorithmic software cannot be used to collude because Plaintiff's landlord clients do not know the recommendations made to other landlords. ECF No. 23, ¶ 19; MOL at 23. Yet this proclamation of impossibility is baseless, as a hub-and-spoke conspiracy *by its very nature* does not require such actual knowledge. *Supra* at 4-5; Hoffmann Decl., ¶¶16-19. Similarly unavailing is the contention that landlords have discretion to reject the algorithmic pricing and supply recommendations. ECF No. 23, ¶ 22. In fact, DOJ's investigation highlighted Plaintiff's pressure tactics to enforce these "recommendations." Rubinstein Decl., Ex. D, ¶¶ 61-74 (describing steps Plaintiff takes making it difficult to decline recommendations, use of auto-accept to ensure acceptance, and pressure applied upon property managers by Plaintiff's "pricing advisors").

Finally, S.7882 satisfies *Central Hudson*'s fourth prong. The State is only required to establish "a reasonable fit between the regulation and its goal," and the regulation need not be "the least restrictive means of advancing its asserted interests." *Vugo*, 931 F.3d at 58. Moreover, the State "is afforded considerable leeway in determining the appropriate means to further a legitimate government interest," and courts are "loath to second-guess the government's judgment to that effect." *Id.* at 58 (cleaned up). The Legislature's focused targeting of the "coordination function" that is the mechanism for landlords to hike rents constitutes a "reasonable fit."

Plaintiff's primary argument to the contrary is that S.7882 is too broad, and that the State can address price collusion by enforcing existing antitrust laws. MOL at 23. But Plaintiff's opinion regarding the proper route for the State to pursue is fundamentally misguided given the "considerable leeway" afforded to the Legislature. *Vugo*, 931 F.3d at 58; *CRN*, 159 F.4th at 165 ("the fit need only be 'reasonable,' not 'perfect'") (quoting *Fox*, 492 U.S. at 480). The Donnelly Act need not remain frozen in amber to pass constitutional muster under the *Central Hudson*

framework. It was eminently reasonable for the Legislature to bolster the provisions of the Donnelly Act to address harms caused by new technologies that could not have been foreseen even 15 years ago, let alone in 1899 when first enacted.[7]

In addition, Plaintiff complains S.7882 is overinclusive by supposedly making it unlawful to use tools such as ChatGPT to assess data on rental websites such as Zillow. MOL at 6. Yet a statute's alleged overbreadth is only relevant under *Central Hudson* if it is applied to *non-commercial* speech. *Fox*, 492 U.S. at 481. And any "speech" regulated by S.7882 is purely commercial. *Supra* at 15-16. Plaintiff's purported concern is misplaced anyway, as S.7882 is violated only if all three elements of the "coordinating function" in § 340-b(1)(c) are satisfied. Plaintiff does not argue, and has presented no evidence, that ChatGPT is used to generate pricing recommendations knowing that multiple landlords utilize the recommendations.

S.7882's regulation of both non-public and public data is likewise reasonable, as both types of data may be fed into an algorithm to generate price recommendations. Hoffmann Decl., ¶¶14-15. The distinction between "public" and "non-public" is difficult to draw in any case: the full data sets inputted into a pricing algorithm may not be replicable by searching or scraping public websites such as StreetEasy or Zillow. *Id.*

Plaintiff also suggests that S.7882 is underinclusive by exempting from the "coordinating function" a "product used for the purpose of establishing rent or income limits" pursuant to rent stabilization laws and other government programs. MOL at 6-7. But "the First Amendment imposes no freestanding under-inclusiveness limitation," and the exception makes "rational sense"

---

[7] Plaintiff cites to *U.S. v. Caronia*, 703 F.3d 149 (2d Cir. 2012), in arguing that the State has alternative means of regulating algorithmic software used in the rental housing market. MOL at 23. But *Caronia* merely held that the federal government's interest in "advanc[ing] the integrity of the FDA's drug approval process and increas[ing] the safety of off-label drug use" could be addressed by means other than "a complete and criminal ban on off-label promotion by pharmaceutical manufacturers." 703 F.3d at 167. *Caronia* by no means establishes that the First Amendment bars states from bolstering existing statutes to address the harms resulting from new technologies.

because these products help *stabilize* rents, rather than driving them up. *Vugo*, 931 F.3d at 53-54 (cleaned up). In sum, Plaintiff is unable to establish a clear or substantial likelihood that S.7882 fails to satisfy intermediate scrutiny under the *Central Hudson* framework.

### 2.    S.7882 is Not Subject to Strict Scrutiny

Plaintiff's motion argues at length that S.7882 is subject to strict scrutiny because it allegedly imposes a content, viewpoint, and speaker-based restriction on speech, and is not narrowly tailored. MOL at 11-19.[8] Strict scrutiny, however, only applies to "the direct targeting of fully protected speech." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484 (2025). And as detailed above, S.7882 does not target protected speech of any kind. *Supra* at 9-12.

Moreover, Plaintiff fails to cite even a single federal or state antitrust statute that has been subjected to strict scrutiny under the Free Speech Clause of the First Amendment. In fact, many antitrust statutes such as the Donnelly Act date back to the nineteenth century, and "are traditional, widespread, and not thought to raise a significant First Amendment issue." *Free Speech Coalition*, 606 U.S. at 485; *Giboney*, 336 U.S. at 502 (emphasizing that "[t]he Missouri policy against restraints of trade is of long standing"); *California v. ARC America Corp.*, 490 U.S. 93, 101 (1989) (antitrust law "is an area traditionally regulated by the States," which have a "long history of state common-law and statutory remedies against monopolies…"). It is far too late in the day for Plaintiff to contend that *this* particular enhancement to New York's venerable antitrust statute somehow raises First Amendment concerns warranting strict scrutiny, while numerous federal and state antitrust statutes dating back more than a century do not.

---

[8] Plaintiff briefly asserts that S.7882 also imposes a prior restraint on speech by supposedly banning its speech in advance, but Plaintiff does not otherwise develop this argument. MOL at 9. In any event, the Second Circuit has held that restrictions on anticompetitive conduct do not impose an unconstitutional prior restraint on speech. *Am. Medical Ass'n v. FTC*, 638 F.2d 443, 451-52 (2d Cir. 1980), *aff'd by equally divided Court*, 455 U.S. 676 (1982).

Plaintiff falls well short of demonstrating that strict scrutiny applies in any case. The Second Circuit held in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 451-52 (2d Cir. 2001)—a case Plaintiff cites—that computer code is content-neutral and not subject to strict scrutiny due to its "functionality," even if the code contains "functional and expressive elements." *Corley*'s holding applies even more forcefully to machine learning algorithms, like Plaintiff's software, that lack any expressive element at all.

Moreover, the Second Circuit has repeatedly declined to apply strict scrutiny to commercial regulations irrespective of whether they are content-based. *See CRN*, 159 F.4th at 164 (challenged New York statute satisfied intermediate scrutiny under *Central Hudson* even assuming it was content-based); *Vugo*, 931 F.3d at 49 & n.6 (applying intermediate scrutiny to City's ban on advertisements in for-hire vehicles, although City did not dispute the ban was content-based); *CompassCare v. Hochul*, 125 F.4th 49, 64-65 (2d Cir. 2025) (New York statute mandating notice in employee handbooks of law against discrimination in reproductive health decision making was content-based, but satisfied "the rational basis review standard articulated in [*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626 (1985)]"); *see also Walden v. Kosinski*, 153 F.4th 118, 139-40 (2d Cir. 2025) (rejecting argument that New York statute prohibiting candidate from using "Independence Party" on nominating petition was content-based restriction subject to strict scrutiny). Plaintiff relies heavily upon inapposite snippets from Supreme Court decisions (MOL at 11-19), but fails to even address these on-point Second Circuit decisions.[9]

---

[9] Indeed, the plaintiff in *National Retail Federation v. James*, No. 25-cv-5500 (JSR), which brought a First Amendment challenge before this Court to New York's Algorithmic Pricing Disclosure Act codified in N.Y. Gen. Bus. Law. § 349-a, candidly acknowledged that "the Act is likely not subject to strict scrutiny under Second Circuit precedent." 2025 WL 2848212 at *3 n.2 (S.D.N.Y. Oct. 8, 2025). By contrast, Plaintiff's failure to even address the same Second Circuit precedent in this case further illustrates that strict scrutiny does not apply.

Plaintiff fares no better in arguing that S.7882 is subject to strict scrutiny as a viewpoint-based restriction. MOL at 13, 19. S.7882 imposes no such restriction based upon viewpoint. *Supra* at 16. And Plaintiff's reliance upon *Sorrell* is once again misplaced. MOL at 12-13. The Second Circuit has made clear that *Sorrell* did not apply a standard "akin to strict scrutiny," and "leaves the *Central Hudson* regime in place." *Vugo*, 931 F.3d at 49-50.

Finally, Plaintiff errs in asserting that S.7882 imposes a speaker-based restriction by restricting a landlord from utilizing the algorithmic recommendation, while a tenant can employ "like tools" to negotiate with a property. MOL at 14-15. S.7882 does not target any disfavored speaker based upon the content of the speech, and the statute restricts algorithmic recommendations made to landlords precisely because the software's "coordinating function" facilitates the price fixing that is harmful to tenants. *TikTok*, 604 U.S. at 72-73 (strict scrutiny "is unwarranted when the differential treatment is justified by some special characteristic of the particular speaker being regulated") (cleaned up). In sum, Plaintiff's three purported grounds for invoking strict scrutiny are baseless.

### 3.    Plaintiff's Purported Antitrust Analysis is Immaterial to the Constitutionality of S.7882

Perhaps recognizing the infirmity of its First Amendment claim, Plaintiff's motion takes a detour away from constitutional law altogether. Plaintiff argues Defendant "cannot prove that [the current version of Plaintiff's] software violates antitrust law." MOL at 24. Plaintiff cites decisions interpreting federal antitrust statutes as well as the purported "preliminary analysis" of Dr. Lorin Hitt. *Id.* at 24-26.

Plaintiff's extensive discussion of antitrust doctrine under federal law is fundamentally misplaced. S.7882 was only recently enacted on October 16, 2025, and has yet to actually be enforced by OAG. Hoffmann Decl., ¶¶ 22-23. It is likewise audacious for Plaintiff to invoke the

November 24, 2025 proposed consent judgment with DOJ as a basis to maintain Defendant cannot prove Plaintiff's current software violates antitrust law. MOL at 24. Notably, the proposed consent judgment has yet to be approved and can expire as soon as four years from its entry. Hoffmann Decl., ¶ 12. Moreover, the proposed consent judgment was signed one month *after* S.7882 was enacted, and it cannot "displace [New York's] antitrust remedies" either. *ARC America*, 490 U.S. at 102.[10]

Plaintiff's argument is not only absurd on its own terms, but is wholly immaterial to its First Amendment claim. The relevant constitutional analysis concerns the evidence before the legislature at the time a statute is enacted, and an "anecdotal record" is sufficient to justify a commercial speech regulation. *Florida Bar*, 515 U.S. at 627; *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-68 (1991); *Id.* at 583-84 (Souter, J., concurring); *Nixon v. Shrink Gov't PAC, Inc.*, 528 U.S. 377, 390-91 (2000); *Tyler v. City of Kingston*, 74 F.4th 57, 64 (2d Cir. 2023). As demonstrated above, the stark evidence before the Legislature was sufficient to justify restricting the "coordinating function" of algorithmic software utilized by Plaintiff and other technology companies. Plaintiff's suggestion that Defendant is somehow obligated to establish a current antitrust violation specifically against Plaintiff, as a prerequisite for S.7882 to be upheld under the First Amendment, is frivolous.[11]

---

[10] Plaintiff has also submitted a declaration from one of its attorneys claiming that OAG requested data and information from Plaintiff, and baselessly surmising that OAG "closed" its investigation after Plaintiff did not receive further communications from OAG after February 2023. ECF No. 22, ¶ 4. Such unsupported speculation is both incorrect and immaterial to Plaintiff's First Amendment claim. Hoffmann Decl., ¶¶ 26-27.

[11] Although Dr. Hitt's declaration has absolutely no bearing upon the constitutionality of S.7882, even a cursory review shows that his "preliminary analysis" is focused narrowly on Plaintiff's conduct. But S.7882 will address potential harms flowing from algorithmic software developed by any company, not just Plaintiff's algorithmic software. Moreover, the report relies upon stale data from prior to July 2024, and examines Plaintiff's penetration rates in census-based area geographies that are extremely overbroad. Hoffmann Decl., ¶¶ 24-25.

**B.**     **The Remaining Preliminary Injunction Factors Weigh Decisively in Defendant's Favor**

Plaintiff's motion fails to establish that it will be irreparably harmed absent the "extraordinary and drastic remedy" being sought. *Mazurek*, 520 U.S. at 972. Because Plaintiff is unable to establish a clear or substantial likelihood of success on the merits of its First Amendment claim, "any irreparable injury premised on those claims alone cannot justify a preliminary injunction." *CRN*, 159 F.4th at 171. Nor is there merit to the argument that Plaintiff and its customers will be irreparably harmed by needing to choose between refraining from speaking or risking prosecution and financial penalties. MOL at 27. Plaintiff's "argument proves too much, as every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-06 (1986); *CRN*, 159 F.4th at 172 (organizational plaintiff's "fear of the enforcement of civil penalties" did not justify issuance of preliminary injunction).

Finally, the equities and public interest counsel strongly against a preliminary injunction. *See N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 545 F.Supp.2d 363, 368 (S.D.N.Y. 2008), *aff'd*, 556 F.3d 114 (2d Cir. 2009) ("The public interest…in enforcement of legislation enacted in the public interest, weigh[s] heavily against granting a stay of enforcement."); *Maryland v. King*, 567 U.S. 1301, *3 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (cleaned up). Because the purported harms to Plaintiff and its customers "pale in comparison to the State's goal" of protecting consumers from the use of algorithmic software to facilitate anticompetitive conduct, it "would be unquestionably against the public interest to impede enforcement of" S.7882. *Council for Responsible Nutrition v. James*, No. 24 Civ. 1881, 2024 WL 1700036, at *10 (S.D.N.Y. Apr. 19, 2024), *aff'd*, 159 F.4th at 172.

## **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that the Court grant her motion to dismiss, dismiss the Complaint with prejudice, and deny Plaintiff's motion for a preliminary injunction, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 9, 2026

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York
By:
_____/s/_____
Yuval Rubinstein
Special Litigation Counsel
28 Liberty Street
New York, New York 10005
(212) 416-8673
yuval.rubinstein@ag.ny.gov

## <u>CERTIFICATION</u>

In accordance with Rule 7.1(c) of the Local Rules of the Southern and Eastern Districts of New York and the stipulation so-ordered by the Court (ECF No. 38), I hereby certify that the foregoing Defendant's Memorandum of Law in Support of Her Motion to Dismiss the Complaint and in Opposition to Plaintiff's Motion for a Preliminary Injunction contains 8,317 words, exclusive of the caption, table of contents, table of authorities, and signature block, as established using the word count function of Microsoft Word.

                    _____/s/_____
                    Yuval Rubinstein