UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REALPAGE, INC.,

Plaintiff,

- against -

LETITIA JAMES, in her official capacity as the Attorney General of the State of New York,

Defendant.

Case No. 1:25-cv-9847 (VEC)

**DECLARATION OF ELINOR R. HOFFMANN IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**ELINOR R. HOFFMANN**, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Antitrust Bureau Chief in the Office of the New York State Attorney General ("OAG"), and attorney for Defendant LETITIA JAMES ("Defendant"), in her official capacity as New York State Attorney General. I am familiar with the matters set forth herein based upon my personal knowledge and on the basis of documents that have been created or reviewed by me in the ordinary course of business.

2. I submit this declaration in opposition to Plaintiff RealPage Inc.'s ("Plaintiff") motion for a preliminary injunction. ECF Nos. 19-25.

**Background**

3. OAG's Antitrust Bureau is tasked with the enforcement of New York's antitrust statute, the Donnelly Act, which was originally enacted in 1899. *See* N.Y. General Business Law ("Gen. Bus. L.") §§ 340 *et seq.*

4. As part of its enforcement responsibilities, the Antitrust Bureau investigates entities

and individuals for violations of the Donnelly Act. Investigations are ordinarily commenced through the issuance of a *subpoena duces tecum* civil subpoena.

5. Pursuant to Gen. Bus. L. § 343, OAG is empowered to, among other things, demand the production of data and information as well as examine witnesses under oath.

6. The Donnelly Act also empowers OAG to criminally prosecute persons charged with a criminal offense in violation of the Act pursuant to Gen. Bus. L. § 347, and to bring civil actions against "any person, trustee, director, manager or other officer or agent of a corporation, or against a corporation, foreign or domestic" for violations of the Act. Gen. Bus. L. § 342.

**The Enactment of S.7882**

7. On October 16, 2025, Governor Hochul signed into law S.7882, which is codified in Gen. Bus. L. § 340-b. The new statute amends the Donnelly Act to address the growing impact of pricing algorithms that facilitate anticompetitive conduct amongst landlords and residential property owners, which could drive up rents for residential rental dwelling units to the detriment of New York consumers and the New York economy.

8. S.7882 makes it unlawful to "facilitate an agreement" by "two or more residential property owners or managers to not compete" by "operating or licensing a software, data analytics service, or algorithmic device that performs a coordinating function on behalf of or between and among such residential rental property owners or managers." Gen. Bus. L. § 340-b(2). In addition, S.7882 makes it unlawful for residential property owners or managers to "set or adjust rental prices, lease renewal terms, occupancy levels, or other lease terms and conditions in one or more of their residential rental properties based on recommendations from a software, data analytics service, or algorithmic device performing a coordinating function." Gen. Bus. L. § 340-b(3).

9. The unlawful "coordinating function" at the heart of S.7882 consists of three

elements, all of which must be satisfied to establish the "coordinating function": (i) *collecting* information on prices, supply levels, and termination and renewal dates of residential units from two or more property owners or managers; (ii) *analyzing or processing* this information through the use of a "system, software or process that uses computation, including by using that information to train an algorithm," and (iii) *recommending* "rental prices, lease renewal terms, ideal occupancy levels, or other lease terms and conditions" based upon the analyses. Gen. Bus. L. § 340-b(1)(c)(i) – (iii) (emphases added).

**DOJ's Proposed Consent Judgment With Plaintiff Does Not Affect S.7882**

10. It is my understanding that Plaintiff's motion cites to a lawsuit filed against Plaintiff by the U.S. Department of Justice ("DOJ") and several states in August 2024. *See United States of America et al. v. RealPage, Inc.*, No. 24-cv-710 (M.D.N.C.). The lawsuit alleges, among other things, that Plaintiff's software incorporates nonpublic competitor data that is provided by landlords to generate pricing recommendations, in violation of federal and state antitrust laws.

11. In particular, Plaintiff refers to a proposed consent judgment filed on November 24, 2025—more than one month *after* S.7882 was signed into law—that largely prohibits Plaintiff's algorithmic software from utilizing nonpublic competitor data in generating price recommendations to landlords. *See* ECF No. 21-10, Declaration of Michael Klurfeld, Exhibit J. Plaintiff asserts that the current version of its software "does not pose the risks the State worries about" in enacting S.7882 because it does not incorporate nonpublic competitor data. ECF No. 20 at 23. In addition, Plaintiff contends that S.7882's restriction on using public data in the "coordinating function" violates the First Amendment. *Id.* at 5-6.

12. It is my understanding that the proposed consent judgment has not been approved or entered by the district court in North Carolina as of this date. It is also my understanding that,

even if the judgment is eventually entered, it can by its terms be terminated as soon as "four years from the date of its entry." ECF No. 21-10, ¶ XIV. Unlike the proposed consent judgment, S.7882 will bind actors in New York State unless and until it is repealed or superseded. Thus, S.7882 will serve as a valuable enforcement tool beyond the expiration date of Plaintiff's proposed consent judgment with DOJ, and in the event the district court rejects the proposed consent judgment.

13. In addition, S.7882 is intended to regulate the conduct of all entities that utilize algorithms to facilitate price fixing by landlords. Indeed, other companies that are not subject to the proposed consent judgment may well be engaged in anticompetitive conduct that violates S. 7882. *See, e.g., Duffy v. Yardi Systems, Inc.*, 758 F.Supp.3d 1283 (W.D. Wash. 2024). OAG investigations pursuant to S. 7882, and potential enforcement of S. 7882—neither of which has yet occurred due to the recent passage of the law—will address potential harms flowing from algorithmic software developed by any company, not just Plaintiff's algorithmic software.

14. S.7882 appears designed, in part, to rectify an information asymmetry between landlords and renters. The law does not distinguish between nonpublic and public data—use of either type of data is prohibited if the data is used to perform a "coordinating function." The distinction between "public" and "private" data can also be difficult to draw. For example, the ostensibly "public" data fed into Plaintiff's software may not be truly "public," insofar as the complete data sets that landlords provide to Plaintiff may not be replicable by searching or scraping public sources such as StreetEasy or Zillow.

15. As noted above, three predicate elements must all be satisfied for an algorithmic "coordinating function" to be unlawful under S.7882: collecting data, analyzing the data, and recommending a price. It is the coordinating function of the pricing algorithm, using granular data from numerous sources, that is harmful to tenants and to the public. Property owners and managers,

acting individually, remain free to search public sources to see what rents and terms are being demanded by other landlords, and to use that information in making their own pricing decisions.

**Plaintiff's Pricing Algorithm is a "Hub-and-Spoke" Method of Facilitating Anticompetitive Conduct**

16. I have reviewed the declaration of Amy Dreyfuss, Plaintiff's Senior Vice President and General Manager of Data & Analytics. ECF No. 23. Ms. Dreyfuss asserts that Plaintiff's software (both the prior and current versions) cannot be used by landlords to collude with each other because the software does not provide landlords visibility into pricing recommendations made by Plaintiff to other landlords, or into other landlords' rent information. ECF No. 23, ¶ 19.

17. However, Ms. Dreyfuss's assertion is misleading. As DOJ alleged in its lawsuit, "RealPage is an algorithmic intermediary that collects, combines, and exploits landlords' competitively sensitive information." *United States v. RealPage, Inc. et al.*, No. 24-cv-710 (M.D.N.C.), ECF No. 47, Amended Complaint, ¶ 12. Plaintiff's software is expressly designed to facilitate anticompetitive conduct amongst landlords to, *inter alia*, inflate rents, as described in detail in DOJ's lawsuit. *Id.* at ¶¶ 14-182. By accepting Plaintiff's pricing recommendations, landlords may keep units vacant that would otherwise be rented, thereby generating artificial scarcity in keeping with Plaintiff's motto that a "rising tide raises all ships." *Id.* at ¶ 6.

18. Plaintiff's historic business model, as I understand it, bears similarity to "hub-and-spoke" competitor coordination, a term of art used in antitrust law to describe coordination between direct (or "horizontal") competitors that is orchestrated by a party who is in a "vertical" (e.g. supplier or service provider) relationship with the horizontal participants. In such a model, the horizontal "spokes" do not need to coordinate directly with one another, because the vertical "hub" – which has business relationships with all of the "spokes" – coordinates the behavior of the "spokes" by, for example, providing guidance on pricing or output. In a "hub-and-spoke" model,

competitive harm can occur whether the "hub" is a human or a pricing algorithm. As a former Commissioner of the Federal Trade Commission ("FTC") put it:

> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. *Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob". Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.*[1]

19. The Assembly floor debate that took place prior to the passage of S.7882 makes clear that legislators who supported S. 7882 intended to give the Attorney General the tools to combat the use of "an algorithm or algorithmic device to adjust rental price levels," ECF No. 21-1, Exhibit A, Assembly Debate Transcript at 144, because use of such software "decrease[s ...] competition among landlords," to the detriment of tenants and the public, *id.* at 146.

**Dr. Hitt's Preliminary Analysis is Immaterial to S.7882**

20. I have also reviewed the Declaration of Dr. Lorin M. Hitt. ECF No. 25. Dr. Hitt has been hired by Plaintiffs at an hourly rate of $1,325 to purportedly conduct a "preliminary

---

[1] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, FED. TRADE COMM'N (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf (last visited January 5, 2026) (emphasis added).

evaluation" as to whether "price coordination enabled through the use of RealPage Revenue Management Software is plausible in New York." *Id.* at ¶ 9.

21. The OAG, acting in its enforcement capacity, does not rely upon "preliminary evaluations" conducted by experts retained by private corporations to determine whether a legal violation is capable of occurring or has occurred.

22. Furthermore, S.7882, codified as Gen. Bus. L. § 340-b, was enacted only on October 16, 2025. It is not applicable retroactively and OAG has agreed to a stay of enforcement as to Plaintiff pending a decision on Plaintiff's motion. ECF No. 12-1. Moreover, since the enactment of the statute, OAG has not conducted any investigations or initiated any enforcement actions pursuant to § 340-b.

23. Because OAG has not conducted any investigative or enforcement activity concerning Gen. Bus. L. § 340-b as applied to the business activities of Plaintiff or any other corporation, OAG cannot at this time determine whether Plaintiff's software in its current form would be capable of enabling price coordination of the sort prohibited by § 340-b or any other provision of the Donnelly Act.

24. Though OAG has not yet conducted any investigative or enforcement activity pursuant to Gen. Bus. L. § 340-b, Dr. Hitt's report has many shortcomings on its face. To begin with, it is focused narrowly on Plaintiff's conduct and its potential anticompetitive effects on New York residents. S.7882, on the other hand, condemns the use of algorithmic software that meets the statutory criteria by any firm.

25. Even if one could assume that an analysis of the effects of Plaintiff's conduct in New York was relevant to the constitutionality of the statute (and it is not), a cursory reading by a layperson reveals that Dr. Hitt's report contains multiple flaws. For example, it analyzes stale

averages for a period extending from 2015 to pre-July 2024, considers Plaintiff's penetration rates in census-based area geographies that are extremely overbroad, disregards the fact that what Dr. Hitt characterizes as "low compliance" is not the same as lack of adverse effects, and cannot establish whether Plaintiff may be capable of violating § 340-b as of today.

**OAG's Investigation of Plaintiff**

26. I have also reviewed the Declaration of Stephen Weissman, who is one of Plaintiff's attorneys. ECF No. 22. Mr. Weissman purports to rely upon his "experience" to infer that a prior OAG investigation of Plaintiff has been closed. Mr. Weissman has never reached out to OAG on behalf of his client to inquire whether OAG closed its investigation of his client.

27. Regardless of whether that investigation was closed (and it was not), the Legislature has empowered OAG to investigate and enforce the Donnelly Act, including Gen. Bus. L. § 340-b, against any firm or person that violates the law.

Dated: January 6th, 2026
New York, New York

ELINOR R. HOFFMANN