UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REALPAGE, INC.,

                    Plaintiff,

        v.

LETITIA JAMES, in her official capacity as
the Attorney General of the State of New
York,

                    Defendant.

Case No. 1:25-cv-9847-VEC

ORAL ARGUMENT REQUESTED

**PLAINTIFF REALPAGE, INC.'S CONSOLIDATED MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN FURTHER
<u>SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .......................................................................................................................4

    I.    RealPage Is Likely To Succeed On The Merits Of Its First Amendment Claim...........................................................................................................................4

        A.    The Statute Regulates Speech, Not Conduct. ...............................................4

        B.    The State Cannot Escape The First Amendment With An "Antitrust" Label........................................................................................................7

            1.    There Is No "Call-It-Antitrust" First Amendment Exception. ....................................................................................................7

            2.    The Statute Does Not Address Any Anticompetitive Conduct. ...................................................................................................10

        C.    Strict Scrutiny Applies And The Rent Advice Statute Cannot Survive It...........................................................................................................13

        D.    The Statute Is Not A Commercial Speech Regulation, But Would Still Be Unconstitutional Even If It Were...................................................15

            1.    The Commercial Speech Doctrine Does Not Apply.......................15

            2.    The Statute Fails Under Intermediate Scrutiny As Well. ..............18

    II.    Irreparable Harm To RealPage And The Public Interest Support Injunctive Relief.........................................................................................................................25

    III.    The State Is Wrong About Facial And As-Applied Challenges. ...........................26

CONCLUSION..................................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996)................................................................................................ *passim*

*Anderson v. Treadwell,*
    294 F.3d 453 (2d Cir. 2002)........................................................................................16

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986)....................................................................................................25

*Bigelow v. Virginia,*
    421 U.S. 809 (1975)..................................................................................................2, 7

*Boelter v. Hearst Commc'ns, Inc.,*
    192 F. Supp. 3d 427 (S.D.N.Y. 2016)........................................................................17

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984)....................................................................................................17

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972)......................................................................................................9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980)....................................................................................................17

*Clear Channel Outdoor, Inc. v. City of New York,*
    594 F.3d 94 (2d Cir. 2010).........................................................................................16

*Conn. Bar Ass'n v. United States,*
    620 F.3d 81 (2d Cir. 2010).........................................................................................16

*Council for Responsible Nutrition v. James,*
    159 F.4th 155 (2d Cir. 2025) ...........................................................................19, 20, 26

*Council for Responsible Nutrition v. James,*
    2024 WL 1700036 (S.D.N.Y. Apr. 19, 2024)............................................................25

*Counterman v. Colorado,*
    600 U.S. 66 (2023)..........................................................................................22, 23, 27

*DoorDash, Inc. v. City of New York,*
    789 F. Supp. 3d 337 (S.D.N.Y. 2025)........................................................................6, 7

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014).......................................................................................25

*Fla. Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995)....................................................................................................16

*FTC v. Superior Ct. Trial Lawyers Ass'n,*
    493 U.S. 411 (1990)......................................................................................................9

i

# TABLE OF AUTHORITIES
## (*Continued*)

Page(s)

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) .................................................................................2, 7, 8

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) .........................................................................11

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 ...............................................................................................21

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .................................................................................2, 4, 6, 8

*IMS Health Inc. v. Sorrell*,
  630 F.3d 263 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011) .....................................18

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939) .......................................................................................12

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*,
  968 F.2d 286 (2d Cir. 1992) ..............................................................................9

*Matal v. Tam*,
  582 U.S. 218 (2017) .......................................................................................18

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .............................................................................5, 13, 26

*Moore v. Hadestown Broadway LLC*,
  722 F. Supp. 3d 229 (S.D.N.Y. 2024) ..................................................................5

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ...........................................................................12

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................................17

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) .............................................................................25

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
  556 F.3d 114 (2d Cir. 2009) .............................................................................16

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) .........................................................................................6

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) .............................................................................16

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ..............................................................................1, 17, 18

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
    160 F.4th 360 (2d Cir. 2025) ....................................................................................16

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978)..................................................................................................9

*Near v. Minnesota*,
    283 U.S. 697 (1931)..................................................................................................6

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)..................................................................................................6

*Nixon v. Shrink Mo. Gov't PAC*,
    528 U.S. 377 (2000)................................................................................................20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.
    Co.*, 290 F.3d 578 (3d Cir. 2002)...........................................................................25

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................................10

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ..................................................................................5

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind.
    State Dep't of Health*, 732 F. Supp. 3d 971 (S.D. Ind. 2024)..................................6

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)............................................................................................4, 13

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006).......................................................................................5, 6, 7, 9

*Safelite Grp., Inc. v. Jepsen*,
    764 F.3d 258 (2d Cir. 2014)....................................................................................25

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .........................................................................................*passim*

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025)..................................................................................................14

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)................................................................................................15

*In re UBS Secs. Litig.*,
    2012 WL 4471265 (S.D.N.Y. 2012)........................................................................15

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*United States v. Caronia*,
  703 F.3d 149 (2d Cir. 2012) ......................................................................... *passim*

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ...............................................................14, 22, 23, 24

*United States v. Quattrone*,
  402 F.3d 304 (2d Cir. 2005) ................................................................6

*United States v. Rowlee*,
  899 F.2d 1275 (2d Cir. 1990) .............................................................9

*United States v. Stevens*,
  559 U.S. 460 (2010) ..........................................................................27

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429, 450 (2d Cir. 2001) ......................................................13

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) .................................................................. *passim*

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) .......................................................................4, 27, 28

*Vugo, Inc. v. City of New York*,
  931 F.3d 42 (2d Cir. 2019) ........................................................ *passim*

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018) .............................................................14, 18

*Wine and Spirits Retailers, Inc. v. Rhode Island*,
  418 F.3d 36 (1st Cir. 2005) ..............................................................9

*Yellowhammer Fund v. Marshall*,
  776 F. Supp. 3d 1071 (M.D. Ala. 2025) .........................................7, 8

### Statutes

New York General Business Law § 340-b ........................................ *passim*

### Other Authorities

Ariel Ezrachi & Maurice E. Stucke, *Sustainable and Unchallenged Algorithmic
  Tacit Collusion*, 17 Nw. J. Tech. & Intell. Prop. 217 (2020) ...................23

Michal S. Gal, *Limiting Algorithmic Coordination*,
  38 Berkeley Tech. L.J. 173 (2023) ...................................................3, 23

## INTRODUCTION

The Statute at issue here, New York General Business Law § 340-b, on its face makes it a crime for certain speakers to speak on a particular subject to a specific audience. It is a ban on speech that must satisfy strict scrutiny. And whatever the State labels it, the Statute is miles away from a conventional antitrust law. Unlike those laws, which target and prohibit *conduct* that harms competition like agreements to restrain trade, the Statute bans RealPage and other companies from providing, and their customers from receiving, "recommendations" about lease terms and conditions. The Statute requires nothing for a violation other than speaking or receiving speech—no agreement, no anticompetitive activity, and no conduct. If the Statute is constitutional, nothing would stop the State from banning a host of other speech that provides advice—something lawyers, consultants, financial advisors, review writers, and many others do daily—under the guise of "antitrust" regulations. Worse, the Statute exempts speech that the State thinks will "help *stabilize* rents" while banning speech the State speculates might "driv[e] them up"; in practice, classic viewpoint discrimination prohibited by the First Amendment. Dkt. 40 ("State Motion") 21. The Statute violates the First Amendment under any standard that could apply here. RealPage is likely to succeed on the merits. The Statute will cause RealPage irreparable harm. And the public interest strongly favors an injunction. The Court should enjoin the State from enforcing the Statute and deny the State's motion to dismiss.

The Statute is a "content-based law[]" regulating the provision of "specialized advice"; it regulates "speech" and is subject to "strict scrutiny." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010)); *see also* Dkt. 20 ("RealPage Motion") at 2, 10, 11-12. The Statute is entirely unlike a law that regulates non-speech conduct, like a ban on race-based hiring that only incidentally prevents

speech along the way (for example, prohibiting signs that warn non-white people not to apply). *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The Statute requires *no* conduct—and certainly no agreement to restrain trade—for a violation. And the Statute "imposes more than an incidental burden on protected expression"—"[b]oth on its face and in its practical operation, [the Statute] imposes a burden based on the content of speech and the identity of the speaker." *Id.* Therefore the Statute must satisfy First Amendment "strict scrutiny." It cannot; the State does not argue it can.

The State cannot immunize the Statute from review because it was codified in "New York's venerable antitrust statute." State Motion 21. There is no "call-it-antitrust" exception to the First Amendment: "Regardless of the particular label asserted by the State…a court may not escape the task of assessing the First Amendment interest at stake[.]" *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975). Courts do uphold laws, including antitrust statutes, under the ordinary rule that governments can incidentally burden speech when regulating conduct, as in the State's primary authority, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). But the Statute does not require any conduct for a violation. "[T]he conduct *triggering coverage* under the [S]tatute consists of communicating a message"; it regulates speech. *Holder*, 561 U.S. at 28 (emphasis added). Regardless, the Statute is not an "antitrust law" in substance—it does not distinguish between pro- and anticompetitive conduct, and does not require any agreement or collusion to restrain trade. The State did not rebut RealPage's evidence that its software *cannot* enable price-fixing coordination or facilitate anticompetitive agreements. RealPage's speech is pro-competitive and often recommends *lowering* rents.

Nor can the State recategorize the Statute as a ban on commercial speech subject to less rigorous review. Statutes get a "commercial speech" benefit of the doubt when they "protect

consumers from misleading, deceptive, or aggressive sales practices, or require[] the disclosure of beneficial consumer information." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996). The Statute does neither.  It criminalizes speech on a certain subject matter from certain speakers to a certain audience.  And in practice, it discriminates against a disfavored viewpoint, permitting speech that the State believes "help[s] *stabilize* rents" while banning speech the State speculates might "driv[e] them up."  State Motion 21.  "[S]peech prohibitions of this type rarely survive constitutional review." *44 Liquormart*, 517 U.S. at 504.

Regardless, the Statute could not survive even less rigorous First Amendment review.  To satisfy intermediate scrutiny, the State has the burden of showing the Statute "directly advance[s]" a government interest "to a material degree" and only restricts as much speech as "necessary to serve" that interest. *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012).  The Statute *does not* advance the State's asserted interest; RealPage's speech cannot facilitate price-fixing coordination.  RealPage Motion 16-23.  The Statute criminalizes speech without materially advancing the State's asserted interest at all.

For that reason, "narrower restrictions on expression would serve" the State's asserted "interests as well"; the State "cannot completely suppress" speech as the Statute does. *Caronia*, 703 F.3d at 164.  In fact, academic research *cited in the State's Motion* shows the State can regulate *how* software like RealPage's *works*, rather than restricting its speech. *See, e.g.*, Michal S. Gal, *Limiting Algorithmic Coordination*, 38 Berkeley Tech. L.J. 173, 196-98 (2023) (cited at State Motion 3, 17) (observing that regulation of "data inputted" and "analysis performed" "rather than…communication" would limit "the conduct which facilitates coordination").  And that is the *same* solution the Department of Justice reached in its consent decree with RealPage, *and* which the city of Berkeley, California adopted after RealPage challenged Berkeley's speech-banning

ordinance.  Where such alternatives exist, the State cannot criminalize speech.

RealPage satisfies the other injunctive factors.  This First Amendment violation creates presumed irreparable harm, and RealPage has shown actual irreparable harm as well.  And the equities and public interest strongly favor an injunction to preserve "the free flow of information." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

The State does not contest that RealPage properly challenged the statute as applied to itself. Any facial or as-applied questions only go to the scope of relief, not the merits.  Regardless, RealPage properly brought a facial challenge because a substantial number of the Statute's applications are unconstitutional.  And RealPage can advance facial and as-applied challenges for its customers because speakers and listeners can sue to protect each others' rights.  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

The First Amendment's core purpose is to forbid criminalizing speech because the State disapproves of the message conveyed.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  The Statute fails that test and should be preliminarily enjoined.

## ARGUMENT

## I.     RealPage Is Likely To Succeed On The Merits Of Its First Amendment Claim.

### A.     The Statute Regulates Speech, Not Conduct.

The State is wrong that the Statute "does not restrict any protected speech in the first place." State Motion 2.  Providing "information," *Sorrell*, 564 U.S. at 568, and "advice," *Holder*, 561 U.S. at 26-27, is protected speech.  And the Statute bans speech based on content and speaker: specific kinds of recommendations about rental terms from specific speakers to a specific audience.[1]  If

---

[1] The State purports to "reserve[] the right to argue that" algorithmic output isn't subject to constitutional speech protections.  State Br. 10 n.4.  Omitting that argument here waives it.  In

anything, RealPage's "claim to First Amendment protection here is more compelling…because this case involves a criminal regulatory scheme subject to more careful scrutiny." *Caronia*, 703 F.3d at 165.

The State characterizes the Statute as only a regulation on a "coordinating function," and insists, therefore, the Statute merely "regulat[es]…conduct," not speech.  State Motion 7, 9.  But the Statute defines "coordinating function" to ban speech:  Under the Statute, a "coordinating function" means "collecting" and "analyzing" information about residential lease terms and "*recommending*…lease terms and conditions to a residential rental property owner or manager." § 340-b(1)(c)(iii) (emphasis added).  "Coordinating" conduct thus means providing or receiving speech—"recommendations" based on analysis.  That is no different than a law prohibiting the "conduct" of selling or buying a book on topics the State disfavors.  The First Amendment is not so easily circumvented.

Courts routinely reject attempts to conceal speech restrictions under the guise of supposed prohibitions on conduct.  "[G]overnments [cannot] evade the First Amendment's ordinary presumption against content-based speech restrictions by saying that the plaintiffs' speech is actually conduct."  *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020).  A "regulation violates the speaker's First Amendment right"—even if the government pretends the regulation controls only conduct—"if it compels the speaker to 'alter its expressive content' or 'alter the message the speaker wished to express.'"  *Moore v. Hadestown Broadway LLC*, 722 F. Supp. 3d 229, 260 (S.D.N.Y. 2024) (cleaned up) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 63-64 (2006)).  In other words, the Statute regulates speech because

---

any event, "content" conveyed "through the use of algorithms" is protected expression.  *Moody v. NetChoice, LLC*, 603 U.S. 707, 734 (2024).

the "conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28. RealPage faces felony prosecution unless it stops communicating "the message [it] wish[es] to express." *Id.*; *see also, e.g.*, *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 732 F. Supp. 3d 971, 977 (S.D. Ind. 2024) (statute regulates speech, not conduct, when "speech [it] prohibit[s]…is not merely incidental to separate, prohibited conduct…but itself constitutes the very [activity] that the statute prohibits").

By banning "recommendations" preemptively, the Statute effects "a prior restraint," "'the most serious and least tolerable infringement'" on the First Amendment. *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).[2] The Statute would "freeze[]" RealPage so it could never communicate speech the State disfavors. *Stuart*, 427 U.S. at 559. Such a ban is "the essence of censorship," *Near v. Minnesota*, 283 U.S. 697, 713 (1931), and "bear[s] a heavy presumption against its constitutional validity," *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citation omitted).

While "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," *Sorrell*, 564 U.S. at 567, "this rule is applicable only when a restriction on speech is a necessary byproduct of the government's regulation of conduct," *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 351 (S.D.N.Y. 2025). "[A] ban on race-based hiring may require employers to remove 'White Applicants Only' signs"; or "'an ordinance against outdoor fires' might forbid 'burning a flag.'" *Sorrell*, 564 U.S. at 567 (citations omitted); *FAIR*, 547 U.S. at 60-62 (requiring schools to "afford equal access to military recruiters" did not affect "what they may or may not *say*" even if schools "send[] e-mails and

---

[2] The State cannot dodge this constitutional violation by pretending RealPage did not "develop this argument." State Motion 21 n.8. RealPage explained that the Statute bans speech before it occurs by criminalizing it for taking place. RealPage Motion 9. That is a prior restraint.

distribut[e] flyers" as part of providing access). But the Statute criminalizes RealPage's "recommendations," § 340-b, based on speaker, audience, and content. "[R]egulation of speech is the object—not an incidental byproduct—of the law." *DoorDash*, 789 F. Supp. 3d at 352. The Statute "imposes a burden based on the content of speech and the identity of the speaker"; it must face "First Amendment scrutiny." *Sorrell*, 564 U.S. at 567.

**B.    The State Cannot Escape The First Amendment With An "Antitrust" Label.**

**1.    <u>There Is No "Call-It-Antitrust" First Amendment Exception.</u>**

The State argues RealPage is "barred" from challenging the Statute because it was codified in "New York's antitrust law." State Motion 10. But "a State cannot foreclose the exercise of constitutional rights by mere labels." *Bigelow*, 421 U.S. at 826 (quoting *NAACP v. Button*, 371 U.S. 415, 429 (1963)). "Regardless of the particular label asserted by the State…a court may not escape the task of assessing the First Amendment interest at stake." *Id.* at 826. The First Amendment applies because of the Statute's content, not its title.

The State finds no support for its "call-it-antitrust" gambit in *Giboney*. *Giboney* did not hold that any statute labeled "antitrust" is lawful; it simply applied the well-established rule that a law does not "abridg[e]…freedom of speech" when it "make[s] a course of conduct illegal," even if "the conduct was in part…carried out by means of language." *FAIR*, 547 U.S. at 62 (quoting *Giboney*, 336 U.S. at 502). In *Giboney*, a union was prosecuted for "a single and integrated course of conduct" that "restrain[ed]…trade." *Giboney*, 336 U.S. at 498. The Supreme Court held that the government may prohibit "conduct" even if speech—such as "display of placards by peaceful picketers"—is "integral" to it. *Id. Giboney* thus applied the general rule that governments can indirectly regulate speech that is part of "an independently unlawful course of conduct." *Yellowhammer Fund v. Marshall*, 776 F. Supp. 3d 1071, 1108 (M.D. Ala. 2025).

Here, the Statute does not target any independently unlawful conduct such as an agreement

or collusion to restrain trade. The Statute requires no conduct at all for a violation. It bans speech, criminalizing RealPage's "recommendations" and banning customers from receiving them. § 340-b(2)-(3). Because all that is required to "trigger[] coverage under the [S]tatute" is "communicating a message," *Holder*, 561 U.S. at 28, the Statute regulates speech. *See also, e.g.*, *Caronia*, 703 F.3d at 161 (First Amendment applies when government prosecutes someone "for his words"). Under the State's "antitrust" rationale, it could prohibit speech by passing a law that banned it and then insisting the speech could be regulated as now-unlawful conduct. The Constitution demands more than "circular reasoning." *Yellowhammer Fund*, 776 F. Supp. 3d at 1108 (rejecting attempt to immunize speech ban by invoking *Giboney*). That is especially true here. RealPage offered evidence, which the State failed to rebut, showing its speech *cannot* cause anticompetitive effects. And the Statute is not an antitrust law—it does not distinguish between pro- and anticompetitive conduct or even require an agreement.

The State distorts the Supreme Court's *Sorrell* decision by saying that case simply "reaffirmed…*Giboney*." State Motion 11. *Sorrell* acknowledged that states can regulate "conduct" in ways that "impos[e] incidental burdens on speech." 564 U.S. at 567 (citing *Giboney*, 336 U.S. at 502). But *Sorrell* held the law there *was* subject to the First Amendment because it "impose[d] *more* than an incidental burden" by "target[ing]…[certain] speakers and their messages" for being "in conflict with the goals of the state." *Id.* at 565 (emphasis added). So does the Statute: It criminalizes RealPage's "recommendations" based on content, speaker, and audience. § 340-b(3). And the Statute *exempts* speech the State prefers because it supposedly "help[s] *stabilize* rents, rather than driving them up," State Motion 21; "in practice," the Statute is "viewpoint discriminatory," *Sorrell*, 564 U.S. at 571. (Worse, the State is incorrect about RealPage's advice; uncontested evidence shows it often recommends lowering rents. RealPage

8

Motion 14.)

The State's other cases, *see* State Motion 9-10, are irrelevant.

Many, like *Giboney*, involved regulations of non-speech conduct incidentally burdening speech or not burdening speech at all. *See FAIR*, 547 U.S. at 67; *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 296 (2d Cir. 1992) ("[T]he First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute."); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) ("the act of conspiracy" is "not protected by the First Amendment merely because, in part, it may have involved the use of language"); *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 51-53 (1st Cir. 2005) (upholding statute that "impose[d] no burden" on speech). None of those cases apply to the Statute, which criminalizes RealPage's advice.

And the State's other cases did not even involve a challenge to a statute. Instead, each involved conduct that was illegal under well-established laws, and considered whether speech incidental to that conduct could be prohibited. Each held that illegal conduct was not immunized just because it involved some speech along the way. *See FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 431 (1990) (holding boycott designed to force an increase in pay rates was unlawful); *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) (affirming post-judgment remedy prohibiting professional organization from adopting an anticompetitive policy on fees); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514-15 (1972) (plaintiffs could sue for alleged monopolization attempted through bad-faith conduct in judicial and administrative proceedings). Here, the Statute expressly prohibits speech.

Finally, the State attempts to sweep the Statute under an "antitrust" rug by claiming the

Statute merely "make[s] it unlawful to 'facilitate an agreement…not to compete.'"  State Motion 10.  But nothing in the Statute requires, or regulates, any agreement at all.  *See* RealPage Motion 1, 5-6.  The Statute proclaims that "it shall be *considered* an unlawful agreement" to accept RealPage's advice, § 340-b(3) (emphasis added), and that RealPage "*facilitate[s]*" a nonexistent "agreement" simply by "licensing…software" that provides "recommendations," § 340-b(2)-(3) (emphasis added).  The Statute simply calls it an agreement if RealPage provides, or customers receive, a one-way recommendation.  That is not an "agreement" under any definition.  This Court should reject the State's attempt to label its way out of the First Amendment.

### 2.      The Statute Does Not Address Any Anticompetitive Conduct.

The State also cannot pass off the Statute as an antitrust law because it does not distinguish between pro- and anticompetitive activity—the distinction which is the essence of antitrust law. *Ohio v. Am. Express Co*., 585 U.S. 529, 541 (2018) (goal of antitrust laws "is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest").  The Statute does not require any anticompetitive conduct and does not require any agreement or collusion.  It criminalizes providing or receiving recommendations, regardless of whether they harm or help competition or consumers.

The State does not attempt to demonstrate that RealPage's (or any other company's) software actually facilitates anticompetitive agreements or does anything to cause competitive harm.  The State calls it "wholly immaterial" that RealPage showed that its software *cannot* facilitate collusion among landlords.  State Motion 24.  That concession gives the game away—if the State believed the Statute was an "antitrust law," it would try to show the law restricts anticompetitive conduct.  But the State has no answer to RealPage's undisputed evidence showing that its software cannot facilitate collusion or anticompetitive agreements.

The State knows the Statute targets protected expression.  The State admits the Statute was motivated by a single years-old article whose misrepresentations and misstatements have been repeatedly debunked in litigation, forcing multiple state attorneys general to withdraw allegations made against RealPage.  *Compare* Compl. ¶ 69, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Nov. 1, 2023), *and* First Am. Compl. ¶¶ 97-99, *State of Arizona, ex rel. Kristin K. Mayes v. RealPage*, No. CV2024-003889 (Maricopa Cnty. Super. Ct. Oct. 8, 2024), *with* First Am. Compl. ¶ 90, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. Jan. 8, 2025) (withdrawing allegations after Rule 11 challenge), *and State of Arizona, ex rel. Kristin K. Mayes v. RealPage*, No. CV2024-003889 (Maricopa Cnty. Super. Ct. May 23, 2025) (same).  The State also focuses on *allegations* filed by the U.S. Department of Justice, even though DOJ since worked with RealPage to understand its software better and blessed the software's current incarnation in a consent decree.  Klurfeld Decl. Ex. J.

The State chides RealPage for its "self-serving argument" that its software is procompetitive.  State Motion 18.  But that wasn't RealPage's characterization; it was the Ninth Circuit's assessment of analogous software in the hotel industry.  *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025) ("Why don't the independent choices of [hotels] to obtain pricing advice from the *same company* harm competition, as alleged here?  Because here, obtaining information from the same source does not reduce the incentive to compete.").  By contrast, depriving competitors of such information could "*harm* competition, as it would take away a means by which competitors might compete."  *Id.* at 1084.

As *Cendyn* makes clear, the Statute doesn't just fail to target anticompetitive conduct; it curbs *pro*competitive speech.  The State cannot rely on generic statements from former antitrust regulators and commentators that some algorithms that use confidential data "can" facilitate "tacit

collusion," *see* State Motion at 4-5, to defend a Statute that bans speech without addressing collusion. Nor can the State simply invoke the specter of a "hub-and-spoke" conspiracy. *See* State Motion 19. As the State's own authorities make clear, such conspiracies require a "hub" providing one set of pricing information so co-conspirators can take "concerted action" to fix prices. *Interstate Cir. v. United States*, 306 U.S. 208, 226 (1939) (cited as the "classic example," State Motion 4 n.1). And the State's declarant agrees that a "hub-and-spoke" conspiracy exists when a "hub" "share[s]…pricing" among conspirators to enable concerted action. Hoffman Decl. ¶ 18. RealPage does not share recommendations among competing landlords; it makes individualized recommendations to each customer. RealPage Motion 16-23. Moreover, hub-and-spoke conspiracies require a horizontal agreement—often called the "rim"—joining the "spokes" and an agreement that "unreasonably restrain[s] trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191-92 & n.3 (9th Cir. 2015) ("what is a wheel without a rim?"). The Statute does not incorporate any of these elements. It makes a crime out of three simple steps, State Motion 7-8, none of which relate to hub-and-spoke conspiracies—or, for that matter, any agreement at all. These same steps would criminalize using Excel to (i) analyze data (ii) collected from public websites to (iii) generate recommendations for rental prices.

The State does not engage with the undisputed evidence that RealPage's software *cannot* facilitate anticompetitive collusion in New York. RealPage's software does not allow landlords to communicate recommendations with one another nor to see any other landlord's data. Dreyfuss Decl. ¶¶ 14, 19, 25. The software analyzes customer-specific data to generate recommendations based on that specific property's data and public sources; it does not pool private competitor data to fix prices. *Id*. ¶ 12; Hitt Decl. ¶ 15. The "mechanism" for collusion the State fears simply does

not exist in RealPage's software.  The State does not address any aspect of RealPage's evidentiary showing other than brushing off its economist's analysis as "preliminary."[3]  State Motion 23.  This cannot justify the Statute or prove it targets anticompetitive conduct.

### C.    Strict Scrutiny Applies And The Rent Advice Statute Cannot Survive It.

The Statute restricts speech based on content, viewpoint, speaker, and audience.  RealPage Motion 11-16.  It is "presumptively[] unconstitutional" and subject to "strict scrutiny."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015); *Sorrell*, 564 U.S. at 564-65; *Rosenberger*, 515 U.S. at 828 ("axiomatic" that governments "may not regulate speech based on…substantive content or…message").

***Content.***  The Statute bans speech about specific subjects: "lease terms and conditions." § 340-b(1)(c)(iii).  The State, in a complete non sequitur, responds that "computer code is content-neutral."  State Motion 22.  But this case does not ask whether "computer code," standing alone, expresses content.  This case asks whether the Statute, which criminalizes "recommendations" on certain subjects, regulates speech based on content.  Of course it does.  The Statute's "restriction[]…depend[s] entirely on the communicative content" of RealPage's recommendation. *Reed*, 576 U.S. at 164; *see also, e.g.*, *Sorrell*, 564 U.S. at 564 (law restricting "pharmaceutical" information was "content-based").[4]  The State cites *Universal City Studios, Inc. v. Corley*, which held that a prohibition on posting computer code online was "content-neutral" because posting

---

[3] The State's "cursory" attempt at rebutting Dr. Hitt's analysis, State Br. 24 n.11, holds no water. The State bears the burden of justifying the Statute; it cannot fault Dr. Hitt without its own data or analysis.  The State criticizes Dr. Hitt's use of supposedly "stale" pre-July 2024 data, *id.*, but offers no reason to think changes between then and now call that data into question.  Nor does Dr. Hitt's so-called "narrow[]" focus on RealPage make any difference, *id.*; RealPage has brought, in part, an as-applied challenge.

[4] And the First Amendment protects "content" conveyed through algorithms like RealPage's. *NetChoice*, 603 U.S. at 734.

code did not express specific content.  273 F.3d 429, 450 (2d Cir. 2001).  That has nothing to do with RealPage's claim.

*Viewpoint.*  The State conceded that the Statute discriminates on viewpoint—by exempting speech related to affordable housing programs, the Statute permits recommendations that the State speculates "help *stabilize* rents, rather than driving them up."  State Motion 21; *see* § 340-b(1)(c) (exempting recommendations "in accordance with" State-preferred "rent or income limits").  The Statute "targets…particular views taken by speakers on a subject"—which is "viewpoint discrimination."  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018).  The admission that the Statute is, "in practice, viewpoint discriminatory," requires strict scrutiny (and dooms the Statute).  *Sorrell*, 564 U.S. at 571.

*Speaker.*  The Statute discriminates against speakers too.  Its sponsors even identified RealPage by name in arguing why the Statute was purportedly justified.  Klurfeld Decl. Exs. A (State Assembly transcript), B (op-ed by Statute's sponsors calling for RealPage's prohibition).  "Laws designed or intended to suppress…expression of specific speakers contradict basic First Amendment principles."  *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 812 (2000) (invalidating law under First Amendment where "[o]ne sponsor of the measure even identified [the plaintiff] by name").  The Statute also discriminates against specific *audiences*—restricting "recommendations made to landlords," State Motion 23—thus infringing RealPage's customers' "First Amendment right to receive information and ideas."  *Va. State Bd.*, 425 U.S. at 757; *accord Sorrell*, 564 U.S. at 578.

*TikTok Inc. v. Garland*, which the State cites, supports RealPage.  *TikTok* reiterated that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."  604 U.S. 56, 72 (2025) (per curiam) (cleaned up).  The

14

*TikTok* Court held that requiring TikTok's parent to divest its U.S. holdings was not "'a subtle means of exercising a content preference'" because it had "special characteristics—a foreign adversary's ability to leverage its control over the platform to collect vast amounts of personal data from 170 million U.S. users—that justify this differential treatment." *Id.* at 73 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994)). RealPage has no comparable "special characteristics." And unlike in *TikTok*, the Statute "reflects a content preference"—and not a "subtle" one. *Id.* at 72-73. The Statute bans speech on a specific subject to a specific audience, and it admittedly discriminates on viewpoint in practice. State Motion 21.

Because the Statute discriminates based on content, viewpoint, speaker, and audience, it is subject to strict scrutiny and violates the Constitution. *See Sorrell*, 564 U.S. at 571 (where a regulation "is content based and…viewpoint discriminatory," that is "all but dispositive"); *see also* RealPage Motion 16-19.[5]

### D. The Statute Is Not A Commercial Speech Regulation, But Would Still Be Unconstitutional Even If It Were.

The State cannot save the Statute by invoking the less demanding scrutiny that applies to commercial speech regulations. It is not a commercial speech regulation. And regardless, as in *Sorrell*, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied"—the Statute is unconstitutional. 564 U.S. at 571.

#### 1.    The Commercial Speech Doctrine Does Not Apply.

The State "errs in concluding that *all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression." *44 Liquormart*, 517 U.S. at 501. Far from the "capacious[]" catchall the State says it is, State Motion

---

[5] The State did not argue the Statute could survive strict scrutiny, "conced[ing] through silence" it cannot. *See, e.g.*, *In re UBS Secs. Litig.*, 2012 WL 4471265, at *11 (S.D.N.Y. 2012).

15, the commercial speech doctrine exists to allow regulations that "protect consumers from misleading, deceptive, or aggressive sales practices, or require[] the disclosure of beneficial consumer information," *44 Liquormart*, 517 U.S. at 501. A law must satisfy "the rigorous review that the First Amendment generally demands" when it "entirely prohibits the dissemination of truthful, nonmisleading" speech, as the Statute does. *Id.*

"The core notion of commercial speech is that which does no more than propose a commercial transaction." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025) (citation omitted). All the cases the State cites in support of its commercial speech argument fall into that category. State Motion 14-15. For example, courts have regularly held that regulations of advertisements urging consumers to buy products or services are "commercial speech" regulations. *See, e.g.*, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995) (attorney rules of professional conduct restricted advertisements to potential clients); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103 (2d Cir. 2010) (regulation restricted placement of outdoor commercial advertising); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) (ban on direct solicitations from real estate brokers to homeowners). Similarly, courts have held that laws regulate only commercial speech when they require truthful disclosures about goods and services. *See, e.g.*, *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) ("debt relief agencies" required to make specific disclosures to bankruptcy clients); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009) (restaurants required to disclose calorie information on menus); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (manufacturers required to label products that contained mercury).

The Statute does not fall into those categories and does not govern speech that only "propose[s] a commercial transaction." *James*, 160 F.4th at 374. It criminalizes providing or

16

receiving "recommendations," § 340-b(3)—"specialized advice," *Becerra*, 585 U.S. at 771—that customers can use in making decisions about their rental properties, "prohibit[ing] the dissemination of truthful, nonmisleading" speech, *44 Liquormart*, 517 U.S. at 501. That criminal ban must satisfy "the rigorous review that the First Amendment generally demands." *Id.*

Nor can the Statute qualify as a commercial speech regulation merely because RealPage "has an economic interest" in conveying its recommendations. State Motion 15. "Speech…is protected even though it is carried in a form that is sold for profit." *Va. State Bd. of Pharm.*, 425 U.S. at 761. As the Supreme Court explained in *New York Times Co. v. Sullivan*, "[t]hat the *Times* was paid for publishing the advertisement [at issue] is as immaterial in this connection as is the fact that newspapers and books are sold." 376 U.S. 254, 266 (1964). "[T]he economic motivation of a speaker [cannot] qualify his constitutional protection; even Shakespeare may have been motivated by the prospect of pecuniary reward." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 580 (1980) (Stevens, J., concurring in the judgment). Similarly, many types of speech are "economically valuable" to their recipients, State Motion 15: product recommendations, restaurant reviews, financial advice. The First Amendment protects such speech in full regardless of its value to those paying for it. *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) (affording full First Amendment protection to a *Consumer Reports* evaluation of a loudspeaker).

The State gets no help from *Boelter v. Hearst Communications, Inc.*, which considered a law that prohibited "selling demographic information about…consumers to data miners…which allow[ed] for targeted…solicitations" to those consumers. 192 F. Supp. 3d 427, 435 (S.D.N.Y. 2016). The court upheld the law because it only restricted information "used to solicit business or market goods and services" that "facilitated the proposal of new commercial transactions." *Id.* at

445.  Far from restricting disclosure of "the identity of individuals who purchase…products," *id.*, the Statute makes it a crime for RealPage to analyze customers' unique strategies and provide recommendations on lease terms tailored to stated goals and preferences—"specialized advice" in the heartland of protected speech, *see Becerra*, 585 U.S. at 771 (citing *Holder*, 561 U.S. at 27-28). That is not speech that merely "facilitat[es]…transactions" or is simply part of a transaction itself, like requiring an informative disclosure during a purchase.  And RealPage's advice does not lose First Amendment protection because it is sold.  *See IMS Health Inc. v. Sorrell*, 630 F.3d 263, 274 (2d Cir. 2010) ("The sale of information is protected by the First Amendment, and is not necessarily commercial speech."), *aff'd*, 564 U.S. 552 (2011).

Holding that the Statute regulates only "commercial speech" would demote a vast province of speech like newspapers, books, movies, editorials, reviews, and professional analysis—all provided in exchange for payment and all "valuable" to its audience—down a tier in the First Amendment's protections.  This Court should not allow that result.

### 2.    The Statute Fails Under Intermediate Scrutiny As Well.

Regardless, when a law is "content based and in practice, viewpoint discriminatory"—as the Statute is—"the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  *Sorrell*, 564 U.S. at 571; *accord Matal v. Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring); *Destito*, 879 F.3d at 39.[6]

---

[6] *Matal* and *Destito* reiterate that viewpoint discrimination requires rigorous scrutiny under any standard.  RealPage Motion 20; *Matal*, 582 U.S. at 251 (Kennedy, J., concurring) ("'Commercial speech is no exception'…to the principle that the First Amendment 'requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.'" (quoting *Sorrell*, 564 U.S. at 566)); *Destito*, 879 F.3d at 39 ("[V]iewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context.").  The State cannot disregard those cases simply because they involved discrimination against phrases, State Motion 16, instead of advice.

The Statute "entirely prohibits" providing or receiving advice about lease terms. *44 Liquormart*, 517 U.S. at 501. "[S]uch bans often serve only to obscure an underlying governmental policy that could be implemented without regulating speech." *Id.* at 503. "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Id.* "[S]peech prohibitions of this type rarely survive constitutional review." *Id.* at 504.[7]

***The State has not validated its asserted interest***.  The State says its interest is in "regulating pricing algorithms that drive up residential rents." State Motion 17. That "asserted interest" is not consistent with "basic First Amendment principles." *Sorrell*, 564 U.S. at 576. The State "impose[d] an aimed, content-based burden on particular speakers" and sought "to 'quiet' truthful speech with a particular viewpoint that [the government] 'fear[ed]…might persuade.'" *Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 n.7 (2d Cir. 2019) (quoting *Sorrell*, 564 U.S. at 564, 576). That RealPage's speech might be effective "provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576.

***The State has not shown the Statute directly and materially advances its interest.***  The State must provide "sufficient evidence" that the Statute's "speech restrictions will in fact alleviate [real harms] to a material degree." *Council for Responsible Nutrition v. James* ("*CRN*"), 159 F.4th 155, 164 (2d Cir. 2025). "The need for the State to make such a showing is particularly great given the drastic nature of its chosen means—the wholesale suppression of truthful, nonmisleading information." *44 Liquormart*, 517 U.S. at 505.

---

[7] Although the State suggests that so-called "commercial speech" is "hardy," State Motion 16 (citation and emphasis omitted), the Supreme Court has held that "the 'greater hardiness' of truthful, nonmisleading commercial speech [does not] justif[y] reviewing its *complete suppression* with added deference." *44 Liquormart*, 517 U.S. at 502 (emphasis added).

"[T]he State has presented no evidence to suggest that its speech prohibition will *significantly* reduce" rent prices, or what will happen to rent "prices…without the [speech] ban." *Id.* at 506-07; *compare* State Motion 17 (citing *CRN*, 159 F.4th at 164 (finding government provided "sufficient evidence" based on unrebutted scientific studies showing dietary supplements caused "serious medical problems"); *Vugo*, 931 F.3d at 52 (finding government "substantiated" the challenged regulation based on surveys of passenger reactions to taxi video advertising)). Instead, the State admits that the Legislature "relied" on a 2022 article about how outdated versions of RealPage's software might have affected rents in a few Seattle neighborhoods, as well as allegations in legal pleadings which have since been debunked. State Motion 17; *supra* Section I.B.2. This is legislation by hypothesis, not "sufficient evidence." *CRN*, 159 F.4th at 164; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden.").

By comparison, RealPage provided unrebutted evidence that the Statute does not regulate price increases or prevent price collusion. *First*, contrary to the State's unsupported speculation that RealPage's advice "driv[es]" rent "up," State Motion 21, RealPage demonstrated that it helps customers set optimal rental terms and "accurately respond[] to changes in competitive dynamics," Dreyfus Decl. ¶¶ 9-10—including advising rent *reductions* to increase occupancy. Compl. ¶ 17; RealPage Motion 21-23; Dreyfuss Decl. ¶¶ 9-11; Hitt Decl. ¶ 29. The Statute makes it a crime for RealPage to provide *any* advice on market-rate properties, even if it would lower rent. § 340-b(1)(c). *Second*, the State did not rebut RealPage's evidence that its software cannot be used to "coordinate, collude, or conspire," or otherwise lead to anticompetitive effects, including because it "do[es] not use any non-public competitor data…to generate price recommendations." Dreyfuss Decl. ¶¶ 6, 19-20; *supra* Section I.B.2. The State simply asserts, citing nothing, that the distinction

between "public" and "non-public" data "is difficult to draw."  State Motion 20.  The State made

no effort to substantiate that claim or to show that RealPage's software could facilitate collusion

even if it did use non-public data in runtime (it cannot).  Such unsupported speculation cannot

satisfy the State's evidentiary burden.  *See 44 Liquormart*, 517 U.S. at 506.

The State tries and fails to dismiss a small fraction of RealPage's evidence, while ignoring

most of it.  The State cannot wave away RealPage's supporting declarations by saying they don't

qualify as "substantial proof."  State Motion 18-19.  "The *State*," not RealPage, "bears the burden

of showing…that its regulation will advance its interest…to a material degree."  *44 Liquormart*,

517 U.S. at 505 (emphasis added).  The State has not tried to meet that burden; this Court should

grant RealPage's motion for that reason alone.  RealPage does *not* bear the same burden; but

RealPage made an evidentiary showing anyway, demonstrating that the State *could not* meet its

burden even if it tried.  The Statute *does not* advance the State's interest:  RealPage's software

*cannot* facilitate collusion or anticompetitive agreements.  A one-way recommendation cannot be

an "agreement."  No landlord sees recommendations given to other landlords.  And no landlord's

recommendation is based on any other landlord's confidential data.  RealPage Motion 16-23;

Dreyfuss Decl. ¶ 19.  Nor, as explained above, can the State justify the Statute by gesturing to

"hub-and-spoke" conspiracies, State Motion 19, since the Statute requires none of the elements of

a hub-and-spoke conspiracy—not even an actual agreement—even while expressly banning

speech, *supra* Section I.B.2.  This blunt and senseless ban does not advance the State's asserted

interest at all, much less to a material degree.

*No more extensive than necessary.*  The Statute also fails because it is "more extensive

than is necessary to serve" the State's asserted interest.  *Greater New Orleans Broad. Ass'n, Inc.*

*v. United States*, 527 U.S. 173, 183-84, 188-89.  "[I]f a less restrictive means is available for the

Government to achieve its goals, the Government must use it." *Playboy*, 529 U.S. at 815; *accord*

*Caronia*, 703 F.3d at 164 ("The government cannot 'completely suppress information when

narrower restrictions on expression would serve its interests as well.'" (quoting *Cent. Hudson*, 447

U.S. at 565)).  And the State has the burden to "affirmatively establish a reasonable fit between

the regulation and its goal." *Vugo*, 931 F.3d at 58.  "As in other contexts, these standards ensure

not only that the State's interests are proportional to the resulting burdens placed on speech but

also that the law does not seek to suppress a disfavored message." *Sorrell*, 564 U.S. at 572.

There is no "reasonable fit" here.  The Statute bans landlords and property managers

responsible for approximately 1 million rental units in New York City alone from receiving

recommendations.  Compl. ¶ 59.  It covers a sweeping array of tools and technologies.  As the

Statute's own sponsor acknowledged, the law outlaws everything from RealPage's specialized

software to a "mom-and-pop style landlord[]" using an AI chatbot to analyze publicly available

data for advice on setting rents—even using Microsoft Excel might risk felony conviction under

the Statute.  RealPage Motion 18-19; Klurfeld Decl. Ex. A at 161-63; Compl. ¶¶ 28, 51, 54, 60-

61, 65-66.[8]  As discussed above, the Statute does not even require an *agreement*—the hallmark of

an antitrust violation—to impose penalties; it requires only speaking or receiving speech.  That

---

[8] The State asserts, contrary to the Statute's own sponsors, that the use of tools like AI chatbots
would not be regulated because AI chatbots are not "used to generate pricing recommendations
knowing that multiple landlords utilize the recommendations."  State Motion 20.  The State did
not explain this assertion.  It is not clear from the Statute's text and structure which elements of
the offense are subject to a "knowledge" requirement; the Statute could be read to impose
liability on anyone who knowingly receives recommendations from an algorithm, regardless of
whether they know other landlords are using the same tool.  *See* § 340-b(3).  And ambiguity
about what "knowledge" it takes to violate the Statute further underscores the Statute's defects
and its chilling effect—when the State and the Statute's sponsors disagree about what it bans, no
one can be confident about its scope.  *Cf. Counterman v. Colorado*, 600 U.S. 66, 73-78 (2023);
*see also* Klurfeld Supp. Decl. Ex. 1 at 2 (Apartment Trade Society of New York warning that
the Statute would "[c]reate confusion for small and independent operators relying on third-party
tools").

unbounded scope supercharges the Statute's breadth, creating a "chilling effect" that risks the "hazard of self-censorship." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Indeed, the bill jacket reveals that, while the legislation was under consideration, one prominent industry organization warned that the Statute "could…criminalize routine, lawful business practices," especially for "small landlords" who "use third-party tools" to make "informed pricing decisions." *See* Klurfeld Supp. Decl. Ex. 1 (Letter from Apartment Trade Society of New York) at 1. The State ignored those concerns when it enacted the Statute, imperiling a wide array of business practices from large and small landlords alike with an ill-defined threat of criminal prosecution.

"When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals. The Government has not met that burden here." *Playboy*, 529 U.S. at 816. Many alternatives would achieve the State's asserted interest without a broad criminal ban on speech. The State could enforce existing antitrust laws. RealPage Motion 24; *see also Playboy*, 529 U.S. at 809 (invalidating statute that banned speech where another law provided "plausible, less restrictive alternative"). As in the DOJ's consent decree with RealPage, the State could regulate *how* RealPage's software *works* and analyzes data to ensure it cannot facilitate collusion, rather than banning speech. *See* Dreyfuss Decl. ¶¶ 15-18; Klurfeld Decl. Ex. J. Even the academic papers cited by the State highlight the benefits of regulating software like RealPage's by restricting how the software works and analyzes data, rather than banning speech. *See* Gal, *supra*, at 196-98 (observing that regulation of "the data inputted" and "the analysis performed on such data" "rather than…the existence of…communication" would "go[] to the root of the problem—to the conduct which facilitates coordination"); Ariel Ezrachi & Maurice E. Stucke, *Sustainable and Unchallenged Algorithmic Tacit Collusion*, 17 Nw. J. Tech. & Intell. Prop. 217, 255-59 (2020)

(recommending regulating "the design of price algorithms").

Illustratively, in 2025, Berkeley, California adopted an ordinance banning recommendations on lease terms provided by software like RealPage's.  *See* Klurfeld Supp. Decl. Ex. 2.  After RealPage brought a First Amendment challenge to that ordinance, *RealPage, Inc. v. City of Berkeley*, No. 25-cv-3004 (N.D. Cal. Apr. 2, 2025), Berkeley agreed to amend the ordinance so that, like the DOJ's consent decree, it now regulates how software works and analyzes data to ensure it cannot facilitate anticompetitive conduct, without categorically banning speech. See Klurfeld Supp. Decl. Ex. 3.  That alternative and others, RealPage Motion 16-23, would restrict far less speech while actually advancing the State's asserted interest—unlike the Statute.

The State responds that antitrust statutes "need not remain frozen…to pass constitutional muster."  State Motion 19.  Of course the State can pass new laws.  But in *this* Statute, the State chose to criminalize speech as a "*first*" "resort."  *Caronia*, 703 F.3d at 168 (emphasis added).  The First Amendment imposes a high burden on the State to justify that decision, which the State cannot satisfy.  The State tries to distinguish *Caronia* because the government could have achieved its goals there "by means other than 'a complete and criminal ban'" on "certain speech."  State Motion 20 n.7.  That's exactly right.  The same is true here.

Because alternatives would achieve the State's asserted interest better with less restriction on speech, the Statute cannot survive.  *Playboy*, 529 U.S. at 815-16; *Caronia*, 703 F.3d at 164.

Finally, the State tries to duck the Statute's obvious under-inclusiveness—exempting recommendations related to affordable housing programs—by arguing there is no "freestanding under-inclusiveness limitation" in the First Amendment.  State Motion 20 (quoting *Vugo*, 931 F.3d at 53-54).  But *Vugo* explains "[u]nderinclusiveness *is* problematic insofar as it…raises doubts about whether the government is in fact…disfavoring a particular speaker of viewpoint."  931 F.3d

at 53 (emphasis added) (cleaned up).  Here, unlike in *Vugo*, there is no question "the government's real end is to discriminate on the basis of message."  *Id.* at 53 n.10.  The Statute explicitly does so—as the State admitted.  State Motion 21 ("*stabilize* rents, rather than driving them up").

RealPage is likely to succeed on the merits—the "dominant, if not…dispositive" preliminary injunction factor in the First Amendment context.  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

## II.     Irreparable Harm To RealPage And The Public Interest Support Injunctive Relief.

Irreparable harm is "presumed" because the Statute "directly limits speech," *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (citation omitted), regardless of whether RealPage's speech is commercial, *see Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 266 n.4 (2d Cir. 2014).  The State responds that "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities."  State Motion 25 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-06 (1986)).  But the Statute does not incidentally burden speech like the health code in *Arcara*; it criminalizes RealPage's advice to its customers about lease terms, banning speech based on content, speaker, audience, and viewpoint.

Anyway, the State ignored RealPage's showing that the Statute will also inflict actual irreparable harm, including by permanently depriving it of market share and customer goodwill.  *See* Dreyfuss Decl. ¶ 26; *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial" (cleaned up)).

The public interest decisively favors an injunction where the State's goal is to impede the "free flow of information."  *Va. State Bd. of Pharm.*, 425 U.S. at 765.  The State cannot simply assert that its interest in banning this speech matters more.  Nor can the State rely on *Council for Responsible Nutrition v. James*, 2024 WL 1700036, at *1 (S.D.N.Y. Apr. 19, 2024).  The State's

interest there was "not in restricting the flow of information…but in protecting the health of minors" by restricting dangerous health supplements. *CRN*, 159 F.4th at 164. Here, the only harms the State identifies are consequences it claims will arise if RealPage's speech proves persuasive. State Motion 21.

### III.    The State Is Wrong About Facial And As-Applied Challenges.

RealPage brought facial and as-applied challenges for itself and its customers. The State argues RealPage cannot bring a facial challenge at all or sue on behalf of its customers. State Motion 12-13. The State does not contest that RealPage properly challenged the Statute as applied to itself, so this argument has no bearing on RealPage's entitlement to relief. At most, these issues would only affect whether the Statute is enjoined broadly or only as to RealPage.

In any event, the State is wrong.

***RealPage properly asserted a facial challenge.*** Though the State says RealPage must demonstrate the Statute is unconstitutional in "all of its applications" to bring a facial challenge, State Motion 12 (citing *NetChoice*, 603 U.S. at 723), that is only the rule in *non*-First Amendment challenges, *NetChoice*, 603 U.S. at 723. "In First Amendment cases" the Supreme Court "has lowered that very high bar"; a *First Amendment* facial challenge requires only that "a *substantial number* of [the law's] applications are unconstitutional." *Id.* (emphasis added). Even "a law with 'a plainly legitimate sweep' may be struck down in its entirety" if its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723-24.

RealPage has shown that a "substantial number" of the Statute's applications are unconstitutional. The Statute applies to a huge swathe of landlords and property managers and covers a potentially immense and unclear array of tools, from RealPage's software to an Excel average calculated from information found online. *Supra* Section I.D.2. Those applications impermissibly ban speech based on content, speaker, and audience, while exempting viewpoints

the State favors.  Worse, the State now says the Statute does *not* apply to applications the Statute's sponsor said *would* be covered—leaving the public with no clear idea of how to avoid felony prosecution.  *Id.*  The First Amendment does not permit statutes so broad and ill-defined that we are left "at the mercy of" a prosecutor's "*noblesse oblige.*"  *United States v. Stevens*, 559 U.S. 460, 480 (2010); *see also Counterman*, 600 U.S. at 75.

In any case, RealPage *did* address the "full scope" of the Statute's coverage.  The Statute only applies to those who provide recommendations and to the "residential rental property owners or managers" who receive them.  § 340-b(2)-(3).  RealPage explained that restriction is unconstitutional as to the speakers and the audience.  RealPage Motion 13; *supra* Sections I.A, C-D.  That is "all of [the Statute's] applications."  State Motion 12.

***RealPage has standing to challenge the Statute on behalf of its customers.***  "In the First Amendment context, litigants are permitted to challenge a statute" where its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Booksellers*, 484 U.S. at 392-93 (cleaned up).  RealPage alleged—and substantiated with unrebutted sworn testimony—that the existence of the Statute has made RealPage's customers afraid to receive RealPage's advice lest the State prosecute them.  Compl. ¶ 51; Dreyfuss Decl. ¶ 26.  These are exactly the circumstances where RealPage can assert claims on its customers' behalf.

Even if RealPage could not bring a *facial* challenge for its customers (it can), RealPage can still challenge the statute as applied to them.  "[F]reedom of speech necessarily protects the right to receive."  *Va. State Bd. of Pharm.*, 425 U.S. at 757.  Because the Statute prevents RealPage's customers from receiving recommendations, RealPage may sue on their behalf.  The State argues that RealPage has not "plausibly show[n] these landlords are 'refrain[ing]' from engaging in

protected speech due to [the Statute's] 'very existence.'"  State Motion 13 (citing *Booksellers*, 484 U.S. at 392-93).  But RealPage did so; the State just ignored it.  *See* Compl. ¶ 51; Dreyfuss Decl. ¶ 26.  RealPage can assert its customers' rights facially and as-applied, along with its own.

## **CONCLUSION**

RealPage's motion for a preliminary injunction should be granted and the State's motion to dismiss should be denied.

Respectfully submitted,

February 9, 2026                    By:  s/ *Theodore J. Boutrous Jr.*

Theodore J. Boutrous Jr.
  tboutrous@gibsondunn.com
Jay P. Srinivasan (*pro hac vice*)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger (*pro hac vice*)
  bhamburger@gibsondunn.com
Alexander N. Harris (*pro hac vice*)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Avenue
  Los Angeles, CA  90071-3197
  Telephone:   213.229.7000

Connor S. Sullivan
  cssullivan@gibsondunn.com
Jacob U. Arber
  jarber@gibsondunn.com
Michael Klurfeld
  mklurfeld@gibsondunn.com
Iason Togias
  itogias@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000

*Attorneys for Plaintiff RealPage, Inc.*

## **WORD COUNT CERTIFICATION**

I, Theodore J. Boutrous Jr., an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1(c) because it contains 8746 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1(c).  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
        February 9, 2026

s/ *Theodore J. Boutrous Jr.*
Theodore J. Boutrous Jr.