UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/2026

REALPAGE, INC,

Plaintiff,

-against-

LETITIA JAMES, *in her official capacity as the Attorney General of the State of New York*,

Defendant.

25-CV-09847 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

This case concerns a New York law prohibiting agreements not to compete with respect to residential rental dwelling units through the use of certain electronic systems. On November 26, 2025, Plaintiff, RealPage, Inc. ("Plaintiff" or "RealPage"), which licenses software within the ambit of the law, sued alleging that the law violates the First Amendment. On December 5, 2025, Plaintiff moved to preliminarily enjoin enforcement of the law. The parties promptly agreed to a briefing schedule, and the State agreed to stay enforcement of the law pending a decision on Plaintiff's motion for a preliminary injunction. Letter, Dkt. 12 at 1. On January 9, 2026, Defendant Letitia James, in her official capacity as the Attorney General of New York ("Defendant"), moved to dismiss. Plaintiff's Motion for a Preliminary Injunction is GRANTED as to N.Y. Gen. Bus. Law § 340-B(3), and Defendant's Motion to Dismiss is DENIED.

## FACTUAL BACKGROUND

### I. RealPage's Operations

RealPage is a technology company that licenses proprietary software to its customers — owners and managers of residential rental properties — to aid them in setting apartment rents. *See* Compl., Dkt. 1 at ¶ 5. RealPage currently operates in New York by licensing its pricing software to New York property owners and managers. *Id.* at ¶ 8.

RealPage offers three revenue management software ("RMS") products, powered by artificial intelligence ("AI"), that recommend rents and occupancy levels to optimize revenues of the property owners.[1] *Id.* at ¶ 17; Decl. of Amy Dreyfuss, Dkt. 23 ("Dreyfuss Decl.") at ¶ 2. All of RealPage's RMS products generate individualized price recommendations by evaluating property-specific information provided by the user (*e.g.*, supply and demand data, such as unit availability and apartment renewal rates) alongside publicly available rent data (*e.g.*, market rates for similar properties). *See* Dreyfuss Decl. at ¶¶ 2, 5. Each user may configure a unique price-recommendation strategy by setting over a hundred custom data parameters. *Id.* at ¶ 12. RealPage seeks to optimize revenue for rental managers, *id.* at ¶ 9, asserting that it does so by increasing, maintaining, or decreasing rents where appropriate, Compl., Dkt. 1 at ¶ 17. Users can accept or reject pricing recommendations made by the software, and RealPage asserts that its customers "frequently" reject its recommendations. Dreyfuss Decl. at ¶ 8; Decl. of Lorin Hitt, Dkt. 24 at ¶ 38. Defendant, however, asserts that Plaintiff utilizes "pressure tactics" to compel compliance with its recommendations. *See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss and

---

[1] Despite differences in the underlying code, the distinctions among the three products — "YieldStar," "AI Revenue Management," and "Lease Rent Options" — are not significant for the decision at hand. *See* Dreyfuss Decl. at ¶¶ 2–5.

in Opp'n to Pl.'s Mot. for a Prelim. Inj., Dkt. 40 ("Def.'s Mem.") at 19 (citing Decl. of Yuval Rubinstein, Ex. D, Dkt. 42-4 at ¶¶ 61–74).

Historically, RealPage's RMS products generated price recommendations based on a blend of public and non-public data. *See* Compl., Dkt. 1 at ¶ 19. RealPage transitioned away from using non-public data as a part of a settlement it reached with the Department of Justice, and it now generates pricing advice using (1) data submitted by the customer and (2) publicly available information, with two limited exceptions. *See id*. at ¶¶ 5, 5 n.2, 19 (the Consent Decree allows use of non-public data in (1) the software development phase and (2) "the rare case" in which a customer has no property-specific or nearby historical public data, when historical non-public data from a different market can be used); *see* Proposed Final Judgment, *United States v. RealPage, Inc.*, 24-CV-710 (M.D.N.C. Nov. 24, 2025), Dkt. 159-1 (also available at Dkt. 21-10 in this case) ("Consent Decree"); *see also* Final Judgment, *United States v. RealPage, Inc.*, 24-CV-710 (M.D.N.C. May 19, 2026), Dkt. 194 ("Final Judgment") at 12–14.

Although the Consent Decree had not been entered at the time of briefing on Plaintiff's motion, it was entered as a Final Judgment on May 19, 2026. Final Judgment. Although the Final Judgment is effective 180 days after it is filed (*i.e.*, not until November 15, 2026), *see id.* at 12, RealPage agreed to abide by it in the interim. Stipulation, *United States v. RealPage, Inc.*, 24-CV-710 (M.D.N.C. March 26, 2026), Dkt. 182. By its terms, the Consent Decree can be terminated as early as four years from the date it was entered. Final Judgment at 36. The Consent Decree, however, appears to describe the way RealPage is currently operating. The Consent Decree, of course, does not bind other companies; such companies may use non-public data more broadly than is permitted under the Consent Decree. *See* Decl. of Elinor R. Hoffman, Dkt. 41 at ¶ 13.

## II. The Challenged Statute

On October 16, 2025, New York State enacted New York General Business Law § 340-B (the "Statute"). *See* Compl., Dkt. 1 at ¶¶ 2, 31, 33. The stated purpose of the Statute is to address recent and "notable increases" in New Yorkers' rents and "abnormally long apartment vacancy periods" in rental buildings. Bill Sponsor Op-Ed, Ex. B, Dkt. 21-2.

The Statute contains two specific provisions. Its first provision forbids anyone from facilitating agreements between horizontal competitors in the residential rental market not to compete on pricing, including via software that performs a "coordinating function." N.Y. Gen. Bus. Law § 340-B(2). The Statute's second provision operates against residential rental property owners and managers. It makes it unlawful to set or adjust lease terms based on recommendations from a software performing a "coordinating function."[2] N.Y. Gen. Bus. Law § 340-B(3).

## PROCEDURAL BACKGROUND

Plaintiff sued on November 11, 2025, challenging the Statute purely on First Amendment grounds, both facially and as applied to itself and its customers. *See generally* Mem. of Law in Supp. of Pl.'s Mot. for a Prelim. Inj., Dkt. 20 ("Pl.'s Mem.") at 9. Plaintiff requested (1) an injunction against enforcement of the Statute; and (2) a declaration that the Statute violates the

---

[2] N.Y. Gen. Bus. Law § 340-(B)(1)(c)(i-iii) defines a "coordinating function" as the performance of all three of the following subfunctions:

(i) "[C]ollecting historical or contemporaneous prices, supply levels, or lease or rental contract termination and renewal dates of residential dwelling units from two or more residential rental property owners or managers, provided that at least two such residential rental property owners or managers are not wholly-owned subsidiaries of the same parent entity or otherwise owned or managed by the same residential rental property owner or manager;

(ii) "[A]nalyzing or processing the information described in subparagraph (i) . . . using a system, software, or process that uses computation, including by using that information to train an algorithm; and

(iii) "[R]ecommending rental prices, lease renewal terms, ideal occupancy levels, or other lease terms and conditions to a residential rental property owner or manager."

First Amendment and the Due Process Clause. Compl., Dkt. 1 at 27–28. Plaintiff moved for a Preliminary Injunction, Notice of Mot. for Prelim. Inj., Dkt. 19; the State agreed to stay enforcement of the Statute until the motion for preliminary injunction is decided, Joint Stipulation, Dkt. 12-1 at ¶ 2; and Defendant moved to dismiss, Notice of Mot. to Dismiss, Dkt. 39; Def.'s Mem.[3] Plaintiff's Motion for a Preliminary Injunction is GRANTED as to N.Y. Gen. Bus. Law § 340-B(3), and Defendant's Motion to Dismiss is DENIED.

## LEGAL STANDARDS

### I. Standing

All federal court plaintiffs must satisfy the constitutional minimum for Article III standing. "[T]he irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have "suffered an injury in fact"; (2) there must be "a causal connection between the injury and the conduct complained of"; and (3) there must be a likelihood, beyond mere speculation, that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted). To establish standing in the First Amendment context, the plaintiff must "present more than 'allegations of a subjective chill[ing]'" of speech by showing a "specific present objective harm or a threat of specific future harm." *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)) (cleaned up).

First Amendment challenges can be facial or as applied. A facial challenge "considers only the text of the statute itself, not its application to the particular circumstances of an

---

[3] In April, Plaintiff filed supplemental authority regarding a recent Supreme Court decision on First Amendment law and Defendant responded. Pl.'s Notice of Suppl. Auth., Dkt. 48 (citing *Chiles v. Salazar*, No. 24-539, 2026 WL 872307, slip op. (U.S. Mar. 31, 2026)); Def.'s Resp. to Notice of Suppl. Auth., Dkt. 49. In August, Plaintiff provided further supplemental authority concerning a recent Second Circuit decision enjoining a New York statute on First Amendment grounds, and Defendant responded. Pl.'s Notice of Suppl. Auth., Dkt. 50 (citing *DoorDash, Inc. v. City of N.Y.*, 2026 WL 2249119, slip. op. (2d Cir. Aug. 5, 2026)); Def.'s Resp. to Notice of Suppl. Auth., Dkt. 51.

individual," *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006), and requires a showing that the statute prohibits "a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). This exception to the normal standard for facial challenges exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id.* at 119 (citations omitted).

An as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC*, 463 F.3d at 174. A plaintiff making an as-applied challenge can establish injury-in-fact by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

## II. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Preliminary injunctive relief is "drastic" and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

A plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction;

(3) that the balance of hardships tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). A plaintiff "may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (quoting *Christian Louhoutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)). In the First Amendment context, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

**III. Dismissal**

Defendant has moved to dismiss pursuant to FED. R. CIV. P. 12(b)(1) asserting that the court lacks subject matter jurisdiction. "A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *McIntosh v. United States*, 2018 WL 1275119, at *4 (S.D.N.Y. Mar. 7, 2018) (quoting *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014)). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists," *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), and all reasonable inferences are drawn in favor of the party asserting jurisdiction. *McIntosh*, 2018 WL 1275119, at *3–5.

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) requires the Court to accept all well-pled factual allegations in the Complaint as true and to construe the Complaint in the light most favorable to the plaintiff. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306–07 (2d Cir. 2015). A pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[D]ismissal is appropriate only where [the plaintiff] can prove no set of facts consistent with the complaint that would entitle [it] to relief." *Meyer v. JinkoSolar Holdings Co., Ltd.,* 761 F.3d 245, 249 (2d Cir. 2014). The complaint must contain sufficient detail to rise above "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" and satisfy the plausibility standard, which requires plaintiffs to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 405 U.S. at 555–56).

## IV. First Amendment

As a general rule, the First Amendment prohibits the government from restricting "expression because of its message, its ideas, its subject matter, or its content.'" *Bolger v. Young Drug Prod. Corp.*, 463 U.S. 60, 65 (1983) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

Some statutes do not trigger First Amendment scrutiny. Laws that regulate conduct, as opposed to expression, do not trigger First Amendment scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 375 (1968). Nor do statutes that regulate speech that has historically been unprotected, such as fraud, defamation, obscenity, incitement to violence, and fighting words. *See Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 65–70 (2006); *United States v. Stevens*, 559 U.S. 460, 468–69 (2010); *Virginia v. Black*, 538 U.S. 343, 359 (2003). These

exceptions are "well-defined and narrowly limited" and "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinksky v. N.H.*, 315 U.S. 568, 571–72 (1942)). A law that does not regulate conduct *exclusively* but includes speech or inherently expressive actions within its ambit is subject to First Amendment scrutiny. *See Rumsfeld*, 547 U.S. at 64–66.

If a law regulates protected speech, the next question is what kind of protected speech is being regulated. *Bolger*, 463 U.S. at 65 (holding that the Court "must first determine the proper classification" of the speech at issue to assess "the degree of protection afforded by the First Amendment"). Commercial speech (as opposed to, for example, political speech) is afforded "only 'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values.'" *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

Commercial speech is expression "related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Such speech does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Rels. Comm'n*, 413 U.S. 376, 385 (1973)). Restrictions on commercial speech "need only survive intermediate scrutiny to pass constitutional muster." *Eugene Volokh, Locs. Tech. Inc. v. James*, 148 F.4th 71, 85 (2d Cir. 2025). Specifically, restrictions on commercial speech are subject to a four-part analysis established by the Supreme Court in *Central Hudson*: (1) is the speech protected because it concerns lawful activity and is not misleading; (2) if the speech is protected, is the asserted governmental interest substantial; (3) if

the speech is protected and the governmental interest is substantial, does the regulation directly advance the governmental interest asserted; and (4) is the regulation more extensive than needed to serve the government interest. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566.

In ascertaining the level of protection, a court should consider whether a statute restricts speech on the basis of its content (or not), namely whether it is content-neutral or content-based. The "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Content-based speech restrictions are "presumptively invalid" and are subject to strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 404 (1992). In order for a restriction on speech to survive strict scrutiny, the government must show "that the regulation at issue is narrowly tailored to serve or promote a compelling government interest." *United States v. Caronia*, 703 F.3d 149, 163 (2d Cir. 2012).

**DISCUSSION**

RealPage argues that it is likely to prevail on the merits because the Statute violates the First Amendment. Pl.'s Mem. at 9–23. RealPage asserts that the Statute prohibits protected speech, namely, their algorithmic pricing advice, by "equat[ing] these recommendations with 'an unlawful agreement.'" *See* Compl., Dkt. 1 at ¶ 38 (quoting N.Y. Gen. Bus. Law § 340-B(3)). RealPage argues that the Statute is a "textbook" example of an overbroad, content-based regulation of speech that fails both strict and intermediate scrutiny. Compl., Dkt. 1 at ¶ 4; Pl.'s Mem. at 16–23. RealPage asserts that "[a]bsent injunctive relief, RealPage and others face the dilemma of either self-censoring or subjecting themselves to crippling penalties and criminal prosecution for engaging in constitutionally protected speech." Pl.'s Mem. at 9. Thus, RealPage claims, the threat of irreparable harm, the balance of hardships, and the public interest all support

immediate relief. *Id.* at 26–28. RealPage asks the Court to enjoin the Statute's enforcement facially or, "at minimum," as applied to it and its customers. Compl., Dkt. 1 at ¶ 7.

Defendant responds that the Statute does not restrict protected speech because it regulates conduct, Def.'s Mem. at 9–12, and, in the alternative, that if the Statute regulates speech, it regulates commercial speech, *id.* at 14. According to Defendant, the Statute survives intermediate scrutiny under *Central Hudson*. *Id.* at 14–21. Defendant also argues that Plaintiff will not be irreparably harmed by the Statute, and the equities do not favor Plaintiff, given the strong public interests at play. *Id.* at 25. Finally, Defendant argues that Plaintiff fails to state a claim. *Id.* at 9–12.

**I. RealPage Has Standing on Behalf of Itself and Its Customers.**

RealPage asserts that it has standing to bring this suit on behalf of itself and its customers, both facially and as applied. Defendant does not dispute that RealPage can bring a challenge on behalf of itself, but disputes that RealPage can bring any challenge, whether facial or applied, on behalf of its customers.

At this stage, viewing the Complaint in the light most favorable to Plaintiff, RealPage has adequately alleged its own standing. RealPage contemplates altering its course of business in New York, namely withdrawing or materially changing its RMS products, if the State begins to enforce the Statute. Dreyfuss Decl. at ¶ 26. This imminent self-censorship in order to avoid the risk of penalties and prosecution establishes an injury in fact for purposes of standing in the First Amendment context. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) ("[A] real and imminent fear of such chilling is enough.").

Third-party standing is a prudential doctrine, though a somewhat contested one. *See Farrell v. Burke*, 449 F.3d 470, 494–95 (2d Cir. 2006); *see generally June Med. Servs. L.L.C.*

*v. Russo*, 591 U.S. 299 (2020), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (addressing third-party standing in the context of doctors suing on behalf of their patients). As a baseline principle, "litigants are normally prohibited from asserting the 'legal rights or interests of third parties.'" *Bordell v. General Electric, Inc.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (quoting *Warth v. Seldin*, 422 U.S. 490 (1975)). This rule is intended to avoid "unnecessary pronouncements" and to ensure that the issues before the court are "concrete and sharply presented." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). There exists a slender exception in the First Amendment context. *Id.* at 956–57. This exception applies where "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[4] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (quoting *Joseph H. Munson Co.*, 467 U.S. at 956–57). It is conceivable that the Statute's existence may cause RealPage's customers to refrain from protected speech.[5] RealPage, thus, has established

---

[4] Although they disagree on its application here, the parties agree that there can be third-party standing for facial challenges. They appear, however, to disagree about whether there can be third-party standing for as-applied challenges. *Compare* Def.'s Mem. at 13 (citing *Am. Booksellers*, 484 U.S. at 392) ("The exception only applies to 'a pre-enforcement facial challenge.'") *with* Reply Mem. of Law in Supp. of Pl.'s Mot. for a Prelim. Inj. and Opp'n to Def.'s Mot. to Dismiss, Dkt. 45 at 27 ("Even if RealPage could not bring a facial challenge for its customers (it can), RealPage can still challenge the statute as applied to them."). The Court finds that the facial challenge is likely to succeed, so need not resolve this dispute.

[5] The Court notes that RealPage asserts that it has "substantiated with unrebutted sworn testimony [] that the existence of the Statute has made RealPage's customers afraid to receive RealPage's advice lest the state prosecute them." Reply Mem. of Law in Supp. of Pl.'s Mot. for a Prelim. Inj. and Opp'n to Def.'s Mot. to Dismiss, Dkt. 45 at 27 (citing Compl., Dkt. 1 at ¶ 51; Dreyfuss Decl. at ¶ 26). What RealPage has provided, however, is only a declaration from its own employee: Senior Vice President and General Manager of Data & Analytics Amy Dreyfuss. RealPage has not provided a declaration from any customer. Ms. Dreyfuss does not provide factual support for the assertion that the Statute has made RealPage's customers afraid to receive RealPage's advice. RealPage has not supplied any evidence, aside from its own conclusory statements, to show that its licensees are in fact refraining from speech due to the Statute. *See* Pl.'s Mem. at 27 ("RealPage has already advised its New York customers that the Statute prohibits 'the sale, distribution, and use of [its] pro-competitive software' and expects to lose business as a result."). That said, precedent only requires that "the statute's very existence *may* cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers*, 484 U.S. at 392–93 (emphasis added). Thus, at this stage, the representations from Ms. Dreyfuss are sufficient, albeit barely. RealPage, however, would be wise to substantiate this assertion as the case progresses.

standing on behalf of its customers. RealPage did not explain why its customers would not be able to bring a lawsuit to vindicate their interest in utilizing Plaintiff's service. RealPage, however, did not need to do so. Although the ability of a third party to vindicate is own interest "might defeat a party's standing outside the First Amendment context, [the Supreme] Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech. To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims." *Joseph H. Munson Co.*, 467 U.S. at 957.

## II. RealPage Is Entitled to a Preliminary Injunction.

RealPage seeks a preliminary injunction and complains about the risks of self-censoring, penalties, and prosecution if one is not granted. While irreparable harm is typically the most important prerequisite for the issuance of a preliminary injunction, in the First Amendment context "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Walsh*, 733 F.3d at 488.

### *a. Likelihood of Success on the Merits*

Although it is a close call, the Court determines that, at this stage, RealPage is, marginally, likely to succeed on the merits. The speech in question is commercial, so any restraint on it need only survive intermediate scrutiny, but Section 3 of this Statute, as currently drafted, probably does not.

#### *i. Conduct v. Speech*

The first question is whether the Statute regulates conduct or speech. The First Amendment guards against restraints on speech but not (non-expressive) conduct, and it "does

not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Conduct can be regulated without traipsing on the First Amendment, even when that "conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld*, 575 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949)).

To fall within the protection of the First Amendment, conduct must be sufficiently imbued with elements of communication. *Texas v. Johnson,* 491 U.S. 397, 404 (1989). This requires a finding of "intent to convey a particularized message" and a likelihood that the message will be understood by the audience. *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (quoting *Texas v. Johnson*, 491 U.S. at 404). Here, RealPage intends to communicate to landlords recommendations on lease terms. The crux of RealPage's business model is the communication of pricing recommendations to its users; it argues that communication is expressly regulated by the Statute. Pl.'s Mem. at 11. The Court notes that the Statute does not explicitly prohibit communications; it prohibits commercial actors from taking action based on recommendations made by RealPage.[6] *See* N.Y. Gen. Bus. Law § 340-B(3) ("It shall be considered an unlawful agreement . . . [to] set or adjust rental prices . . . based on recommendations from a software."). That said, for purposes of evaluating Plaintiff's claim, the Court will accept Plaintiff's allegation that the Statute effectively prohibits it from making price recommendations, regardless of the source of the data used to generate the

[6] The Statute is not a paragon of precise drafting. Section 2 prohibits anyone from knowingly or recklessly facilitating an agreement not to compete between horizontal competitors in the residential real estate market, including by operating software that provides a "coordinating function." It is not clear whether the State intends the Statute to reach all uses of such software, even if (for example) the software provider requires its customers to agree to continue to compete with other landlords in setting rent. Section 3 applies to landlords, and it is not clear whether it reaches only the conduct of a landlord who sets or adjusts prices based solely on the recommendation from software that performs a "coordinating function" or whether the Statute would also reach a landlord who sets or adjusts rents based on a range of information and recommendations, one of which comes from such software.

recommendation. Under that assumption, the Statute regulates speech that is protected by the First Amendment.[7]

*ii. Protected v. Unprotected Speech*

There are some categories of speech that are not protected by the First Amendment. Historically, these include "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Stevens*, 559 U.S. at 460. While the speech regulated here, if integral to price-fixing, could conceivably fall into the last category, RealPage is, at least in part, engaged in protected speech because pricing recommendations can be made separate and apart from any price-fixing scheme.[8]

The Court is persuaded that the speech at issue — algorithmically-informed recommendations of housing prices — is commercial speech. The commercial speech doctrine encompasses "expression[s] related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561. Both the speaker and recipient of RealPage's RMS pricing recommendations have a pecuniary interest in the speech being communicated. RealPage, as a software licenser, seeks to maximize the utility, and thus value, of its RMS products. The users, as property managers, seek to maximize revenues by intelligently using RMS pricing recommendations. As a result, the appropriate analysis is the *Central Hudson* test.

---

[7] Despite being delivered via software/algorithm, the Court understands the resulting recommendations to be speech. *Contrast* Pl.'s Mem. at 15 *with* Def.'s Mem. at 10 n.4.

[8] As discussed *infra*, this analysis differs between Sections of the law. While Section 3 concerns protected speech, Section 2 does not, *see infra* Section II(a)(iii).

*iii. Intermediate Scrutiny*

*Central Hudson* requires a four-part analysis: (1) "whether the expression is protected by the First Amendment," *i.e.*, whether it concerns lawful activity and is not misleading; (2) "whether the asserted governmental interest is substantial"; (3) "whether the regulation directly advances the governmental interest asserted"; and (4) "whether it is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566. The Court will evaluate the two sections of the Statute separately for the purpose of this analysis.

Section 2 of the Statute prohibits price-fixing, making it illegal, specifically, to "facilitate an agreement [between horizontal competitors[9]] not to compete." N.Y. Gen. Bus. Law § 340-B(2). RealPage concedes that, generally, the "targeted conduct is already illegal." *See* Pl.'s Mem. at 24 ("Here, price-fixing agreements are already illegal under state and federal law."); *see also* Def.'s Mem. at 2 ("S.7882 strengthens New York's venerable antitrust statute, the Donnelly Act."); State Assembly Transcript, Ex. A, Dkt. 21-1 at 149 (Sponsor explaining that the Statute is needed to clarify that the scope of the Donnelly Act includes AI/algorithmic collusion via a coordinating function). The basic conduct described in Section 2, *i.e.*, facilitating an agreement between horizontal competitors not to compete, seems to borrow from the dictionary definition of price-fixing. Federal Trade Commission, *Price Fixing*, Guide to Antitrust Laws, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/price-fixing. Section 2 of the Statute, therefore, only clarifies an additional method of price-fixing that is unlawful. This Section makes explicit that the price-fixing prohibition includes the use of "coordinating software" to facilitate unlawful price-fixing agreements. It

---

[9] Specifically, the Statute prohibits facilitating "an agreement between or among two or more residential rental property owners or managers to not compete with respect to residential rental units." N.Y. Gen. Bus. Law § 340-B(2).

does not make new conduct unlawful; it clarifies that facilitating an agreement between horizontal competitors not to compete is illegal even when the facilitation is done through the use of software. Because the prohibited conduct is not lawful activity, the analysis can end here. Any such restriction fails the *Central Hudson* test at the first step and, therefore, Section 2 survives intermediate scrutiny.

Section 3 of the Statute prohibits residential rental property owners from setting rental terms based on the recommendation of software that "perform[s] a coordinating function." N.Y. Gen. Bus. Law § 340-B(3). This is less clear cut. The speech of RealPage that is purportedly being restricted by Section 3 — recommendations formulated using almost exclusively public data — is not *per se* illegal, so it is protected speech. Thus, it is appropriate to proceed to the next prong of the *Central Hudson* test.

Section 3 is premised on a substantial government interest. The "Government's interest in eliminating restraints on fair competition is always substantial." *DoorDash, Inc. v. City of N.Y.*, 789 F. Supp. 3d 337, 357 (S.D.N.Y. 2024) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). Defendant explicitly asserts this interest. *See* Def.'s Mem. at 7 ("The statute was intended to strengthen New York State's antitrust law to prevent companies from employing artificial intelligence, or algorithms to fix market prices.") (internal quotations omitted). Explicit antitrust interest aside, Section 3 is targeting software programs due to a legislative belief that they increase rents, aggravating New York's affordable housing crisis. *See id.* at 17–18. This is a substantial interest. *See Real Estate Bd. of N.Y., Inc. v. City of N.Y.*, 786 F. Supp. 3d 788, 808 (S.D.N.Y. 2025) ("[T]he protection of the consumer is probably the most substantial government interest that can be asserted to regulate commercial speech.") (internal quotations omitted).

The Court will assume for argument's sake that Section 3 directly advances the State's interest. The asserted harms are legitimate, and restrictions may alleviate them. *See Council for Responsible Nutrition v. James*, 159 F.4th 155, 164 (2d Cir. 2025); *Vugo, Inc. v. City of N.Y.*, 931 F.3d 42, 52 (2d Cir. 2019). The Legislature relied on an October 2022 exposé in ProPublica that detailed the anti-competitive aspects of Plaintiff's software. Sponsor's Memo, S.7882 (citing Heather Vogell, *Rent Going Up? One Company's Algorithm Could be Why*, PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent (also available at Dkt. 42-1 in this case)). There is also economic literature documenting that AI pricing algorithms have a harmful impact on competition. *See, e.g.*, Robin Feldman & Caroline A. Yuen, AI and Antitrust: "The Algorithm Made Me Do It," 34 COMPETITION J. 1, 16 (2024).

Plaintiff argues that its software is pro-competitive and that the Statute does not address the "real driver" of rising housing costs, which is a lack of housing supply. *See* Pl.'s Mem. at 21–22; *but see* Def.'s Mem. at 18. Rising housing costs are likely caused by many factors; the legislature has determined that among those factors are AI pricing algorithms. Defendant is correct that a statute need not advance every possible facet of an interest for purposes of this test. *Vugo*, 931 F.3d at 54 ("The government is not required to make progress on every front before it can make progress on any front.") (internal quotations omitted). Defendant has shown that New York State relied on research to identify and address legitimate harms.[10] Section 3 advances

[10] The legislature was motivated to act by ProPublica and the Department of Justice's investigations. *See* Sponsor's Memo, S.7882. Many of the documented harms that the law seeks to address, however, would be mitigated by effectively eliminating reliance on non-public data from competitors when making pricing recommendations. *See* Def.'s Mem. at 4–8 (citing the harms of AI pricing algorithms, specifically as agents of tacit collusion, when utilizing non-public data). The Court notes that, as currently pled, the basis for the legislation has relatively thin support when considered in the context of RealPage's current product. Moving forward, the State should be prepared to explain the harm of pricing recommendations based on algorithms that rely almost entirely on public data (and do not rely on non-public data from horizontal competitors).

New York's interest in protecting consumers, who become vulnerable when increases in rent, accelerated by price coordination, outpace increases in wages. *See* Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, Dkt. 42-1 at 13.

The closest and most pivotal question, in the Court's view, is whether Section 3 is more restrictive than necessary to advance the State's articulated goal. The Second Circuit has interpreted this standard "to require 'a reasonable fit between the legislature's ends and the means chosen to accomplish those ends.'" *Anderson v. Treadwell*, 294 F.3d 453, 462 (2d Cir. 2002) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)). The "burden to establish [a] reasonable fit is on the governmental agency defending its regulation, though the fit need not satisfy a least-restrictive-means standard." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (citing *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 416 (1993); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 476–81 (1989)). The agency must "affirmatively establish" a "reasonable fit" between the scope of the regulation and its interests. *See DoorDash, Inc.,* 2026 WL 2249119, at *6 (quoting *Fox*, 492 U.S. at 480). Plaintiff argues that Defendant has not done so. *See* Pl.'s Notice of Suppl. Auth., Dkt. 50 at 1–2. Defendant asserts that the State's interests in enacting the Statute — "to bolster the provisions of the Donnelly Act" — are accomplished through "the legislature's focused targeting of the 'coordination function'" of certain software. *See* Def.'s Mem. at 19–20.

Defendant's affirmative argument regarding reasonable fit is bare bones, and it is insufficient at this stage of the litigation. Although the Statute need not satisfy a least-restrictive-means standard, *Treadwell*, 294 F.3d at 462, less restrictive means are easy to imagine here. For example, an obviously less restrictive means would be to limit the prohibition to the use of

software that performs a coordinating function based on non-public data from horizontal competitors.

In determining that Defendant has not adequately demonstrated a reasonable fit between the Statute and the legislative goal, the Court does not intend to suggest that it will ultimately be unable to do so. The regulatory fit need not be perfect, and the three-part breakdown of the coordinating function, *supra* at 4 n.2, tailors Section 3 somewhat to the harm it seeks to address. With a better explanation of how prohibiting pricing suggestions based primarily on publicly available data advances the State's interest in prohibiting price-fixing agreements in the apartment rental market, *supra* at 20 n.10, the Defendant could, conceivably, persuade the Court that there is a sufficiently reasonable fit to survive scrutiny under *Central Hudson*, particularly given the "considerable leeway" afforded to the State as the executor of its governmental interests. *See Vugo*, 931 F.3d at 58.

Nevertheless, based on the current record, the Statute likely "prohibits a substantial amount of protected speech" relative to its legitimate sweep. *United States v. Williams*, 553 U.S. 285, 292 (2008). As written, under the rubric of preventing price fixing, the Statute prohibits normal commercial conduct just because it is facilitated by software. Whether one is considering a residential landlord or a manufacturer of widgets, there is nothing untoward about considering prices charged by competitors when deciding how to price one's own product. Nevertheless, as written, Section 3 makes it unlawful for a residential landlord to accept the recommendation of a consultant hired to: collect public data regarding rental prices in the area, evaluate that data using software, and make a recommendation about optimal rent prices.[11]

[11] Of course, Section 3 also reaches conduct that is not normal commercial conduct. Specifically, it prohibits a residential landlord from accepting the recommendation of a consultant hired to: collect public and non-public data regarding rent prices (including from horizontal competitors), evaluate the data using software, and make a recommendation based on that data about optimal rental prices. The later scenario is functionally no different than

Section 3, ultimately, is undiscerning in targeting software without regard to its use of public versus non-public data. For that reason, Plaintiff is likely to succeed on its claim that Section 3 is facially invalid.

*iv. Strict Scrutiny*

Although the practical outcome would be the same under either standard, the Court will now quickly address why strict scrutiny is not the appropriate standard of review. Plaintiff argues that the Statute is content-based rather than content-neutral, regulating protected speech by "impos[ing] content-, viewpoint-, and speaker-based restrictions." *See* Pl.'s Mem. at 11. RealPage alleges the Statute regulates "the specific . . . perspective of the speaker," citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger*, 515 U.S. at 829), and it proscribes content pertaining to "the sale, disclosure, and use of . . . information." *Sorrell*, 564 U.S. at 563–64; *see also* Pl.'s Mem. at 12–13.

The content-based restriction that RealPage alleges is disallowing speech because of the topic; specifically, the Statute essentially prohibits recommendations for lease terms based on computer algorithms. *See* Pl.'s Mem. at 12–13. The viewpoint-based restriction that RealPage alleges is disallowing the use of software performing a coordinating function to advise on rental terms *except* to set rents "in accordance with" certain "affordable housing program[s]." *See id.* at 13 (citing N.Y. Gen. Bus. Law § 340-B(1)(c)). RealPage asserts that the Statute only allows advice aligned with the State's policy goals; that is, the Statute restricts solely profit-oriented speech. *Id.* at 13–14. Finally, the speaker-based restriction that RealPage alleges is prohibiting speech of certain speakers, *i.e.*, property owners and managers and RealPage (and other RMS

---

garden-variety price fixing achieved by putting horizontal competitors in a room together to discuss how they will price their apartments.

providers[12]). *See id.* at 14 (citing N.Y. Gen. Bus. Law § 340-B(2)–(3)). Because of these restrictions, RealPage argues, the Statute should be subject to strict scrutiny.

The Court need not wade further into this as strict scrutiny is not the appropriate standard of review. The Second Circuit has declined to apply strict scrutiny to commercial regulations, even assuming that they are, for example, content-based. *See Council for Responsible Nutrition*, 159 F.4th at 163 ("Even assuming that [the law] is a content-based regulation—which the parties contest—it would nonetheless satisfy intermediate scrutiny under the *Central Hudson* test."). Plaintiff does not cite a single case evaluating an antitrust statute under strict scrutiny. Thus, the evaluation under intermediate scrutiny is the appropriate one.

*b. Remaining Factors*

A likelihood of success on the merits, the primary consideration in a First Amendment inquiry, refracts through the other factors that must be evaluated when considering whether to issue a preliminary injunction: irreparable harm, the public interest, and a balancing of the equities. If a plaintiff succeeds in establishing a likelihood of success on the merits, irreparable injury is a likely downstream consequence, *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 372 (2d Cir. 2025), and the equities and public interest will more easily tip in favor of the moving party. *Walsh*, 733 F.3d at 483 ("[S]ecuring First Amendment rights is in the public interest . . . . The Government does not have an interest in the enforcement of an unconstitutional law.") (quoting *Am. C.Ls. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)) (cleaned up).

---

12 *See* Def.'s Mem. at 17 ("Nor is Plaintiff the only technology company whose algorithmic software has stifled competition in the rental housing market and generated antitrust scrutiny.").

*i. Irreparable Harm*

The analysis of irreparable injury is colored by Plaintiff's likelihood of success on the merits. *See Council for Responsible Nutrition*, 159 F.4th at 171; *see also We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021). Because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Plaintiff has established the predicate for this theory of irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 339 ("[I]n order to obtain a preliminary injunction [in the First Amendment context], plaintiff must establish . . . a clear or substantial likelihood of success on the merits.").

Plaintiff's loss of business alone would not be sufficient. *See* Pl.'s Mem. at 27. While RealPage and its customers risk "significant financial penalties," *id.*, "[a] monetary loss will not suffice [to show irreparable harm] unless the movant provides evidence of damage that cannot be rectified by financial compensation." *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). This Second Circuit rule has two narrow exceptions: (1) if "'the very viability of the plaintiff's business' is threatened or [(2)] if the loss will be difficult to quantify at trial." *Air Transp. Intern. Ltd. Liab. Co. v. Aerolease Fin. Grp., Inc.*, 993 F. Supp. 118, 123 (D. Conn. 1998) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)). Neither of these exceptions has been pled. Although RealPage asserts that it would have to "materially diminish" its New York products, it does not suggest that reduction would create an existential threat. *See* Pl.'s Mem. at 27. The damage risked here can be rectified by compensation down the line, if warranted. Nonetheless, although Plaintiff's loss of business claim does not move the needle because a First Amendment deprivation is likely, the Court finds that Plaintiff has established irreparable harm.

*ii. Equities and the Public Interest*

"A plaintiff seeking a preliminary injunction must establish that . . . the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Where the Government is the opposing party, a balancing of the equities "merge[s]" with the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing this, RealPage asks the Court to apply *Volokh*, which holds that "if [a] statute is likely unconstitutional, the public is irreparably harmed by the legislature's infringement on First Amendment freedoms and any resulting chilling effect on expression." 148 F.4th at 82.

This application of *Volokh* requires the Court to find the Statute "likely unconstitutional." *See id.* Per the evaluation of the merits, the Court does so. While a Court must consider a statute's "chilling effect on expression," *id.*, commercial speech is more insulated from chilling effects, given the economic incentives at play. *See Fox*, 492 U.S. at 481 ("[C]ommercial speech is more hardy [and] less likely to be 'chilled.'"). The resilience of commercial speech, however, though a salient consideration for the Court, is not an absolute defense against the chilling of expression. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977).

The plaintiff has the burden of establishing that the preliminary injunction is appropriate because the balance of hardships and consideration of the public interest favor them. *Winter*, 555 U.S. at 20. RealPage's assessment of the equities, predicated on an overbroad chilling effect, requires an affirmative finding of success on the merits. *See* Pl.'s Mem. at 27. Because "securing First Amendment rights is in the public interest," despite the compelling Government/public interests on the other side, a preliminary injunction is warranted. *Nat'l Inst. of Fam. & Life Advocs.*, 160 F.4th at 380 (citing *Walsh*, 733 F.3d at 488).

### III. The Court Has Subject Matter Jurisdiction.

Defendant moves to dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(1). *See* Def.'s Mem. at 8. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova*, 201 F.3d at 113 (citing FED. R. CIV. P. 12(b)(1)). "The party invoking jurisdiction bears the burden of establishing that jurisdiction exists" by a preponderance of the evidence. *Buday v. N.Y. Yankees P'Ship*, 486 F. App'x 894, 895, 898 (2d Cir. 2012); *see also Makarova*, 201 F.3d at 113.

The Court has subject-matter jurisdiction. Section 1331 of Title 28, United States Code, confers jurisdiction for "all civil actions arising under the Constitution . . . of the United States." 28 U.S.C.A. § 1331. RealPage's claim, at its core, concerns the violation of Plaintiff's freedom of speech as protected by the First Amendment. U.S. CONST. amend. I. Defendant argues that the Statute exclusively regulates conduct, not speech, and therefore does not implicate the First Amendment. *See* Def.'s Mem. at 9.

As a general matter, "a federal claim should be dismissed for lack of subject matter jurisdiction only if the federal claim is clearly frivolous or wholly insubstantial." *Levin v. Harleston*, 752 F. Supp. 620, 624 (S.D.N.Y. 1990) (citing *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). That is not the case here. The Court has determined that RealPage's RMS pricing recommendations constitute commercial speech, thus entitling them to some constitutional protection. Whether its arguments will ultimately prevail on the merits remains to be seen. Nevertheless, the Court has subject matter jurisdiction to adjudicate the claim.

Defendant's motion to dismiss pursuant to 12(b)(1) is, therefore, DENIED.

## IV. RealPage Has Stated a Claim.

Defendant also moves to dismiss pursuant to FED. R. CIV. P 12(b)(6). *See* Def.'s Mem. at 8. To survive a 12(b)(6) motion to dismiss, the plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "[T]he party invoking the First Amendment need only plead facts that, if substantiated, would establish the opposing party's liability." *Brooklyn Branch of Nat'l Assoc. for Advancement of Colored People v. Kosinski*, 657 F. Supp. 3d 504, 520 (S.D.N.Y. 2023).

Plaintiff has met this burden through its provision of the Statute, Compl., Dkt. 1 at ¶¶ 1–2; its description of how its RMS products provide recommendations, *id.* at ¶¶ 5, 15–20; and linking the Statute's proscription with RealPage's inability to engage in purportedly protected speech, *id.* at ¶¶ 26–37.

Defendant's motion to dismiss pursuant to 12(b)(6) is, therefore, DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to preliminarily enjoin enforcement of N.Y. Gen. Bus. Law § 340-B is GRANTED as to Section 3, and Defendant's Motion to Dismiss is DENIED. Defendant — and all those acting in concert with Defendant or at Defendant's direction — are preliminarily enjoined from enforcing or causing to be enforced N.Y. Gen. Bus. Law § 340-B(3). The Clerk of Court is respectfully directed to close the open Motions at Dkts. 17, 19, and 39.

The Initial Pretrial Conference, which was adjourned *sine die* at Dkt. 44, is now set for **Friday, October 30, 2026, at 10:00 a.m.** in Courtroom 20C of the Daniel Patrick Moynihan

Courthouse, 500 Pearl Street, New York, New York, 10007. The joint submission described at Dkt. 15 is now due **no later than Thursday, October 22, 2026**.

**SO ORDERED.**

**Date: September 29, 2026**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**